## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

RAYMOND JONNA, SIMON JONNA,
and FARID JAMARDOV,

      Plaintiffs,

    v.

KEVIN JONNA, and GIBF GP, Inc.
d/b/a BITCOIN LATINUM,

      Defendants.

Case No. 22-CV-10208

Hon. Laurie J. Michelson
Mag. Jonathan J.C. Grey

**JURY TRIAL DEMANDED**

---

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, Raymond Jonna, Simon Jonna, and Farid Jamardov, through their attorneys, bring this Amended Complaint against Defendants, Kevin Jonna and GIBF GP, Inc. d/b/a Bitcoin Latinum, as follows:

## NATURE OF THE SUIT

1.    This is a securities fraud case. Defendants, Kevin Jonna ("KJ") and GIBF GP, Inc. d/b/a Bitcoin Latinum ("Latinum"), diverted and misappropriated investments funds for use other than for the intended investment in Bitcoin Latinum tokens ("Tokens") while committing securities fraud and wire fraud in their offer and purported sale of Tokens to their victims, Plaintiffs Raymond Jonna ("RJ"), Simon Jonna ("SJ") and Farid Jamardov ("FJ"). Defendants KJ and Latinum offered and sold unregistered securities in violation of federal and state

law and perpetrated a securities fraud that displayed hallmarks of criminal securities fraud cases involving sales of interests in cryptocurrencies.  KJ, an unregistered person, and Latinum, an unregistered entity, are subject to control person liability, and are liable to Plaintiffs for, *inter alia*, fraud, false advertising in violation of California law, unfair competition under California law, breach of contract, conversion, fraudulent misrepresentation, unjust enrichment, negligent misrepresentation and negligence.  KJ's and Latinum's premeditated and sinister fraud prominently came to light when they failed to fulfill multiple requests from Plaintiffs to deliver evidence of their ownership of Tokens, and, upon refusing to do so, failing to fulfill multiple requests that Latinum return $541,045 that Plaintiffs paid directly to Latinum and paid to KJ for Latinum as investments in Tokens.

## THE PARTIES

2.     Plaintiff Raymond Jonna ("RJ") is a resident of West Bloomfield, Oakland County, Michigan.

3.     Plaintiff Simon Jonna ("SJ") is a resident of Birmingham, Oakland County, Michigan.

4.     Plaintiff Farid Jamardov ("FJ") is a resident of Commerce Township, Oakland County, Michigan.

5.     Defendant Kevin Jonna ("KJ") is a resident of San Diego, San Diego County, California.  Defendant KJ is a cousin of Plaintiffs RJ and SJ.

6.     Defendant GIBF GP, Inc. d/b/a Bitcoin Latinum (Delaware File No. 6892036) is a Delaware corporation that identifies on its Bitcoin Latinum website and in press releases that its principal place of business is 2100 Geng Road, Palo Alto, California 94303.  A Delaware entity search reveals that GIBF GP, Inc. is a Delaware corporation, the registered agent of which is The Corporation Trust Company, located at Corporation Trust Center 1209 Orange Street, Wilmington, New Castle, DE 19801.

## JURISDICTION AND VENUE

7.     Plaintiffs file this Amended Complaint and institute these proceedings to recover damages that Plaintiffs sustained arising from Defendants' KJ's and Latinum's unregistered and unqualified offers and sales of securities in violation of sections 5, 12(a)(1) and 15 of the Securities Act of 1933, 15 U.S.C. §77e, 77l(a)(1) and 77o ("Securities Act"); section 10(b), 15 U.S.C. §78j(b) of the Securities Exchange Act of 1934 ("Exchange Act"); and sections 25110, 25503, 25504 and 25401 of the California Corporations Code; false advertising and unfair competition under California law; and common law fraud, breaches of duties, unjust enrichment, negligent misrepresentation and negligence.

8.     Accordingly, this Court has subject matter jurisdiction over the federal law claims (*i.e.* Securities Act and the Exchange Act claims) pursuant to 28 U.S.C. § 1331.   This Court has subject matter jurisdiction over the pendant state law claims pursuant to 28 U.S.C. § 1367(a).

9.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiffs and Defendants are domiciled in different states (diversity of citizenship) and the amount in controversy exceeds $75,000.00, as a result of the fraud perpetrated by Defendants by their unregistered offer and sale of securities in violation of sections 5, 12(a)(1) and 15 of the Securities Act, section 10(b) of the Exchange Act, sections 25110, 25503, 25504 and 25401 of the California Corporations Code; and California's false advertising and unfair competition laws.

10.     This Court has personal jurisdiction over Defendants pursuant to Michigan's long arm statute, M.C.L. § 600.715.   The exercise of personal jurisdiction over Defendants comports with due process requirements because this action directly arises from Defendants' contacts with Michigan, and the exercise of jurisdiction does not offend notions of fair play and substantive justice.

11.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred within this district.

## GENERAL ALLEGATIONS

### A.    Background

12.    Defendants claim that Token is a cryptocurrency, which unlike fiat currency, is created, distributed, traded, and stored with the use of a decentralized ledger system known as a blockchain.

13.    Token has all of the characteristics of a security, and more specifically an investment contract, as defined under the Securities Act and by the United States Supreme Court in *SEC v. W.J. Howey Co*., 328 U.S. 293 (1946) ("*Howey*").

14.    In *Howey*, the Court developed what is known as the "*Howey* Test" to evaluate whether certain transactions qualify as "investment contracts" under the Securities Act.  Under the *Howey* Test, a transaction is an investment contract if: (1) it is an investment of money; (2) there is an expectation of profits from the investment; (3) the investment of money is in a common enterprise; and (4) any profit comes from the efforts of a promoter or third party.

15.    The first prong of the *Howey* Test is typically satisfied in an offer and sale of a cryptocurrency because the cryptocurrency is purchased or otherwise acquired in exchange for value, whether in the form of currency or other consideration.  Plaintiffs in this matter engaged in a transaction with Defendants by which Plaintiffs delivered or caused to be delivered to Defendants the sum of $541,045 in U.S. currency in exchange for Tokens.

16.     Further, in evaluating digital assets or cryptocurrencies, courts have typically found that a "common enterprise" exists. In this matter, the "common enterprise" is Bitcoin Latinum.

17.     The issues in analyzing a digital asset or cryptocurrency under the *Howey* Test are whether there is an expectation of profits from the investment and whether those profits come from the effort of a promoter or third party.

18.     In determining whether a reasonable expectation of profits exists, the United States Securities and Exchange Commission ("SEC") has issued guidance stating that, the more of the following characteristics that are present, the more likely it is that there is a reasonable expectation of profit:

(a)     The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset;

(b)     The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future;

(c)     Purchasers would reasonably expect that a promoter or third party's efforts would result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase;

(d)     The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the asset;

(e)     There is little apparent correlation between the offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset;

(f)     A promoter or third party has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset;

(g)     A promoter or third party is able to benefit as a result of holding the same class of digital assets as those being distributed to the public;

(h)     A promoter or third party continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset; and

(i)     The digital asset is marketed, directly or indirectly, using the expertise of a promoter or third party, based on the future (and not present) functionality of the digital asset, based on promises to build a business or operation versus currently available goods, and promising appreciation in value.

19.    Defendants KJ and Latinum provided information to and enticed Plaintiffs to invest in Tokens with an expectation of profits.  Specifically,

(a)    Latinum's website advertises itself as the "next-generation Bitcoin blockchain-based token, capable of massive transaction volume, digital asset management, cybersecurity, and transaction capacity." Latinum's website further states "Bitcoin Latinum asset backing is held in a fund model so that base asset value increases over time. It accelerates this asset back funds growth by depositing 80% of the transaction fee back into the asset fund."

(b)    Latinum's website currently offers its Tokens for "Pre-Sale" to the general public.

(c)    Latinum's website advertises that the Token is currently listed on crypto exchanges under the ticker "LTNM."

(d)    Latinum purports to target the "Media, Gaming, Cloud Computing, and Telecommunications Industries."

(e)    Latinum's website provides a "Bitcoin Latinum Investor Analysis" which includes projections, risks and mitigating factors, competition, and other indicia of a prospectus or private placement memorandum.

20.     In evaluating whether any profit comes from the efforts of a promoter or third party, the SEC issued guidance stating that the inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues: (1) does the purchaser reasonably expect to rely on the efforts of a promoter or third party; and (2) are those efforts the undeniably significant ones (including the essential managerial efforts which affect the failure or success of the enterprise) as opposed to efforts that are more ministerial in nature.

21.     If a digital asset has the aforementioned characteristics, then it is highly likely that the SEC will consider it to be a security subject to the SEC's registration requirements. Indeed, it appears that the SEC views most cryptocurrencies as securities, and Latinum projects all such hallmarks of a security.

22.     Plaintiffs reasonably expected to rely on the efforts of Defendants KJ and Latinum, and those efforts of Defendants KJ and Latinum were undeniably significant (*i.e.*, essential managerial efforts which affect the failure or success of the enterprise).

23.     Applying the *Howey* Test, an investment in Tokens is considered an investment contract—*i.e.*, a security.

24.     Section 5(a) of the Securities Act (15 U.S.C. § 77e(a)) provides that, unless a registration statement is in effect as to a security or an exemption from

registration applies, then it is unlawful for any person, directly or indirectly, to offer and sell securities in interstate commerce.  Section 5(c) of the Securities Act (15 U.S.C. § 77e(c)) provides a similar prohibition against offers to sell (or offers to buy) unless a registration statement is on file and in effect with the SEC. Sections 5(a) and 5(c) of the Securities Act prohibit the offer or sale of unregistered securities in interstate commerce absent an applicable exemption.

26. As of the date of this Amended Complaint, Latinum has not filed a Form D with the Securities and Exchange Commission which is a "safe harbor" notice of reliance and exemption from registration requirements, nor has Latinum filed any required notice of exempt securities offerings with any state securities regulator.

26. Rule 506 of Regulation D makes exemptions under Regulation D, Regulation A+ and Regulation CF unavailable for any securities offering in which certain "felons" or other "bad actors" are involved. The disqualification provisions in Rule 506(d) prohibit issuers or other "covered persons" from participating in Rule 506 offerings, if they have been convicted of a felony, or are subject to court or administrative sanctions for, securities fraud or other violations of specified laws.

27. A "covered person" includes, but is not limited to, the issuer, affiliated issuers, directors and officers of the issuer, promoters, and any person that has

been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities.

28.    Under Regulation D, Regulation A+ or Regulation CF, a disqualification from the use of the applicable exemption occurs if (1) a covered person is involved in the offering, (2) that covered person is subject to one or more of the relevant disqualifying events and (3) the disqualifying event occurs within the lookback period provided by the regulation.[1]

29.    KJ, by means of acting as a promoter and solicitor of Latinum, was involved in the offer and sale of the Tokens as a result of his solicitation of SJ, RJ and FJ, and is a "control person" as defined in Rule 506(d).

30.    Upon information and belief, KJ is subject to a disqualifying event under Rule 506(d).  As such, Defendant Latinum is prohibited from utilizing the exemptions from registration available under Regulation D, Regulation A+ and Regulation CF.

31.    At all relevant times, Defendants KJ and Latinum were not registered as broker-dealers with the SEC or with the Financial Industry Regulatory Authority ("FINRA") or associated with a registered broker-dealer.

---

[1] September 23, 2013.

32.     An unregistered person who receives transaction-based compensation for the sale of a security violates section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1).

33.     Persons who knowingly violate provisions of the Securities Act and the Exchange Act are subject to potential federal criminal prosecution for such violations and civil enforcement proceedings by the SEC.

34.     The securities that Defendants KJ and Latinum offered were not registered with the SEC, and there was no applicable exemption from registration in effect for the offering.

### B.     Defendants Induced Plaintiff Simon Jonna to Invest in Tokens

35.     In or about September 2021, Defendant KJ induced SJ to invest in Latinum.  KJ called SJ to praise Latinum as a massively lucrative opportunity that will be backed by large insurance conglomerate, Marsh McLennan. KJ also touted Latinum as a partner of and with prominent sponsors by enumerating many other nameplates and companies, such as Steve Wynn affiliated companies and Monsoon Blockchain, as two examples, either purportedly associated with or backing Latinum. KJ spoke of high-level conference calls with Brian Armstrong, CEO of Coinbase.

36.     KJ was well aware of SJ's novice status and lack of experience in the cryptocurrency space; meanwhile, and at all times relevant hereto, KJ held himself out as a cryptocurrency expert.

37.     KJ claimed he would be investing upwards of $3.5 million dollars from his personal funds, and possibly much more.  KJ told SJ that investors had very limited time to act to invest in Latinum, and that SJ's reputation would benefit even more by making aware Latinum to all of his spheres of influence.  KJ knew that SJ's extensive credibility in the investment arena was time-tested with investors around the nation such that KJ could further extend the fraud that he was perpetrating into SJ's personal network.

38.     On multiple occasions, KJ lobbied SJ for several conference calls with SJ's associates, attorneys, investors and inner circles. KJ spoke highly of his connection to the Latinum Board of Directors and his close affiliations with Latinum's purported creator and Chief Executive Officer ("Latinum CEO") whom KJ stated readily would join ZOOM or conference calls to discuss what KJ and Latinum CEO claimed to be the greatest investment of our lifetimes.

39.     KJ sent to SJ numerous images and text messages with articles about Latinum.  KJ even sent to SJ a vague snapshot of what KJ represented to be and purported to be a personal bank account with funds totaling over $50,000,000.00 as

a reinforcement to accredit KJ's extensive tenure and success within the crypto space.

40.     On multiple occasions, KJ made promises to SJ that KJ guarantees personally the money that SJ and others would invest and invested in Latinum.

41.     After publication of a text message from the founder of Benzinga, who referred to Latinum as a "Shitcoin", KJ expressed to SJ that if Latinum were to "tank" prior to release, then he (KJ) would return Plaintiffs' investment in full.

42.     KJ further promised SJ that no withholding would occur, and that Tokens would be disbursed to Latinum's and KJ's investors immediately upon launch.

43.     As a result of KJ's representations and inducement, SJ made an initial investment of $140,000 in Tokens. On September 30, 2021, upon and following expressly Defendant KJ's instructions, SJ wire transferred $140,000 to a Wisconsin-based bank account in the name of "Jason Otto" (…1825).  Upon information and belief, and as discussed more fully below, Jason Otto is another person not associated with a registered broker-dealer who was selling securities in the form of Tokens for Defendant Latinum and receiving commissions from Defendant Latinum in connection with such sales.

44.     In a text message in or about September 2021, SJ sent a screenshot of his Bitcoin Latimum wallet[2] in a text message to KJ.  KJ responded by saying "I didn't tell you to download it…you are violating our contract…that can result in termination of your coins".

45.     In a series of subsequent text messages in or about September 2021, Defendant KJ advised SJ: "You should put big money in cuz" and "Trust me I know a lot" and "Put big money in it it's better than any investment."

46.     Based upon representations made by KJ and information contained on Latinum's website, SJ invested a total of $140,000 in 10,000 Tokens at $14 per Token, and an additional $100,000 for 4,000 Tokens at $25 per Token for a total investment of $240,000 for 14,000 Tokens.

47.     SJ subsequently made a series of repeated attempts to get more information from KJ regarding his investment in the Tokens.

48.     Defendant KJ failed to provide information to SJ regarding the possession or value of the Tokens that KJ represented to SJ reflected SJ's ownership interest in Tokens.

49.      As of the date of this Amended Complaint, SJ has not received return of funds that he invested in Latinum through KJ in Tokens or Tokens.

---

[2] Digital assets, such as cryptocurrencies, are stored in "digital wallets" on the Blockchain owned and controlled by the holder of the digital assets.

### C.  Defendants Induced Plaintiff Raymond Jonna to Invest in Tokens

50.  In or about September of 2021, Defendant KJ induced RJ to invest in Latinum by, among other things, sending articles about Latinum, and in which Latinum CEO touted Tokens, to RJ about how Latinum was going to revolutionize the crypto space. As a result of KJ's representations and inducement, RJ made an initial investment of $100,000 in approximately 7,143 Tokens at $14 per Token.

51.  Upon KJ's instructions, RJ wire transferred $100,000 on or about September 22, 2021.  On or about September 22, 2021, KJ confirmed that the wire transfer from RJ was received.

52.  On or about October 14, 2021, RJ texted KJ to get an update on the Tokens after receiving no further information from KJ.  Defendant KJ responded by saying "Bro it was all a scam man.  I'm going to try to get your money back. Lol I'm kidding on phone w Simon."

53.  By virtue of KJ's reference to RJ—that RJ's investment in Tokens was a "scam"—RJ became very concerned about the bona fides of the investment that KJ had induced RJ to make in Latinum.

54.  Soon after KJ's "Tokens was a 'scam'" text message, in or about October 2021, in a series of text messages between KJ and RJ, KJ provided reassurance to RJ, made lulling representations to RJ, and further induced RJ to invest additional funds in Latinum.  Such inducement included, among other

things, sending RJ screenshots of what KJ displayed to purport to be LTNM (the trading symbol for Tokens as identified on Latinum's website) trading at $201 per Token on cryptocurrency trading platforms. As a result of KJ's representations, RJ considered investing and then offered to invest an additional $250,000. On October 26, 2021, KJ sent an additional screenshot of LTNM purporting to reflect trading at $212.64 per Token on Crypto Stake, and another screenshot purporting to reflect LTNM trading at $699.99 per Token.

55.     On or about October 27, 2021, after KJ pressed RJ to make an additional investment in Tokens, RJ asked KJ to send wire transfer information. On or about October 28, 2021, RJ sent an additional $100,000 via wire transfer to a Citibank account in New York in the name of Defendant GIBF GP, Inc. (*i.e.*, Latinum) Account No. ******2384) for 4,000 Tokens at $25 per Token. KJ instructed RJ to include "for Kevin Jonna" in the memo line.

56.     RJ was neither asked to complete an "accredited investor questionnaire" nor was any effort made to verify RJ's status as an accredited investor.

57.     RJ was not asked to complete a subscription agreement for the Tokens.

58.     Despite having sent money by wire transfer directly to Defendant GIBF GP, Inc. for the investment in Tokens, Defendant GIBF GP, Inc. never sent any form of subscription documentation to RJ.

59.     The funds that RJ transferred to Defendant Latinum were accepted by Latinum, and no inquiry was made of RJ nor was there any attempt by Latinum to return the funds to RJ.

60.     On or about October 29, 2021, KJ sent to RJ a screenshot of what purported to be a "Congratulations" notification from Latinum regarding RJ's October 28, 2021 investment in Tokens.

61.     On or about November 1, 2021, KJ told RJ that Tokens will be released around the time it launches in the U.S.

62.     In a series of text messages that KJ sent to RJ in November 2021 that purported to be from the Latinum website, RJ noted multiple grammatical and spelling errors on the Latinum website, which were suspicious, particularly in light of KJ's previous statement that Latinum was a "scam."  In a series of subsequent emails, RJ made repeated attempts to obtain from KJ a status update on his investment in Tokens, as well as the investments of SJ and FJ.

63.     Defendant KJ repeatedly was evasive with respect to RJ's messages, as KJ dodged RJ's text messages and phone calls until November 29, 2021.  On

November 29, 2021, KJ claimed that he instructed that the Tokens will be released in February 2022.

64.    On November 29, 2021, RJ asked KJ for confirmation of RJ's $200,000 investment, which amounted to a total of 11,143 Tokens.  Neither KJ nor Latinum provided to RJ confirmation of RJ's $200,000 investment or the 11,143 Tokens.

65.    On or about January 8, 2022, RJ asked KJ to return all money that RJ, SJ and FJ invested with Latinum through KJ in Tokens, with instructions to wire the money back within three business days.

66.    As of the date of this Amended Complaint, RJ, has not received return of funds that he invested in Latinum through KJ and directly with GIBF GP, Inc. in Tokens or received Tokens.

**D.    Defendants Induced Plaintiff Farid Jamardov to Invest in Tokens**

67.    In or about October 2021, Defendant KJ induced FJ to invest in Latinum Tokens.  Initially, when KJ discussed Tokens with FJ, KJ informed FJ that FJ would receive his Tokens the next day, after FJ transferred the funds for the investment.  Following that, FJ asked Defendant KJ whether there would be any restrictions on when FJ could sell or trade Tokens; KJ represented to FJ that KJ assumed there were none.  In a series of text message exchanges on or about October 21, 2021, KJ asked FJ for an investment of $200,000 at $14 per Token

because KJ claimed that he (KJ) was only $110,000 away from reaching his targeted sales total of Tokens and getting a "bonus" in connection with such sales. KJ further told FJ that he would be able to immediately sell Tokens for a profit at $20 per Token.

68.     FJ understood that KJ's reference to KJ's sales total and expectation of a bonus was that KJ was receiving a commission from Latinum in connection with KJ's offer and sale of Tokens by and for Latinum.

69.     On or about October 21, 2021, FJ wire transferred $101,045 to a Citibank Account in the name of Defendant GIBF GP, Inc. (Account No. *****2384), with special instructions for "Kevin Jonna", as an investment in approximately 6,734 Tokens at $15 per Token.

70.     Via text message, KJ subsequently informed FJ that he did not know when Tokens would be in FJ's digital wallet.

71.     On or about October 22, 2021, FJ asked for an update on Tokens, which had not yet hit FJ's digital wallet.  KJ responded by informing FJ that there was a delay in transferring Tokens because of high demand. KJ then represented to FJ that Tokens will transfer on Monday, October 25, 2021.

72.     On October 25, 2021, FJ sent another text message to KJ to inquire about the status of the transfer of Tokens to FJ, and KJ responded to FJ that the Tokens would go "live on Digifinex at midnight."  Upon information and belief,

the Digifinex Exchange is yet another platform on which Latinum has represented that Tokens are transferable or tradeable. That statement by KJ proved to be yet another false and misleading representation, because the Token did not go live on Digifinex at midnight.

73.     On October 28, 2021, KJ, continuing to convey lulling messages to FJ, informed FJ that they were "still trying to figure it out."

74.     From late October 2021 to early December 2021, FJ made repeated attempts to contact KJ to obtain a status update on Tokens.  On December 8, 2021, KJ informed FJ that Tokens would be released directly to KJ on February 26, 2022.

75.     On January 3, 2022, FJ informed KJ that he wanted out of the investment and requested that KJ wire transfer FJ's money back to FJ.

76.     As of the date of this Amended Complaint, and despite KJ having represented to FJ that FJ could sell or trade Tokens without restriction, no money has been returned to FJ.

77.     As of the date of this Amended Complaint, FJ, has not received return of funds that he invested in Latinum through KJ and directly with GIBF GP, Inc. in Tokens or received Tokens.

### E.    Continuing Fraudulent Inducement to Invest in Tokens

78.    Throughout the period September 2021 through the present, Defendant Latinum has issued and continued to issue, and publish on its website, press releases that are designed, at least in part, to induce investors and potential investors to invest in Tokens and to lull investors and potential investors to believe that the securities that Defendant Latinum was and purports to issue have value.

79.    As recently as January 10, 2022, Defendant Latinum issued a press release claiming to partner with a Grammy-nominated recording artist to acquire what purports to be a non-fungible token in "Cyber Yachts."  The website identified in Defendant Latinum's press release is only a colorful landing page with no information.

80.    Latinum's website, further to create the appearance of credibility to potential investors, claims to have entered into relationships of different forms with, *inter alia*, Vast Bank, LBank Exchange, Quavo, OSO ATMs to install ATMs in the United States, AAX Exchange, Hotbit Exchange, HitBTC, Changelly, GK8, Bitmart, XT.com, FMFW.io, DigiFinex Exchange, Monsoon Blockchain, Crypto Climate Accord, H. Wood Group, and CoinMarketCap. Upon information and belief, some these relationships claimed by Latinum are platforms on which Latinum represented that Tokens are transferable or tradeable.

81.     On November 1, 2017, the SEC published the "SEC Statement Urging Caution Around Celebrity Backed ICOs" at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos.

82.     Defendant Latinum's same press release of January 10, 2022 claims that "Latinum currently trades publicly on"  HitBTC, FMFW.com, Changelly, Changelly Pro, Lbank, DigiFinex, Hotbit, AAX and XT.com exchanges, claiming trading volume in the billions of dollars.  Upon information and belief, what Defendant Latinum characterizes as exchanges purport to be platforms on which Defendant Latinum claims tokens are transferable or tradeable.  None of these exchanges is registered as an exchange with the SEC.  Moreover, upon information and belief, the contention that Tokens "trade publicly" on any or all of these quotation media or platforms is materially false and misleading.

83.     On or about January 25, 2022, an issuer for which Latinum CEO served as Chairman and Co-Chief Executive Officer from the issuer's inception as a blank check company through the Closing of the Business Combination, and for which the CEO continues to serve as a Director, filed a S-1 Registration Statement with the SEC ("S-1").  The S-1 discloses that, "[a]s of the date of this Prospectus, the [cryptocurrency wallet] supports [25 specifically enumerated] Cryptocurrencies and other Digital Assets."  The enumerated cryptocurrencies and other digital assets expressly include Bitcoin, Ethereum, USD Coin and Tether, among others.

Despite the touting of Tokens by Latinum CEO, noteworthy in its absence from the S-1 is "Bitcoin Latinum."

84.    Despite widespread representations that Latinum would release its Token and allow investors to exit from their investments, on February 26, 2022 Latinum published a statement that again postponed the release date of its Token— making it impossible for investors to sell.[3]

## F.    KJ is One of Many Latinum Promoters and Sales Agents who targeted Plaintiffs and Other Michigan Residents

85.    At the outset, Latinum sells its Tokens directly to Michigan residents through its website.  In order to purchase Tokens through Latinum's website, and as stated on Latinum's website, an investor need only complete a Simple Agreement for Future Tokens ("SAFT").

86.    Although a provision in Latinum's SAFT states that the investor must be "accredited," upon information and belief, Latinum does nothing to verify the investors' representations as to their "accredited investor" status—taking no reasonable steps to verify that the investors are accredited, which, at the very least, is a requirement under the Rules promulgated under the Securities Act at 17 C.F.R. § 230.506(c).

87.    In fact, upon information and belief, Latinum not only is violating its obligations to take steps to reasonably verify accredited-investor status, but

---

[3] https://bitcoinlatinum.com/latinum-token-update/.

Latinum also is using these SAFT's as cover to deploy sales agents aimed at collecting funds from the general public. Indeed, as detailed below, Latinum (1) knew of, supported, and encouraged sales efforts to the general public, (2) accepted funds from sources other than investors who executed its SAFT, and (3) gave commission-based compensation to its sales agents (those who executed SAFTs) to reward fundraising successes.

88.　　Specifically, upon information and belief, Latinum CEO and others for Latinum made themselves available to agents, like KJ, to shore up the agents' credibility and status as agents of Latinum.  Here, for example, although Plaintiffs did not accept KJ's offer to discuss their investment with Latinum CEO, they were aware of other Michigan residents who did.

89.　　Notably, Latinum utilizes poker players and the poker community to market its Token—as the gambling community is known to be a good market for cryptocurrency investments.[4]

90.　　KJ, like other Latinum promoters and agents, is a high-profile poker player.[5]

---

[4]　　See　https://www.canvas8.com/library/signals/2021/05/27/crypto-gambling; https://www.poker.org/phil-hellmuth-endorsed-altcoin-bitcoin-latinum-accused-of-securities-fraud/.

[5] See https://www.cardplayer.com/poker-players/215535-kevin-jonna.

91.     Significantly, another lawsuit filed three days after the instant case against Defendant Latinum alleges a similar agency relationship with another high-profile poker player. *McCartney v. GIBF GP, Inc.*, Case No. 5:22-cv-00761 (N.D. Cal. Feb. 4, 2022).[6]   In *McCartney*, the Plaintiff alleged the following agency relationship with poker star Brandon Cantu:

> 13. An acquaintance of Plaintiff, Brandon Cantu, reached out to Plaintiff and offered him an opportunity to invest in Bitcoin Latinum, a cryptocurrency offered by Defendant, GIBF.
>
> 14. Upon information and belief, Mr. Cantu is employed by GIBF, and/or acts as an agent of GIBF, and he was responsible in that role for selling the Bitcoin Latinum shares to Plaintiff.
>
> 15. Upon information and belief, Defendant GIBF knowingly relied upon Mr. Cantu and other agents to market Bitcoin Latinum to potential investors and solicit their investment, and Mr. Cantu and those agents did market Bitcoin Latinum to Plaintiff and solicit his investment, as well as others.
>
> 16. In that capacity, upon information and belief, Mr. Cantu and the other agents were entrusted by GIBF with making representations and promises to potential investors in order to encourage their investment.
>
> 17. GIBF either knew or should have known that its agents would make such representations and promises, and intended to be bound by those representations and promises.
>
> 18. Moreover, by having its agents, including Mr. Cantu, reach out to potential investors, GIBF manifested its

---

[6] Another lawsuit filed two days before the instant case relating to Latinum's Token—pleading a similar agency relationship—is *Lowry, et al. v. Edelman et al.*, Case No. 1:21-cv-07861 (S.D.N.Y., Jan. 29, 2022).

consent to such representations being made by those agents.

19. Based on GIBF's decision to allow these agents to solicit potential investors, Plaintiff reasonably believed that Mr. Cantu and the agents of GIBF had the authority to make promises and representations on behalf of GIBF, and Plaintiff reasonably believed that such promises and representations would be binding on GIBF.

92.    Latinum's predisposition to utilize high-profile poker players as sales agents, and KJ being a high-profile poker player, further supports the reasonable conclusion that KJ was an authorized sales representative and agent of Latinum at all relevant times when KJ was hawking Tokens for Latinum to SJ, RJ, and FJ.

93.    Latinum's use of these types of sales agents and promoters—who execute a SAFT then fundraise for Latinum from the general public—appears to be widespread.  Jason Otto, for example, appears to be one such Latinum agent, as Latinum itself admits that "Jason Otto," who received a wire transfer for Tokens from Plaintiff SJ, "is himself an investor that executed a SAFT agreement" ECF No. 7 PageID.93.

94.    Notably, Jason Otto is part of the high-profile poker community and is referenced several times on poker star Phil Hellmuth's social media account (Twitter).  Significantly, Phil Hellmuth is a poker star who is paid by Bitcoin Latinum to promote its Token.[7]

---

[7]    See    https://twitter.com/phil_hellmuth/status/1421297197753065473?lang=en ("I'm a paid endorser of Bitcoin Latinum . . .").

95.     Plaintiffs have personal knowledge of other Michigan residents who invested in Latinum through agents who executed SAFTs with Latinum then proceeded to fundraise to the public with Latinum's assistance. Notably, although Plaintiffs themselves would likely meet the definition of accredited investors, despite never being requested by Latinum to confirm their accredited investor status upon Latinum receiving funds directly from RJ and FJ, Plaintiffs are aware of investors whom these agents solicited and who are not accredited investors.

96.     Upon information and belief, if somehow Latinum can demonstrate that it did not *expressly* deploy these sales agents (it did), then Latinum was at least and willfully blind regarding the fact that its investors were engaged in a general fundraising solicitation from the general public.

97.     Specifically, the language of Latinum's SAFT agreement informs Latinum's perspective investors that a person (such as RJ and FJ) who pays Latinum directly for Tokens is the sole beneficial owner of Tokens—Latinum investors are "purchasing [Tokens] for [their] own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same."  By Latinum's own published position, funds that Plaintiffs RJ and FJ sent to GIBF GP, Inc., which

were accepted by GIBF GP, Inc., confirms Latinum deemed Plaintiffs RJ and FJ purchasers of Tokens for their own accounts.

98.    Notwithstanding this language in the SAFT, Latinum also accepted direct wire transfers from entities that were not the SAFT signatories.  Here, for instance, Plaintiffs made multiple wire transfers directly from Plaintiffs' accounts to Latinum (*i.e.* "GIBF GP, Inc.") that expressly stated in the memo lines that the wire transfers were the result of KJ's solicitation efforts.[8]

99.    Indeed, Latinum admits that it gave KJ's account credit for Plaintiffs' wire transfers—despite the fact that these piecemeal wire transfers were coming from accounts that were clearly not his, ECF No. 7, PageID.92 ("Latinum gave such consideration to KJ at the direction of RJ").

100.   These sales agents, including KJ, received transaction-based compensation in the form of commissions for fundraising and selling to the general public.

101.   For instance, as stated above, in a series of text messages exchanged between KJ and FJ, KJ asked for an additional investment of $200,000 at $14 per Token because KJ claimed that he was only $110,000 away from reaching his targeted sales total of Tokens and getting a "bonus" in connection with such sales.

---

[8] As stated, despite Plaintiffs having directly invested money in Latinum via wire transfer to GIBF GP, Inc., no contracts or investment documents were ever provided to Plaintiffs.

102.   Latinum sold its Tokens to Plaintiffs through KJ, who was acting as an agent of Latinum at all times in his solicitation of and sales to Plaintiffs. Specifically, as detailed above, Latinum (1) engaged KJ as a promoter and sales agent because of his ties to the high-profile poker community, (2) thereafter accepted direct, piecemeal wire transfers directly in a bank account in the name of GBIF GP, Inc. that were attributed to investment solicitations from KJ in the memo lines, and (3) then rewarded KJ with a commission-based sales bonus.

103.   Accordingly, Latinum is liable for the representations and actions of its agent, KJ, and others like him, who induced and are inducing Michigan residents into transactions that are unlawful sales of securities.

### COUNT 1
**Unregistered Offer and Sale of Securities in Violation of Sections 5 and 12(a) of the Securities Act**
**(Against All Defendants)**

104.   Plaintiffs incorporate by reference all paragraphs above as if fully set forth herein.

105.   Defendants KJ and Latinum, and each of them, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or interstate commerce for the purpose of sale or for delivery after sale.

106.   The Token investment that Defendants KJ and Latinum offered and sold to Plaintiffs is a security within the meaning of section 2(a)(1) of the Securities Act, 15 U.S.C. §77b(a)(1).

107.   Plaintiffs purchased securities from Defendants.

108.   No registration statements have been filed with the SEC or have been in effect with respect to any securities offered by Defendants.

109.   By reason of the foregoing, each of the Defendants violated Sections 5(a), 5(c) and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) and 77l(a).

110.   As a direct and proximate result of Defendants' offer or sale of unregistered securities, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants.

## COUNT 2
**Unregistered Offer and Sale of Securities in Violation of
California Corporations Code Sections 25110 and 25503
(Against All Defendants)**

111.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

112.   The Token offering by Defendants are securities within the meaning of the California Corporations Code.

113.   Defendants KJ and Latinum, and each of them, by engaging in the conduct described above within California, directly or indirectly, sold and offered to sell securities.

114.   Plaintiffs RJ, SJ, and FJ purchased securities from Defendants.

115.   No registration statements have been filed with any state or federal government entity or have been in effect with respect to the offering of securities alleged herein.

116.   By reason of the foregoing, each of the Defendants violated Sections 25110 and 25503 of the California Corporations Code.

117.   As a direct and proximate result of Defendants' unregistered sale of securities, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants.

**COUNT 3**
**Securities Fraud in Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5**
**(Against All Defendants)**

118.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

119.   Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of securities, by the use of instrumentalities of interstate commerce or the mails, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in

acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

120.   At all times, KJ was acting under the cloak of actual or apparent authority as an agent of Latinum.  Thus, misrepresentations made by KJ, while acting as an agent of Latinum, are attributable to Latinum itself.

121.   By reason of the foregoing, each of the Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

122.   As a direct and proximate result of Defendants' securities fraud, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants.

## COUNT 4
**Securities Fraud in Violation of California Corporations Code
Sections 25401
(Against All Defendants)**

123.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

124.   Defendants, by engaging in the conduct described above, offered or sold a security in the State of California by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

125.   At all times, KJ was acting under the cloak of actual or apparent authority as an agent of Latinum.  Thus, misrepresentations made by KJ, while acting as an agent of Latinum, are attributable to Latinum itself.

126.   By reason of the foregoing, each of the Defendants violated Section 25402 of the California Corporations Code.

127.   As a direct and proximate result of Defendants' securities fraud, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants.

## COUNT 5
### Rescission under Section 29(b) of the Exchange Act
### (Against All Defendants)

128.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

129.   Section 15(a)(1) of the Exchange Act, 15 U.S.C. §78o(a)(1), makes it unlawful for a person to "effect a transaction in securities" or "attempt to induce the purchase or sale of any security" unless that person is registered as a broker or dealer under the rules and regulation of FINRA.

130.   Defendant Latinum is not a registered broker or dealer with the SEC or FINRA and is not a registered investment adviser with the SEC or any state.

131.   Defendant KJ is not an associated person with a registered broker or dealer or investment advisor.

132.   Section 29(b) of the Exchange Act, 15 U.S.C. §78cc(b), provides that every contract made in violation of any provision of the broker-dealer registration requirements "shall be void" as to rights of persons who made or engaged in the performance of such contract.

133.   By the filing of this Amended Complaint, Plaintiffs exercise their right of rescission under Section 29(b) of the Exchange Act, 15 U.S.C. §78cc(b).

134.   As a direct and proximate result of Defendants' charging of and receipt of transaction-based compensation without being registered with the SEC or FINRA, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants and are entitled to rescission of the contract.

## COUNT 6
### Fraudulent Concealment
### (Against All Defendants)

135.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

136.   Between September 2021 and January 2022, Defendants KJ and Latinum concealed that KJ never purchased Tokens on behalf of Plaintiffs, which was a material fact.

137.   Defendants KJ and Latinum knew KJ never purchased okens on behalf of Plaintiffs and knew that they concealed that information from Plaintiffs.

138.   Defendants KJ and Latinum intentionally concealed from Plaintiffs that they never purchased Tokens on behalf of Plaintiffs.

139.   Defendants KJ and Latinum had a duty to disclose to Plaintiffs that KJ never purchased Tokens on behalf of Plaintiffs.

140.   Plaintiffs were unaware that Defendants never purchased Tokens on their behalf and would have acted differently had they known that information.

141.   As a result of Defendants' concealment of the fact that Defendant KJ never purchased Tokens on behalf of Plaintiffs, Plaintiffs suffered damages.

## COUNT 7
### Fraudulent Inducement
### (Against All Defendants)

142.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

143.   From September 2021 through December 2021, Defendant KJ sent multiple text messages to Plaintiffs SJ, RJ, and FJ seeking to induce each to invest in Tokens with Defendant Latinum.

144.   At all times, KJ was acting under the cloak of actual or apparent authority as an agent of Latinum.  Thus, misrepresentations made by KJ, while acting as an agent of Latinum, are attributable to Latinum itself.

145.   In detrimental reliance on KJ's representations and investment-related materials on the Bitcoin Latinum website to which KJ directed Plaintiffs to induce

Plaintiffs' investments, including press releases that Defendant Latinum issued, Plaintiffs made a series of wire transfers to KJ and directly to Defendant Latinum for the purpose of Plaintiffs investing in Tokens.

146.   Based on these representations, Plaintiffs collectively invested a total of $541,045 in a total of 31,877 Tokens.

147.   Defendants intended for Plaintiffs to rely on KJ's text messages and Latinum's website to invest in Tokens.

148.   Defendant KJ had no intention of purchasing and holding Tokens on Plaintiffs' behalf.

149.   Defendant Latinum never issued Tokens to Plaintiffs.

150.   Defendant KJ never purchased and held Tokens on Plaintiffs' behalf.

151.   Defendants KJ and Latinum knew that Defendant KJ never purchased and held Tokens on Plaintiffs' behalf.

152.   Plaintiffs were not aware that Defendant KJ never purchased Tokens on their behalf.

153.   Plaintiffs were not aware that Defendant Latinum never issued or intended to issue Tokens to Plaintiffs.

154.   Plaintiffs were justified in relying on Defendant KJ's text messages and the information provided on Latinum's website to transfer a collective total of $541,045 to Defendants KJ and Latinum to purchase a total of 31,877 Tokens on

their behalf and with the expectation that Defendants KJ and Latinum would transfer Tokens or issue Tokens directly to Plaintiffs.

155.   As a result of Defendants' false representations that Defendant KJ would purchase and hold Tokens on behalf of Plaintiffs, Plaintiffs collectively transferred $541,045 to Defendants KJ and Latinum, and Plaintiffs have suffered damages.

## COUNT 8
### Fraudulent Misrepresentation
### (Against All Defendants)

156.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

157.   From September 2021 through December 2021, Defendant KJ sent multiple text messages to Plaintiffs SJ, RJ, and FJ seeking to induce each to invest in Tokens with Defendant Latinum.

158.   At all times, KJ was acting under the cloak of actual or apparent authority as an agent of Latinum.   Thus, misrepresentations made by KJ, while acting as an agent of Latinum, are attributable to Latinum itself.

159.   In detrimental reliance on Defendant KJ's text messages and the investment-related materials provided on Defendant Latinum's website, Plaintiffs were induced to invest in Tokens.

160.   Per the Defendants' representations, Plaintiffs collectively transferred $541,045 to Defendant KJ to purchase and hold a total of 31,877 Tokens on Plaintiffs' behalf.

161.   Defendants intended for Plaintiffs to rely on Defendant KJ's text messages and the investment materials on Defendant Latinum's website to transfer the $541,045 to Defendant KJ to purchase and hold a total of 31,877 Tokens on Plaintiff's behalf.

162.   Defendant KJ had no intention of purchasing and holding Tokens on Plaintiffs' behalf.

163.   Defendants never purchased and held Tokens on Plaintiffs' behalf.

164.   Defendant Latinum never issued Tokens to Plaintiffs.

165.   Defendants knew that Defendant KJ never purchased and held Tokens on Plaintiffs' behalf.

166.   Plaintiffs were unaware that Defendant KJ never purchased Tokens for and on Plaintiffs' behalf.

167.   Plaintiffs were justified in relying on Defendant KJ's previous text messages and information on Defendant Latinum's website to transfer a total of $541,045 to Defendant KJ to purchase and hold a total of 31,877 Tokens on Plaintiffs' behalf.

168.   As a result of Defendants' false representations, Plaintiffs collectively transferred $541,045 to Defendant KJ, and Plaintiffs have suffered damages.

## COUNT 9
### Breach of Contract
### (Against All Defendants)

169.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

170.   Defendant KJ, as an agent and representative of Latinum, entered into valid, enforceable contracts between Defendants and each of the Plaintiffs.

171.   Pursuant to the agreements, Defendant KJ was to purchase Tokens from Latinum on Plaintiffs' behalf.

172.   Plaintiffs performed their obligations under the agreements in that they transferred a total of $541,045 to accounts specified by Defendant KJ and directly to Defendant Latinum upon and following the express instruction of KJ to purchase a total of 31,877 Tokens on Plaintiffs' behalf.

173.   Defendant KJ never purchased Tokens for Plaintiffs.

174.   Defendant Latinum never issued Tokens to Plaintiffs.

175.   As a result of Defendants material breach of the agreements, Plaintiffs have suffered damages.

## COUNT 10
**Unjust Enrichment**
**(Against All Defendants)**

176.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

177.   Defendants KJ and Latinum conveyed a benefit on Defendants in that Plaintiffs transferred a total of $541,045 to Defendant KJ for Defendant Latinum and to Defendant Latinum directly to purchase and hold a total of 31,877 Tokens on Plaintiffs' behalf.

178.   Defendant KJ never purchased and held Tokens on Plaintiffs' behalf.

179.   Defendant Latinum never issued Tokens to Plaintiffs.

180.   Defendants have not returned Plaintiff's $541,045.

181.   Because Defendants KJ and Latinum did not use the $541,045 for the purpose for which Plaintiffs transferred the funds, it would be inequitable and unjust for Defendants to retain the $541,045.

182.   On October 26, 2021, after Plaintiffs invested $541,045 at an average per Token cost of $16.94 per Token, the Tokens purported to trade at $212.64 per Token on the Crypto State trading platform, suggesting that the total value of Plaintiffs' Tokens at that time to be $6,778,325.28.

183. Defendant KJ's failure to purchase Tokens resulted in a real-time and immediate loss to Plaintiffs of the opportunity to sell the Tokens for a gain of approximately $6,238,325.28.

184. Defendant Latinum's failure to issue Tokens resulted in a real-time and immediate loss to Plaintiffs of the opportunity to sell the Tokens for a gain of approximately $6,238,325.28

185. As of January 25, 2022, the Tokens purported to be quoted and tradeable for $13.22 per Token on the Digifinex trading platform, making the total value of Plaintiffs' Tokens $421,414—or a loss of approximately $118,586 on the value of the Plaintiffs' total initial investments.

186. As of March 10, 2022, Tokens were quoted at $9.39 per Token on the Digifinex trading platform.

## COUNT 11
### Conversion
### (Against All Defendants)

187. Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

188. Plaintiffs transferred a total of $541,045 to Defendants KJ and Latinum to purchase and hold Tokens on Plaintiffs' behalf or to issue Tokens to or for the benefit of Plaintiffs.

189.   However, Defendant KJ never purchased and held Tokens on Plaintiffs' behalf.  Instead, KJ purchased and held Tokens in his own name.

190.   Defendant Latinum did not issue Tokens to Plaintiffs.

191.   Defendants have not returned Plaintiffs' $541,045, nor provided Plaintiffs with their purchased Tokens.

192.   Because Defendants did not use the $541,045 for the purpose for which Plaintiffs transferred the $541,045, the $541,045 (and/or Tokens amounting to a combined value of $541,045) belongs to Plaintiffs.

193.   Defendants' possession of the $541,045 and/or Tokens is a wrongful exercise of dominion and control over property owned by Plaintiffs in a manner inconsistent with Plaintiffs' rights as the owner, and as a result, Plaintiffs have suffered damages.

194.   On October 26, 2021, after Plaintiffs invested $541,045 at an average per Token cost of $16.94 per Token, the Tokens purported to trade at $212.64 per Token on the Crypto State trading platform, making the total value of Plaintiffs' Tokens at that time $6,778,325.28.

195.   Defendants' failure to purchase the Tokens resulted in a real-time loss to the Defendants of the opportunity to sell the Tokens for a gain of approximately $6,238,325.28.

196.   As of January 25, 2022, the Tokens purported to be quoted and tradeable for $13.22 per Token on the Digifinex trading platform, making the total value of Plaintiffs' Tokens $421,414—or a loss of approximately $118,586 on the value of the Plaintiffs' total initial investments.

197.   As of March 10, 2022, the Tokens were quoted at $9.39 per Token on the Digifinex trading platform.

## COUNT 12
### Intentional Tort of Wire Fraud in Violation of 18 U.S.C. § 1343
### (Against All Defendants)

198.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

199.   Title 18 United States Code section 1343, the federal criminal wire fraud statute, defines wire fraud as "[w]hoever, having devised … any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … in interstate … commerce, any writings … for the purpose of executing such scheme or artifice, shall be fined … or imprisoned not more than 20 years, or both."  Violation of a criminal statute may constitute an intentional tort.

200.   Defendants devised a scheme or artifice to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises,

and transmitted and caused to be transmitted writings by means of wire in interstate commerce for the purpose of executing the scheme and artifice against Plaintiffs to obtain the sum of $541,045.

201.  As a direct and proximate result of Defendants' intentional tort of wire fraud, Plaintiffs have suffered damages in connection with their purchases of securities from Defendants.

**COUNT 13**
**False Advertising in Violation of Business and Professions Code**
**Section 17500,** *et seq.*
**(Against All Defendants)**

202.  Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

203.  Plaintiffs bring this claim for relief for false advertising in violation of California Business and Professions Code Section 17500 under the alternative theory in the event the Court were to consider Tokens in the manner offered not to be a security.

204.  Defendants operate a business where and through which they intend to and did sell, or purported to sell, cryptocurrency in the form of Bitcoin Latinum Tokens to members of the general public, including to Plaintiffs.

205.  Defendants caused to be made or disseminated through California and the United States through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of

reasonable care should have been knows to Defendants, to be untrue and misleading to consumers and to Plaintiffs.

206.   Defendants violated California Business and Professions Code Section 17500 because the misrepresentations and omissions they made, as set forth above in this Amended Complaint, were material and likely to deceive a reasonable consumer or investor.

207.   As a direct and proximate result of Defendants' false advertisements, Plaintiffs have suffered injury to their property and have been deprived of the benefits of fair competition.  Defendants perpetrated a premeditated fraud against Plaintiffs. Had Plaintiffs known the truth, they would not have purchased investment interests in Tokens issued by Latinum through Defendant KJ or directly from Defendant Latinum.  As a result, Plaintiffs suffered damages in an amount according to proof at trial.

## COUNT 14
### Unfair Competition in Violation of Business and Professions Code Section 17200, *et seq.*
### (Against All Defendants)

208.   Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

209.   Plaintiffs bring this claim for relief for unfair competition in violation of California Business and Professions Code Section 17200 under the alternative theory in the event the Court were to consider Token not to be a security.

210.   California Business and Professions Code Section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."   Defendants have engaged in unlawful, fraudulent and unfair business acts and practices in violation of the California Unfair Competition Law.

211.   Defendants have violated the "unlawful" prong of California Business and Professions Code Section 17200 by their violations of the federal and state securities laws, including sections 5(a), 5(c) and 12(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a)(1), section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 thereunder; violation of federal criminal law, including 18 U.S.C. §1343, and sections 25110, 25503, 25504 and 25401 of the California Corporations Code.

212.   Defendants also have violated the "unlawful" prong of California Business and Professions Code Section 17200 by their violations of California's False Advertising Law (Bus. & Prof. Code §§ 17500, *et seq.*), as set forth above.

213.   Defendants also have violated the "fraudulent" prong of California Business and Professions Code Section 17200 by making false and misleading statements regarding their purchase and sale of Tokens, refusal to provide evidence of Tokens and/or a digital wallet or wallets, and refusal to provide evidence of purchase and sale.

214.   Defendants also have violated the "unfair" prong of California Business and Professions Code Section 17200 because the acts and practices set forth in this Amended Complaint offend established public policy, violate federal and state law, cause disproportionate harm to investors.  Defendants' conduct also has prevented Plaintiffs and their representatives from making fully informed decisions about the implications of purchasing Tokens from Defendant Latinum through Defendant KJ and from Defendant Latinum directly.

215.   In purchasing Tokens from Defendant Latinum through Defendant KJ—or believing that there was a purchase of Tokens through Defendant KJ, Plaintiffs relied on the misrepresentations made by Defendants.  Had Plaintiffs known the truth about Defendants, and their business practices, as set forth above, then Plaintiffs would not have purchased Tokens from Defendant Latinum through Defendant KJ.

216.   Plaintiffs have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful and/or deceptive practices, as a result of the acts of Defendants set forth throughout this Amended Complaint. Defendants received and continue to hold money and property belonging to Plaintiffs.

217.   All of the wrongful and unlawful conduct alleged herein occurred, and may well be continuing to occur, in the conduct of Defendants' business.

Defendants' wrongful conduct is part of a pattern or generalized course of conduct that appears to be perpetuated and repeated in the State of California, and, possibly, nationwide.

218.  Plaintiffs have no adequate remedy at law for the injuries which Plaintiffs have suffered and will continue to suffer until such time as Defendants return all principal and pay damages to Plaintiffs.

## COUNT 15
### Negligent Misrepresentation
### (Against All Defendants)

219.  Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

220.  From September 2021 through December 2021, Defendant KJ, as agent for Defendant Latinum, sent multiple text messages to Plaintiffs SJ, RJ, and FJ seeking to induce each to invest in Tokens with Defendant Latinum.

221.  At all times, KJ was acting under the cloak of actual or apparent authority as an agent of Latinum.  Thus, misrepresentations made by KJ, while acting as an agent of Latinum, are attributable to Latinum itself.

222.  In detrimental reliance on Defendant KJ's text messages and content intended by Defendant Latinum to be relied on by investors to make investment decisions as provided on Defendant Latinum's website, Plaintiffs were induced to invest in the Tokens.

223.   At all times, KJ was acting under the cloak of actual or apparent authority, which was furthered by Defendant Latinum's willingness to facilitate KJ's selling to the general public by, among other things, Latinum CEO joining ZOOM conferences with KJ's prospective investors.

224.   Per Defendants' representations, Plaintiffs collectively transferred $541,045 to Defendant Latinum to purchase a total of 31,877 Tokens.

225.   Defendants intended for Plaintiffs to rely on Defendant KJ's text messages and the investment materials on Defendant Latinum's website to transfer the $541,045 to Defendant KJ to purchase and hold a total of 31,877 Tokens on Plaintiff's behalf.

226.   Defendant Latinum knew or should have known that its representations, though agents like KJ, were resulting in sales to the general public and inducing illegal investments.   Indeed, Bitcoin Latinum received Plaintiffs' investments directly from Plaintiffs' personal bank accounts, not from KJ—despite the fact that KJ purportedly received a "bonus" for these sales, which were credited to him via memo lines in the wire transfers.

227.   Plaintiffs were justified in relying on Defendant KJ's text messages and the information on Defendant Latinum's website to transfer a total of $541,045 to Defendant KJ and to Defendant Latinum to purchase and hold a total of 31,877 Tokens on Plaintiffs' behalf.

228.  As a result of Defendants' negligent representations, Plaintiffs collectively transferred $541,045 to Defendant KJ and Defendant Latinum, and Plaintiffs have suffered damages as a direct and proximate result.

## COUNT 16
### Negligence
### (Against GIBF GP, Inc. d/b/a Bitcoin Latinum)

229.  Plaintiffs incorporate by reference all foregoing factual allegations as if fully set forth herein.

230.  Defendant GIBF GP, Inc. d/b/a Bitcoin Latinum has a duty of care it owes to the public relating to its receipt of investments in exchange for Tokens. Indeed, in addition to the foregoing duties arising at law, Defendant Latinum has a duty to monitor reasonably the investment activities and wire transfers it receives from persons and entities proclaiming to be accredited investors. *See* 17 C.F.R. § 230.506(c).

231.  At a minimum, Latinum had a duty to inquire into the direct wire transfers it received from SJ and RJ with whom it had no written agreement or dealings (other than through its agent, KJ).

232.  Defendant Latinum breached its duty of care when it received numerous wire transfers directly from certain Plaintiffs from various bank accounts in the names of individuals who were not KJ.  Indeed, RJ and FJ wired their investments directly to Defendant Latinum, *i.e.*, "GIBF GP, Inc.".  These wire

transfers would have put a prudent and responsible business entity on notice that KJ was soliciting investments from the general public.

233.   In fact, Defendant Latinum negligently encouraged sales to the general public.  KJ requested that Plaintiffs include "Kevin Jonna" in the memo line of their wire transfers, and later represented that these sales were being tracked by Defendant Latinum and credited to him as some sort of bonus.

234.   At all times, KJ was acting under cloak of actual or apparent authority, which was furthered by Defendant Latinum's willingness to facilitate KJ's selling to the general public by, among other things, Latinum CEO joining ZOOM conferences with KJ's prospective investors.

235.   Defendant Latinum's breach of its duty of care directly and proximately caused Plaintiffs injury.  Plaintiffs were misled into investing in Tokens for which they any evidence of ownership as of the date of this filing.  In addition to monetary damages, Defendant Latinum's negligence has caused Plaintiffs to sustain reputational damages as well as injuries relating to emotional distress, embarrassment, and mental anguish—to which a reasonably prudent person under similar circumstances would likewise suffer.

## **PRAYER FOR RELIEF**

Based on the foregoing factual allegations and legal claims for relief, Plaintiffs respectfully request that this Court:

A. Enter a Judgment Against Defendants for any and all damages sustained by Plaintiffs arising from the foregoing wrongful and unlawful acts of Defendants;

B. Enter an Order of rescission of the investments;

C. Enter a Judgment awarding Plaintiffs' costs and reasonable attorneys' fees incurred in connection with the institution and prosecution of this civil action;

D. Enter a Judgment awarding punitive and/or exemplary damages, as appropriate, in an amount to be determined at trial; and

E. Order such other and further relief, including equitable relief, as justice may require.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury for each and every issue so permitted by law and statute.

Respectfully Submitted,

/s/ *Kory M. Steen*

Dated: March 10, 2022
Mark A. Jotanovic (P73752)
Kory M. Steen (P83170)
**DICKINSON WRIGHT PLLC**

2600 W. Big Beaver Road, Suite 300
Troy, Michigan 48084-3312
(248) 631-2050
(844) 670-6009
mjotanovic@dickinsonwright.com
ksteen@dickinsonwright.com

Jacob S. Frenkel
(*pro hac vice* application forthcoming)
**DICKINSON WRIGHT PLLC**
1825 I St., N.W., Suite 900
Washington, DC  20006
(202) 466-5953
(844) 670-6009
jfrenkel@dickinsonwright.com

Frank Borger Gilligan
(*pro hac vice* application forthcoming)
**DICKINSON WRIGHT PLLC**
424 Church Street, Suite 800
Nashville, TN  37205
(615) 780-1106
(844) 670-6009
fborgergilligan@dickinsonwright.com

## **CERTIFICATE OF SERVICE**

I, Kory M. Steen, certify that on March 10, 2022, I caused the foregoing document to be filed with the Clerk of the Court via the CM/ECF system, which will cause notice of the same to be sent to all counsel of record.

Plaintiffs have not yet been able to serve Defendant Kevin Jonna with the pleadings in this case. Plaintiffs will attempt to effectuate service of this Amended Complaint upon Kevin Jonna pursuant to the Federal Rules of Civil Procedure.

Dated:  March 10, 2022                       */s/ Kory M. Steen*

Kory M. Steen (P83170)
DICKINSON WRIGHT PLLC
2600 W. Big Beaver Road, Suite 300
Troy, Michigan 48084-3312
(248) 631-2050
ksteen@dickinsonwright.com