UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| RAYMOND JONNA, SIMON JONNA, and FARID JAMARDOV,  Plaintiffs,  v.  BITCOIN LATINUM, KEVIN JONNA, and GIBF GP, INC.,  Defendants. | Case No. 22-10208 Honorable Laurie J. Michelson |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART BITCOIN LATINUM'S MOTION TO DISMISS [19] AND DENYING AS MOOT BITCOIN LATINUM'S MOTION FOR PROTECTIVE ORDER [30] AND PLAINTIFFS' MOTION FOR SUR-REPLY [36]

In the fall of 2021, Kevin Jonna claimed to have a lucrative investment opportunity for his cousins, Raymond and Simon Jonna, and Farid Jamardov. That opportunity was to invest in GIBF GP, Inc. (doing business as Bitcoin Latinum and referred to collectively as "Latinum") and its cryptocurrency, Token. Raymond, Simon, and Farid all say that Kevin made false statements about Latinum's Token that induced them to invest almost a half-a-million dollars. After they invested, Kevin evaded their calls and texts and would not give them clear answers as to their investment. And, say Plaintiffs, Kevin did all of this as Latinum's agent. After a few months of getting the run-around, Plaintiffs asked

Kevin for their money back. They did not receive a response, nor their money nor any Tokens.

So Raymond, Simon, and Farid sued Kevin and Latinum, bringing a host of claims that mostly boil down to making false statements to induce Plaintiffs to invest and to unjustly retaining that investment.

Latinum has a different take on the situation, and thus, moved to dismiss the complaint against it. As an initial matter, Latinum says this Court does not have personal jurisdiction over it. But even if it does, Latinum sees this as a purely family dispute that it had nothing to do with. It argues that Plaintiffs have not plausibly stated that Kevin acted as its agent, and that Plaintiffs have not met the heightened pleading requirements for fraud, among other things.

For the reasons given below, the Court GRANTS IN PART and DENIES IN PART Latinum's motion.

## I. Background

## A. Facts

Because Latinum seeks dismissal under Federal Rules of Civil Procedure 12(b)(2) and (6), and the Court is relying only on the parties' written submissions for Latinum's 12(b)(2) motion, the Court accepts the factual allegations in Plaintiffs' complaint as true and draws reasonable inferences from those allegations in Plaintiffs' favor. *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020).

GIBF GP, Inc. (doing business as Bitcoin Latinum, like "Platinum" without the "P") is in the business of cryptocurrency. (ECF No. 11, PageID.230.) Latinum's cryptocurrency is called Token, which unlike, say, the U.S. dollar, "is created, distributed, traded, and stored with the use of a decentralized ledger system known as blockchain." (ECF No. 11, PageID.233.) Plaintiffs allege that Token's characteristics make it akin to a security. (*Id.*)

Latinum currently offers Tokens for "pre-sale" to the general public on its website. (*Id.* at PageID.236.) The website states that Token is the "next generation Bitcoin block-chain based token, capable of massive transaction volume, digital asset management, cybersecurity, and transaction capacity." (*Id.*) The website also contains press releases that, according to Plaintiffs, "lull investors and potential investors to believe that the securities [Latinum] . . . purports to issue have value." (*Id.* at PageID.250.) For example, Latinum issued a press release claiming to partner with a popular recording artist to market a "non-fungible token in 'Cyber Yachts.'" (*Id.*) But the website listed for the Cyber Yacht Token in the press release "is only a colorful landing page with no information." (*Id.*) Latinum also published a press release listing exchanges Latinum "currently publicly trades on," and claimed, "a trading volume in the billions of dollars." (*Id.* at PageID.251.)

Plaintiffs were first introduced to Latinum via another defendant, Kevin Jonna.[1] Kevin Jonna is Raymond and Simon's cousin. (ECF No. 11, PageID.231.)

Kevin reached out to Simon about Latinum in September 2021. (ECF No. 11, PageID.240.) Kevin called Simon about a "massively lucrative opportunity" that was backed by an insurance conglomerate and partnered with other "prominent sponsors[.]" (*Id.*) Kevin told Simon about partnerships with Steve Wynn, Monsoon Blockchain, and conference calls with Brian Armstrong, the CEO of Coinbase. (*Id.*) Kevin also touted Latinum's demand, stating Simon "had very limited time to act to invest in Latinum." (*Id.* at PageID.241.)

Kevin also held himself out to be knowledgeable about the cryptocurrency industry and Latinum specifically. He sent Simon a screenshot of what he claimed was his personal bank account with funds over $50 million, which he stated was due to his success within the cryptocurrency space. (ECF No. 11, PageID.241.) He claimed to have connections to Latinum's Board of Directors and CEO, who, according to Kevin, "readily would join ZOOM or conference calls to discuss what [Kevin] and Latinum CEO claimed to be the greatest investment of our lifetimes." (*Id.*)

---

[1] Kevin Jonna is represented by different counsel and therefore, filed a separate motion to dismiss (ECF No. 29), which the Court addresses in a separate opinion.

Kevin also told Simon that he would "return Plaintiffs' investment in full" and "promised [Simon] that no withholding would occur[.]" (ECF No. 11, PageID.242.)

Based on Kevin's statements and Latinum's website, Simon says he invested $140,000 in Tokens. (*Id.*; *see also* ECF No. 11, PageID.243.) On September 30, he wired the money to a Wisconsin-based bank account owned by Jason Otto. (*Id.*) Simon believes Otto is an agent of Latinum's who earns a commission from promoting and inducing investment in Latinum's Token. (*Id.*)

Following his investment, Simon sent a screenshot of his Latinum "wallet" to Kevin. (ECF No. 11, PageID.243.) Kevin responded, "I didn't tell you to download it . . . you are violating our contract . . . that can result in termination of your coins." (*Id.*) Though not clear what this statement means, it appears that Kevin believed he and Simon had entered into a contract and per that agreement, Simon was not to have access to his own wallet.

Kevin also sent Simon other text messages encouraging him to "put big money in it's better than any investment" and that Simon should "trust" him because "I know a lot." (*Id.*) So Simon invested another $100,000 in Tokens. (*Id.*)

After investing, Simon says he reached out to Kevin to get "more information" on the Tokens, including information on "possession or value of the Tokens[.]" (*Id.*) He received no response. (*Id.*)

5

Raymond Jonna's story is much the same. In September 2021, Kevin sent Raymond articles about Latinum and told him how "Latinum was going to revolutionize the crypto space." (ECF No. 11, PageID.244.) On September 22, Raymond wire transferred $100,000 to invest in Token, though it is not clear to whom. (*See id.*)

About a month later, in October, Raymond began to become concerned about his investment. (*Id.*) Kevin "provided reassurance" by sending Raymond "screenshots of what [Kevin] displayed to purport to be LTNM [Latinum's trading symbol] trading at $201 per Token." (*Id.* at PageID.245.) Kevin also sent a screenshot reflecting LTNM trading at $212.64 per Token on Crypto Stake, and another screenshot reflecting LTNM trading at $699.99 per Token. (*Id.*)

Around October 27, Kevin asked Raymond for another investment in Tokens and sent him account information. (*Id.* at PageID.245.) Raymond wired another $100,000 to a Citibank account in New York in the name of GIBF GP, Inc. (*Id.*) He wrote "for Kevin Jonna" in the memo line. (*Id.*) Raymond says Latinum accepted his funds, and he received no inquiry from Latinum regarding the funds. (*Id.* at PageID.246.)

Kevin told Raymond that the Tokens would be released around the time Latinum launched in the United States. (*Id.*) He was "evasive" when it came to Raymond's follow-up messages and phone calls, however. (*Id.*) On November 29,

6

he told Raymond that the Tokens would be released in February 2022. (*Id.* at PageID.247.)

Farid Jamardov (who is apparently not Kevin's cousin) entered the story a little bit later, in October 2021. Kevin told Farid that he would "receive his Tokens the next day, after [Farid] transferred the funds for the investment." (*Id.*) Kevin also said that he assumed there would be no restriction on selling or trading Tokens, and that Farid "would be able to immediately sell Tokens for a profit at $20 per Token." (*Id.* at PageID.247–248.) He also represented that he was "only $110,000 away from reaching his targeted sales total of Tokens and getting a 'bonus' in connection with such sales." (*Id.* at PageID.248.)

On October 21, Farid transferred $101,045 to GIBF GP's Citibank account with "for Kevin Jonna" in the memo. (*Id.*)

The next day, Farid asked for an update as to when the Tokens would be in his wallet. (*Id.*) Kevin said that there was a delay because of "high demand" but that the Tokens would be transferred on "October 25, 2021." (*Id.*)

On October 25, Farid again asked about the status of the Tokens. (*Id.*) Kevin said they "would go live on Digifinex at midnight." (*Id.*) Plaintiffs allege that Digifinex is "yet another platform on which Latinum has represented that Tokens are transferable or tradeable." (*Id.* at PageID.249.) Farid says that the Token did not go live as promised. (*Id.*)

7

From October to December 2021, Farid "made repeated attempts" to contact Kevin. (*Id.*) On December 8, Kevin said the Tokens would be released to himself on February 26, 2022. (*Id.*)

Plaintiffs contend that Kevin was acting as Latinum's agent when he convinced them to invest. (*See, e.g.*, ECF No. 11, PageID.253.) Farid states that, based on Kevin's statements that he had a sales target and expected a bonus, Latinum was paying Kevin a commission in connection with Kevin's offer and sale of Tokens. (ECF No. 11, PageID.248.) Plaintiffs state that Latinum uses its Simple Agreement for Future Tokens (SAFT) "as cover to deploy sales agents aimed at collecting funds from the general public." (ECF No. 11, PageID.253.) Specifically, "Latinum (1) knew of, supported, and encouraged sales efforts to the general public, (2) accepted funds from sources other than investors who executed its SAFT, and (3) gave commission-based compensation to its sales agents (those who executed SAFTs) to reward fundraising success." (ECF No. 11, PageID.253.) Plaintiffs state they have personal knowledge of "other Michigan residents who invested in Latinum through agents who executed SAFTs with Latinum then proceeded to fundraise to the public with Latinum's assistance." (*Id.* at PageID.256.) The SAFT states, in relevant part, that investors are purchasing Tokens "for [their] own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or

otherwise distributing the same." (*Id.* at PageID.256; *see also* ECF No. 22-2, PageID.514.)

Plaintiffs also state that Latinum's CEO "made themselves available to agents . . . to shore up the agents' credibility and status[.]" (ECF No. 11, PageID.256.) Though Plaintiffs never took Kevin up on his offer to meet Latinum's CEO, they know of other Michigan investors who did meet with Latinum's CEO. (*Id.*)

Latinum's and Kevin's connections to the poker community also support (at least according to Plaintiffs) Plaintiffs' perception that Kevin was Latinum's agent. Plaintiffs allege that Latinum "utilizes poker players and the poker community to market its Token[.]" (*Id.*) Kevin is a "high profile poker player." (*Id.*) Other such poker players turned Latinum agents include Brandon Cantu and Jason Otto. (*Id.* at PageID.254–255.) Phil Helmuth, a popular poker player, is paid by Latinum to promote its Token and has referenced Otto "several times" on Twitter. (*Id.* at PageID.255.)

In January 2022, apparently having had enough of Kevin's evasiveness, Raymond asked Kevin to return "all money" that each Plaintiff invested in Latinum within three business days. (ECF No. 11, PageID.247.) Farid also told Kevin he no longer wanted to invest. (*Id.* at PageID.249.) Plaintiffs have yet to receive their investment nor any Tokens from Kevin or Latinum. (*Id.* at PageID.243, 247, 249.) Plaintiffs allege that instead of giving them access to

Tokens, Latinum credited Kevin's account for the wire transfers with the pre-purchase of Tokens. (*Id.* at PageID.257.)

## B. Procedural History

Soon after their demand was ignored, Plaintiffs filed this suit against GIBF GP, Inc., Bitcoin Latinum, and Kevin. (ECF Nos. 1, 11.) The amended complaint alleges 16 counts under federal, California, and Michigan law. The federal counts include unregistered offer and sale of securities in violation of the Securities Exchange Act (Count 1); securities fraud in violation of Section 10(b) of the Securities Exchange Act (Count 3); rescission under Section 29(b) of the Securities Exchange Act (Count 5); and wire fraud under 18 U.S.C. § 1343 (Count 12). The California counts include unregistered offer and sale of securities in violation of the California Corporations Code (Count 2); securities fraud in violation of the California Corporations Code (Count 4); false advertising in violation of the California Business and Professions Code (Count 13); and unfair competition in violation of the California Business and Professions Code (Count 14). And the Michigan counts are fraudulent concealment (Count 6); fraudulent inducement (Count 7); fraudulent misrepresentation (Count 8); breach of contract (Count 9); unjust enrichment (Count 10); conversion (Count 11); negligent misrepresentation (Count 15); and negligence against only Latinum (Count 16).

In response, Latinum moved to dismiss. (ECF No. 19.) While this motion was pending, Latinum also filed a motion for a protective order, which asked this

Court to stay discovery pending the motion to dismiss. (ECF No. 30.) Plaintiffs then filed an unopposed motion for leave to file a sur-reply or for oral argument in relation to the motion for a protective order. (ECF No. 36.)

The parties' positions are briefed extensively, and the motions can be decided without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the

complaint in the light most favorable" to Plaintiffs and determines whether their "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Additionally, Plaintiffs have brought certain claims with elements that are subject to the heightened pleading standard found in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA). *See City*

*of Taylor Gen. Empls. Retirement Sys. v. Astec Indus, Inc.*, 29 F.4th 802, 810 (6th Cir. 2022). The Court will discuss this standard more when it analyzes the relevant claims.

## III. Federal Securities Law

The Court starts with Latinum's arguments regarding Plaintiffs' claims under federal securities laws.

### A. Personal Jurisdiction

As in most cases, the Court starts with jurisdiction. Latinum argues that this Court does not have personal jurisdiction over it.

The Securities Exchange Act of 1934, which governs Plaintiffs' federal-securities claims, provides for what is known as nationwide service of process. *See* 15 U.SC. § 78aa(a) ("Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."). The Sixth Circuit has interpreted that provision to confer personal jurisdiction to any federal district court over any defendant with minimum contacts to the United States as a whole. *See United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993).

Latinum has minimum contacts to the United States. Bitcoin Latinum is a Delaware corporation with its principal place of business in California and GIBF GP, Inc. is a Delaware corporation with its principal place of business in Delaware. (ECF No. 11, PageID.231.) It is therefore a resident of the United States, which meets a higher standard than merely establishing minimum contacts with the United States. *See, e.g. Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (recognizing that jurisdiction may be exercised over corporations when their affiliations with a forum are so "continuous and systematic as to render them essentially at home in the forum[.]"). Thus, this Court has personal jurisdiction over Latinum, at least as to Plaintiffs' Securities-Exchange-Act claims.

## B. Agent-Principal Relationship

Now to Latinum's 12(b)(6) arguments. Latinum's primary argument for dismissal is that Plaintiffs have not properly pled that Kevin Jonna is an agent of Latinum. According to Latinum, the securities claims "depend on the finding of an agency relationship between [Kevin] and Latinum." (ECF No. 19, PageID.324.)

Plaintiffs seemingly accept Latinum's premise, as their response brief only argues that they have sufficiently pled a principal-agent relationship between Kevin and Latinum. In other words, they do not argue that they have sufficiently alleged that Latinum's actions, without consideration of Kevin's actions, constitute securities fraud.

13

The Court notes that Plaintiffs have alleged that Latinum itself made certain representations that falsely induced them to invest in Latinum. For example, Plaintiffs allege that the ability to trade or resell Token has been overstated (if not completely misstated) by Latinum. Specifically, Plaintiffs allege that Latinum's website purports to be the "next-generation Bitcoin blockchain-based token, capable of massive transaction volume, digital asset management, cybersecurity, and transaction capacity." (ECF No. 11, PageID.236.) Latinum published press releases on its website "that are designed, at least in part, to induce investors and potential investors to invest in Tokens[.]" (*Id.* at PageID.250.) One such press release "claim[ed] to partner with a Grammy-nominated recording artist to acquire what purports to be a non-fungible token in 'Cyber Yachts.' The website identified in Defendants Latinum's press release is only a colorful landing page with no information." (*Id.*) Latinum also made statements on its website that its Token is "publicly traded" on certain exchanges, which Plaintiffs allege is misleading. (*Id.* at PageID.251.) These are not representations attributed to Kevin. Instead, these come from Latinum's website, which presumably is controlled by the company itself.

And the complaint alleges that Plaintiffs made a series of wire transfers directly to Latinum "[i]n detrimental reliance on . . . investment-related materials on the Bitcoin Latinum website . . . including press releases that Defendant Latinum issued[.]" (*Id.* at PageID.264–265.) So there seems to be at least some

reliance on statements made by Latinum itself, which could form the basis of a federal securities claim if pled with particularity. *See City of Taylor General Empls. Retirement Sys.*, 29 F.4th at 810 ("Together, Rule 9(b) and the PSLRA require a complaint to allege the 'who, what, where, when and why' of the fraudulent statements."). Thus, the Court does not necessarily agree with Latinum that "Plaintiffs never had any interaction with Latinum." (ECF No. 19, PageID.327.)

Given the parties briefing, though, the Court will not rely on the allegations against Latinum alone to determine whether securities fraud is properly pled against the company. Instead, it will determine whether Plaintiffs have plausibly pled an agency relationship such that Kevin's actions and statements can be attributed to Latinum. Then, once the Court has determined the universe of actions properly attributed to Latinum, it will consider Latinum's other arguments regarding whether Plaintiffs have pled the elements of a federal-securities-fraud claim.

## 1. Choice of Law

A threshold issue the Court must consider before it can determine whether agency has been properly pled is which jurisdiction's law of agency applies. The parties have not briefed the choice-of-law issue directly, but each took a different position. Latinum cited Michigan common law, while Plaintiffs cited the Restatement of Agency, federal common law, and California common law.

The Supreme Court has made clear that invocation of federal common law over state law is disfavored "in the absence of either a clear statutory prescription, or a direct conflict between federal and state law[.]" *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988); *Atherton v. F.D.I.C.*, 519 U.S. 213, 218 (1997) (finding that cases where federal common law is appropriate to apply are "few and restricted"). A conflict between federal and state law is "normally a precondition" to a federal court fashioning or applying rules of federal common law. *Atherton*, 519 U.S. at 219.

The Court finds that there is no "significant conflict" between federal common law and Michigan law. Most federal courts rely on restatements of law to fashion rules of federal common law. *See DaimlerChrysler Corp. Healthcare Benefits Plans v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006) (relying on restatement). The Restatement (Third) of Agency defines agency as "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control[.]" § 1.01. Michigan law similarly states that "[a]n agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. 1992). And the main test for agency is "whether the principal has a right to control the actions of the agent." *Id.* Further, Michigan courts have recently cited the Restatement (Third) of Agency when analyzing state-law claims relying on agent-

principal relationships. *See Dobronski v. NPS, Inc.*, No. 356617, 2022 WL 1194212, at \*4–5 (Mich. Ct. App. Apr. 21, 2022).

California courts have likewise relied on the Restatement of Agency when analyzing issues of agency. *See IAR Sys. Software, Inc. v. Superior Court*, 218 Cal.Rptr.3d 852, 862–63 (Cal. Ct. App. 2017) ("An agency relationship is limited in scope and defined by control. And an agent's duties are limited by the scope of the agency relationship." (citing Restatement (Second) of Agency § 14)).

Having determined that all three jurisdictions rely on similar, if not identical, rules of agency, the Court need not choose which jurisdiction's laws govern. *See In re E.I. du Pont de Nemours and Company C-8 Personal Injury Litig.*, 316 F.Supp.3d 1021, 1030 (S.D. Ohio 2015). It will rely on both Michigan law of agency and the Restatement (Third) of Agency[2] to conduct its analysis.

## 2. 12(b)(6) on Agency

Now to the heart of the matter—whether Plaintiffs plausibly pled that Latinum and Kevin had a principal-agent relationship such that Kevin's actions can be attributed to Latinum. (As noted, Plaintiffs appear to concede, at least for purposes of Latinum's current motion, that an agency relationship is required for liability under federal securities laws.)

---

[2] Some courts rely on the Restatement (Second) of Agency. For the purposes of this opinion, the Restatement (Third) of Agency and the Restatement (Second) of Agency do not diverge significantly. And the parties have not argued that they do. So the Court will mostly rely on the Restatement (Third) of Agency in its analysis.

Again, an "agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. 1992) (citing Restatement (Second) of Agency § 15.2). An agent may have actual or apparent authority to act on behalf of the principal. Restatement (Third) of Agency §§ 2.01, 2.03. Plaintiffs argue that they have pled both forms of authority. The Court agrees.

Start with actual authority. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006); *see* Restatement (Second) of Agency § 26 (similar). Actual authority may be "implied," meaning that the "agent believes he possess[ed]" certain authority. *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992); *see also Wigfall v. City of Detroit*, 934 N.W.2d 760, 765 (Mich. 2019). But regardless of whether it is implied or not, actual authority is concerned with the actions of the principal and the reasonable beliefs of the agent.

The primary allegation that Kevin had actual authority is that Plaintiffs say Kevin was being paid a commission by Latinum based on the amount of investment he was responsible for bringing to Latinum. (*See* ECF No. 11, PageID.257 (alleging that Latinum paid agents like Kevin "transaction-based compensation in the form of commissions for fundraising and selling to the general

public.").) According to Plaintiffs, Kevin stated that he had a "targeted sales total of Tokens" and that he would be "getting a bonus in connection with such sales." (*Id.* at PageID.248.)

Taking this allegation as true, Plaintiffs have provided some support that Latinum manifested its assent to Kevin's efforts to seek third-party investment in Latinum's Token. If Latinum paid Kevin a commission, it would be plausible that Kevin was providing some sort of service to Latinum. And based on the allegations against Kevin in the complaint, the main service Kevin provided was encouraging Plaintiffs to invest in Latinum. Further, if Kevin was being paid by Latinum, it would be reasonable for him to believe that Latinum approved of his actions.

Latinum resists this conclusion by arguing that Plaintiffs only allege that Kevin told them he was being paid a commission, and not that Latinum acted or communicated with them in a way that would suggest that a "commission-based sales bonus program ever existed." (ECF No. 19, PageID.328.) This Court must make all reasonable inferences in favor of Plaintiffs, though. One inference from this allegation could be that Kevin was lying, and thus Latinum did not manifest that Kevin had any authority. But to Plaintiffs' point, it is equally reasonable to infer that Kevin told Plaintiffs he was earning a bonus because Latinum told him it would pay him a bonus or commission if he promoted Token. If such an inference is true, then it would be evidence of actual authority. And Plaintiffs also explicitly

allege that Latinum "gave commission-based compensation to its sales agents (those who executed SAFTs) to reward fundraising successes" and that Kevin was one such agent. (ECF No. 11, PageID.253, 257.) An inference that Kevin made those statements to Plaintiffs because Latinum represented the same to him is not an "unwarranted factual inference." *See Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 446 (6th Cir. 2000). If Latinum paid Kevin a commission, or if it told Kevin he would earn a commission under certain circumstances, then it would be reasonable for Kevin to think he had authority. So the commission allegation too supports finding that Plaintiffs plausibly alleged actual authority.

Defendants argue that the SAFT between Kevin and Latinum presents a roadblock against finding that Kevin had actual authority. (ECF No. 19, PageID.306.) The SAFT states that, "The Investor [Kevin] is purchasing this security instrument for his, her or its own account for investment, *not as a nominee or agent*, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same." (ECF No. 22-2, PageID.514 (emphasis added).)[3] The plain language of the SAFT does not

---

[3] The SAFT is referenced in Plaintiffs' complaint, and so the Court may consider it at this stage without converting the motion to one for summary judgment. *See Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (providing that at the motion to dismiss stage, a court "may consider . . . exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.").

establish any agency or promoter relationship between Latinum and Kevin such that Kevin had authority to redistribute or resell his Tokens. But Plaintiffs allege that Kevin solicited them so that they would send money to Latinum and invest in Token, which is slightly different. They do not allege that Kevin tried to resell his own Tokens to them. Instead, Kevin was to facilitate Plaintiffs' purchase of their own Tokens. So the SAFT weighs slightly against finding that Kevin had actual authority from Latinum to act as an agent but does not completely preclude a finding that he had authority to promote Latinum's Token.

The Court also infers actual authority from the allegation that Kevin "spoke highly of his connection to the Latinum Board of Directors and his close affiliations with Latinum's purported creator and Chief Executive Officer . . . whom [Kevin] stated readily would join ZOOM or conference calls[.]" (ECF No. 11, PageID.241.) One reasonable inference based on this allegation is that Latinum's CEO offered to speak to the people whom Kevin was recruiting. If true, that offer would make it plausible that Latinum approved of Kevin's actions and therefore provided Kevin with actual authority to promote Latinum's Token. Defendants argue that Plaintiffs merely alleged that Kevin told them Latinum's CEO was available to speak with them, and not that they heard this from Latinum itself or actually spoke to Latinum's CEO to confirm that was the case. Once again, the Court recognizes that this is another inference that could be made from the allegations. And if, after discovery, Plaintiffs can only show that Kevin made these

statements, and not that Latinum made such representations to him, then they will have failed to prove actual authority. It is a different story at this stage, though, where Plaintiffs are entitled to all reasonable inferences. And it is just as reasonable to infer that Latinum told Kevin that its high-level executives were available to meet with investors as it is that Kevin made this offer without any manifestation from Latinum.

This is especially so when, as Plaintiffs allege here, Latinum knowingly deployed sales agents like Kevin to collect "funds from the general public." (ECF No. 11, PageID.253.) Indeed, Plaintiffs allege that Latinum expressly deployed these agents and knowingly encouraged and supported their sales efforts to the general public. (*Id.*; *see also id.* at PageID.256.) So, according to Plaintiffs, Latinum was not an unaware principal throughout these events. Rather, Latinum instructed sales agents to fundraise for Token and supported and encouraged their efforts to do so.

There is one more theory that also supports Plaintiffs' actual-authority argument. That is ratification, defined as "the affirmance by a person of a prior act which did not bind him, but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Corcoran for Jackson v. Spartan Barricading & Traffic Control, Inc.*, No. 341009, 2018 WL 6185555, at *5 (Mich. Ct. App. Nov. 27, 2018) (citing *David v. Serges*, 129 N.W.2d 882, 883 (Mich. 1964)); *see also Dobronski v. NPS, Inc.*, No.

356617, 2022 WL 1194212, at *4–5 (Mich. Ct. App. Apr. 21, 2022) (citing Restatement (Third) of Agency § 4.01(1) (similar)); Restatement (Second) of Agency § 82 (same). A principal can ratify an act in two ways: by "manifesting assent that the act shall affect the person's legal relations" or "conduct that justifies a reasonable assumption that the person so consents." *Dobronski*, 2022 WL 1194212, at *4–5 (citing Restatement (Third) of Agency § 4.01(2)); Restatement (Second) of Agency § 83 (similar). Ratification can only occur, however, if the principal has "knowledge of the material facts, on which such conduct was based[.]" *David Stout Flour Mills v. Saginaw Cnty. Farm Bureau*, 213 N.W. 147, 149 (Mich. 1927).

Plaintiffs claim that they sent money directly to Latinum and Latinum accepted these funds without any objection or inquiry. (ECF No. 11, PageID.245, 248.) This, say Plaintiffs, shows that Latinum ratified Kevin's actions. Further, Plaintiffs state that they wrote "for Kevin Jonna" in the memo line of their payments to Latinum, so Latinum was aware that they were investing due to their interactions with Kevin. (ECF No. 11, PageID.245, 257.)

Making reasonable inferences in favor of Plaintiffs, Latinum's inaction upon receipt of Plaintiffs' funds provides support that Latinum ratified Kevin's actions. Though Latinum may not have known about the details of Kevin's conversations with Plaintiffs, by accepting money that was sent for Kevin, it is reasonable to infer that Latinum was aware that Kevin was soliciting funds to

23

invest in Latinum. And as the complaint alleges, Latinum did not ask Plaintiffs to complete the SAFT after receiving their funds or treat them as independent investors. Instead, Latinum credited Kevin's account with Plaintiffs' funds. (ECF No. 11, PageID.257.) Latinum argues that it was merely following the directions that accompanied the transfers, which stated the money was "for Kevin Jonna." But it would also be reasonable for Plaintiffs to assume that Latinum's acceptance of the money demonstrated its approval of Kevin's solicitation efforts as Latinum made no independent effort to communicate with Plaintiffs. *See Dobronski*, 2022 WL 1194212, at *4–5 (ratification includes "conduct that justifies a reasonable assumption that the person so consents." (citing Restatement (Third) of Agency § 4.01(2))). In other words, Latinum made no effort to establish a separate relationship with Plaintiffs as investors. Rather it accepted money from them on behalf of Kevin, so it would be reasonable for Plaintiffs to assume that Latinum approved of the arrangement of Kevin as a middleman.

To Latinum's point, perhaps it is true that despite this money being sent to it, it had no knowledge of Kevin's actions and merely thought Kevin's family sent the money to aid his investment as a personal loan or a gift. But at this stage, the Court cannot accept Latinum's version of the facts. It must accept Plaintiffs'—and draw reasonable inferences from the facts in favor of Plaintiffs. And considering the totality of the allegations, it is reasonable to infer that Latinum directed Kevin to induce Plaintiffs to invest, and then manifested its approval of his actions by

accepting Plaintiffs' money without question and crediting that money to Kevin's account, thereby approving of his status as the go-between.

So the Court concludes that Kevin plausibly had actual authority to act as Latinum's agent because it ratified his actions.

And Plaintiffs also plausibly pled that Kevin had apparent authority.

Like actual authority, apparent authority focuses on the principal's manifestations. *See* Restatement (Third) of Agency § 2.03 (2006) ("Apparent authority is the power held by an agent . . . when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."); *Meretta,* 491 N.W.2d at 280 ("Apparent authority must be traceable to the principal and cannot be established by the acts and conduct of the agent." (citing *Smith v. Saginaw Sav. & Loan Assoc.,* 288 N.W.2d 613 (1979))); Restatement (Second) of Agency §27 (similar). "In determining whether an agent possesses apparent authority to perform a particular act, the court must look to all surrounding facts and circumstances." *Meretta,* 491 N.W.2d at 280. In other words, apparent authority is concerned with the actions of the principal and the beliefs of third parties, not with the beliefs of the agent.

Latinum took several actions that reasonably led Plaintiffs to believe that Kevin was Latinum's agent. One such action is Latinum's acceptance of payments from Plaintiffs. *See Verizon Directories Servs v. Allied Home Mortg. Capital Corp.,*

No. 284577, 2009 WL 2448162, at *3 (Mich. Ct. App. Aug. 11, 2009) ("In this case, plaintiff did not simply rely on the statements of [agent] in ascertaining his authority. Defendant tendered payment on the contracts for over three years, thereby ratifying the actions of its agent."); Restatement (Third) of Agency § 3.03 ("The determinative question is whether a third party can establish a linkage between statements of authority by the agent and a manifestation of assent by the principal to the making of such statements."). As discussed before, Latinum did not ask Plaintiffs for further information or treat them as they would other investors—it simply credited Kevin's account, seemingly approving his role in recruiting investors.

Another manifestation is Latinum's use of high-profile poker players as agents to promote Latinum's Token. Plaintiffs state that Latinum uses the "poker community to market its Token—as the gambling community is known to be a good market for cryptocurrency investments." (ECF No. 11, PageID.253.) And Kevin is allegedly a high-profile poker player. (*Id.*) Further, Simon wire transferred money to Jason Otto, who is also "part of the high-profile poker community and is referenced several times on poker star Phil Helmuth's social media account (Twitter). Significantly, Phil Hellmuth is a poker star who is paid by Bitcoin Latinum to promote its Token." (ECF No. 11, PageID.255.) Thus, based on Plaintiffs' knowledge of Latinum's connections to high-profile poker players, and Kevin's status as a high-profile poker player, it was reasonable for Plaintiffs

to think that Kevin was an agent Latinum recruited to promote its product, much like Otto or Helmuth. *See* Restatement (Third) of Agency § 2.03, cmt. d (evaluating reasonableness of third party's belief includes determining whether agent acts according to "reasonable expectations based on analogous situations and other relevant circumstances"). The poker connection alone would likely be insufficient to find Plaintiffs reasonably believed Kevin had authority to promote Latinum's Token (as there are most certainly high-profile poker players that have nothing to do with Latinum). But this allegation in light of the allegations that Latinum accepted Plaintiffs' money "on behalf of Kevin Jonna," and that Simon wired money to Otto upon Kevin's direction, makes it plausible that Plaintiffs reasonably believed Kevin had authority to act on behalf of Latinum based on Latinum's own actions.

Plaintiffs' allegation that Kevin offered meetings with Latinum's CEO further tips the scale in favor of finding it plausible that Kevin had apparent authority. Recall that with apparent authority, the focus is on the principal's manifestations to the third-party. To that end, Plaintiffs allege that they know Latinum's CEO has met with other investors in Michigan that were recruited by agents, just as Plaintiffs had been recruited by Kevin. (ECF No. 11, PageID.253 ("Here, for example, although Plaintiffs did not accept [Kevin's] offer to discuss their investment with Latinum CEO, they were aware of other Michigan residents who did."); *id.* at PageID.256.) Critically, here, Plaintiffs allege that Latinum's

CEO was willing to meet with—and in fact had met with—investors such as themselves through promoters. This provides the necessary link from the principal to the third party for apparent authority.

* * *

In sum, Plaintiffs' allegations that Latinum paid Kevin a commission for his promotion efforts and that Latinum executives offered to meet with the investors Kevin recruited provide some limited evidence that Kevin was acting with actual authority when inducing Plaintiffs to invest in Latinum. And Plaintiffs' allegations that Latinum accepted money from them without executing a SAFT and with knowledge that it was on behalf of Kevin makes it plausible that Latinum ratified Kevin's actions, which supports actual authority. *See* Restatement (Third) of Agency § 4.02 ("[R]atification retroactively creates the effects of actual authority."). So at least at the motion-to-dismiss stage, this is enough to plausibly allege that Kevin had actual authority to act on Latinum's behalf.

Beyond actual authority, Plaintiffs have sufficiently pled that Kevin had apparent authority based on Latinum's manifestations. These manifestations include accepting Plaintiffs' investment without further inquiry or communication, using high-profile poker players as agents to promote Latinum's Token, and making Latinum's CEO available to other Michigan investors to encourage investment. These manifestations made it reasonable for Plaintiffs to

believe that Kevin was also acting as an agent, and lent credence to his statements that he was in touch with Latinum and getting his information from Latinum directly.

So the Court finds that Plaintiffs have plausibly pled that Kevin acted as an agent for Latinum and that the allegations against Kevin can be attributed to Latinum.

Latinum unsuccessfully argues that because Plaintiffs alleged Kevin acted "for his own benefit," he could not have been acting as an agent of Latinum. (ECF No. 26, PageID.655.) Latinum relies on the Restatement (Second) of Agency, which states, "Unless otherwise agreed, authority to act as agent includes only authority to act for the benefit of the principal." § 39. This section applies to an agent's own understanding of their actual authority. In other words, when an agent is making inferences about the scope of their authority from a principal's manifestation, they should infer that the authority only includes authority to act in the benefit of the principal. So this rule does not apply here.

Another provision, § 262, applies to apparent authority. There, the Restatement states, "A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this." Restatement (Second) of Agency § 262; *see also Mais v. Allianz Life Ins. Co. of North America*, 34 F.Supp.3d 754, 763 (W.D. Mich.

2014). This describes the situation here. Having found that Plaintiffs plausibly pled apparent authority, Latinum would otherwise be liable to Plaintiffs for Kevin's actions. So it is "not relieved from liability by the fact that" Kevin acted for his own purposes. And there is nothing in the complaint that suggests Plaintiffs had notice that Kevin was acting "entirely" for his own purposes. Thus, at this stage, this argument fails.

### C. Offer and Sale of Unregistered Securities

Having dealt with the issue of agency, the Court is prepared to analyze the plausibility of Plaintiffs' federal-securities claim. The Court starts with Latinum's arguments for dismissing Plaintiffs' claim that Latinum offered and sold unregistered securities in violation of 15 U.S.C. §§ 77e(a), 77e(c), and 77l(a).

Latinum's only argument for dismissal is that the complaint contains no factual allegations that Latinum "made any attempt to solicit Plaintiffs to offer to buy security, or interest in a security, for value." (ECF No. 19, PageID.332.) Having found that Kevin plausibly acted as Latinum's agent, the Court finds that Plaintiffs also plausibly alleged that Latinum made Plaintiffs an offer for securities. As Latinum recognized, Plaintiffs allege that Kevin specifically contacted them to invest in Latinum and induced them into doing so by praising the value of Latinum's Token. (*See* ECF No. 19, PageID.333.) And some of the plaintiffs invested based "upon representations made by [Kevin] and information contained on Latinum's website[.]" (ECF No. 11, PageID.243.) So the Court finds

30

that Latinum, via Kevin, plausibly "made efforts to induce Plaintiffs to invest in Tokens" (ECF No. 19, PageID.332), which would be an offer to sell Plaintiffs unregistered securities.

### D. Securities fraud

Plaintiffs claim securities fraud under § 10(b) of the Securities Exchange Act and Rule 10b-5. Securities fraud requires pleading (1) a misstatement or omission in connection with the purchase or sale of a security, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff justifiably relied, and (5) which proximately caused the plaintiff's injury. *City of Taylor Gen. Emp. Retirement Sys. v. Astec Indus, Inc.*, 29 F.4th 802, 810 (6th Cir. 2022). Latinum argues that Plaintiffs have not sufficiently pled a material representation or omission, scienter, or reliance.

### 1. Misrepresentation or omission

To properly plead a material misrepresentation or omission, Plaintiffs must meet the standard set out in Federal Rule of Civil Procedure 9(b) and the PSLRA. This means that they must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *City of Taylor Gen. Emp. Retirement Sys.*, 29 F.4th at 810 (citing *La. Sch. Emps. Retirement Sys. v. Ernst & Young*, 622 F.3d 471, 478 (6th Cir. 2010)). In other words, the complaint

must allege the "who, what, where, when, and why" of the fraudulent statements.
*Id.*

Much of the "who, what, where, [and] when" is clear from the complaint.
For example, with respect to Simon, Plaintiffs allege that Kevin (who has been
plausibly alleged to be acting as Latinum's agent) called Simon in September 2021
to "praise Latinum as a massively lucrative opportunity[.]" (ECF No. 11,
PageID.240.) Kevin called Latinum's Token the "greatest investment of our
lifetimes." (*Id.*) He also told Simon that Latinum would not withhold Simon's
investment if "Latinum were to 'tank' prior to release," that Tokens would be
disbursed to investors "immediately upon launch," and that Simon should "[p]ut
big money in it it's better than any investment." (ECF No. 11, PageID.242–243.)
Raymond Jonna was the target of similar statements from Kevin in October 2021,
including a representation that Token was "trading at $201 per Token on
cryptocurrency trading platforms." (ECF No 11, PageID.245.) And on November
29, 2021, Kevin told Raymond that "the Tokens will be released in February
2022." (*Id.* at PageID.247.) Similarly, in October 2021, Kevin told Plaintiff Farid
Jamardov that he "would receive his tokens the next day" and that there would
be no restrictions on selling or trading Tokens. (*Id.* at PageID.247.) As far as
omissions, Plaintiffs allege that Kevin failed to provide information to Simon
regarding "the possession or value of the Tokens" and likewise failed to provide
Farid information as to when he would get his Tokens. (*Id.* at PageID.243, 248.)

32

There are also a few statements made by Latinum on its website that have been alleged with particularity. These include a press release from January 2022 which purports to release a "non-fungible token in 'Cyber Yachts,'" but provides no other information, and statements that the Token will be transferrable or traded on a number of platforms. (ECF No. 11, PageID.250.) Latinum has also stated that Token is traded publicly. (*Id.* at PageID.251.)

The "why" is also straightforward for many of these statements. Plaintiffs allege they have not received Tokens to date, which explains why Kevin's statements regarding when Plaintiffs would receive their Tokens are false. And the statements representing that Tokens could be sold or traded without restriction, or were available on certain platforms, are alleged to have been false because the Token cannot be sold or traded without restriction at this point and has not been made available on certain platforms for public trading. (*See* ECF No. 11, PageID.249.) And if Token is listed on those platforms, Plaintiffs also allege that it is misleading to list that information without any qualifiers because Token has yet to be released to investors, so it is not "publicly traded" in that sense. (*Id.* at PageID.251.) Further, Plaintiffs explain that by postponing the release of Token, Latinum is making it so Token is impossible to sell, which allegedly contradicts its (and Kevin's) claims that the Token can be resold without restriction and at a certain price. (*See id.* at PageID.252.)

As for some of Kevin's other statements regarding the Token being the "greatest" investment of Plaintiffs' lifetimes, it is more difficult to evaluate why they are false other than Plaintiffs' general allegation that the Tokens have minimal value. These statements seem to fall more in the category of puffery as opposed to material guarantees from Latinum.

Nevertheless, given that there are a number of other statements where Plaintiffs have given a more direct explanation as to why they are false, the Court finds that the material representation or omission prongs of securities fraud have been adequately pled under Rule 9(b) and the PSLRA.

## 2. Scienter

Scienter is defined as "knowing and deliberate intent to manipulate, deceive, or defraud" or "recklessness." *City of Taylor Gen. Empl. Retirement Sys.*, 29 F.4th at 812 (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)).

Scienter also must be pled with particular "'facts giving rise to a strong inference that the defendant acted with the required state of mind' in violating securities laws." *Id.* (citing 15 U.S.C. § 78u-4(b)(2)(A)). Hence, the "strong inference" requirement is more stringent than the plausibility requirements of Rule 12(b)(6). It requires that the inference be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In evaluating scienter at the

motion-to-dismiss stage, courts "must consider 'plausible opposing inferences.'"
*City of Taylor Gen. Emp. Retirement Sys.*, 29 F.4th at 812 (citing *Tellabs*, 551 U.S.
at 323).

The Sixth Circuit uses a three-part test to evaluate the sufficiency of a
plaintiff's scienter allegations. *Doughterty v. Esperion Therapeutics, Inc.*, 905 F.3d
971, 979 (6th Cir. 2018). As with all motions to dismiss, the Court first accepts the
factual allegations in the complaint as true. *See Tellabs*, 551 U.S. at 322. Then,
considering the allegations "holistically," it will determine "whether all the facts
alleged taken collectively, give rise to a strong inference of scienter." *City of Taylor
Gen. Emp. Retirement Sys.*, 29 F.4th at 812 (citing *Dougherty*, 905 F.3d at 979).
Third, the Court will take account of "plausible opposing inferences" and "decide
whether a reasonable person would deem the inference of scienter . . . at least as
compelling as any opposing inference one could draw from the facts alleged." *Id.*

Though courts typically evaluate scienter with respect to each defendant
individually, here the Court will focus on Kevin because he made the bulk of the
alleged false statements. This is because Kevin's scienter with regard to his
statements can be attributed to Latinum if Kevin is its agent, and, as discussed,
Plaintiffs have plausibly alleged that Kevin acted as Latinum's agent during his
interactions with Plaintiffs. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476
(6th Cir. 2014) ("The state(s) of mind of any of the following are probative for
purposes of determining whether a misrepresentation made by a corporation was

35

made by it with the requisite scienter under Section 10(b): . . . . The individual agent who uttered or issued the misrepresentation[.]"). So if Plaintiffs plausibly pled that Kevin acted with the requisite scienter, then Latinum did too. *See City of Taylor Gen. Emp. Retirement Sys.*, 29 F.4th at 816 ("At this point in the case, the § 10(b) claims against the company rise and fall with the claims against the individual defendants.").

To echo the Sixth Circuit in other securities cases, a review of Kevin's statements to Plaintiffs reveals a theme. *See City of Taylor Gen. Emp. Retirement Sys.*, 29 F.4th at 813 ("Suffice it to say that a holistic review of Brock's statements reveals a theme: relentless, unfounded optimism that was contradicted by the undisclosed facts."). That theme is persistently pursuing investment in Token even if it meant brushing off or ignoring key details about the availability and value of it.

Kevin's statements as to when the Tokens would be available is the most obvious example of this. Kevin told Raymond that the Tokens would be released around the time Latinum launched in the United States. (ECF No. 11, Page ID.246.) He also told Raymond that the Tokens would be available in February 2022. (*Id.*) In October 2021, he told Farid that the Tokens would be available the next day. (ECF No. 11, PageID.247.) Around October 21, Kevin said he did not know when the Tokens would be available. (*Id.* at PageID.248.) Then on October 22, Kevin said the Tokens would transfer on October 25. (*Id.*) Later on December

8, Kevin said the Tokens would be released on February 26, 2022. (*Id.* at PageID.249.) To date, Plaintiffs have not received any Tokens. (*Id.* at PageID.243, 247, 249.) The number of different dates Kevin provided Plaintiffs as to when they would receive Tokens demonstrates Kevin's intentional, or, at least, reckless, disregard for the truth. Each time a promised date of release passed, Kevin changed his story to push the release back even further. *See Doshi v. Gen Cable Corp.*, 823 F.3d 1032, 1039–40 (6th Cir. 2016) (finding one factor relevant to scienter is "disregard of the most current factual information[.]").

Defendants' statements about the transferability of the Tokens were also made without nuance. Kevin told Farid there would be no restrictions on selling or trading Tokens. (ECF No. 11, PageID.247.) Likewise, Plaintiffs allege that Latinum's website states that Token is "publicly traded" on a number of exchanges and is transferable. (ECF No. 11, PageID.250.) But since Token has yet to be released to investors, broad statements about the transferability of Token without mentioning that investors have yet to actually use these exchanges could mislead potential investors about the value of Token.

And importantly, Kevin's statements cannot be protected by claiming they were made with "mere ignorance." *See City of Taylor Gen. Empl. Retirement Sys.*, 29 F.4th 813. For Kevin stated that he had insider access to Latinum's board of directors and Latinum's CEO, joined high-level investor calls, and could request Latinum's CEO to join Zoom calls with potential investors. (ECF No. 11,

PageID.240–241.) If true, Kevin would have access to material information about Latinum, which would reasonably include when Token would be available. And Kevin apparently had exclusive access to the "wallet" that reflected his and Plaintiffs' investment. (ECF No. 11, PageID.246.) In fact, Kevin told Simon that downloading his Latinum "wallet" would "result in termination of your coins" because it would violate their contract. (*Id.* at PageID.243.) That exclusive access would also likely inform an individual when the Tokens they purchased would actually be available to resell and trade. Or at the very least, Kevin could have not promised any date of availability. Despite his alleged connections to Latinum, however, Kevin was either dishonest about what he knew or recklessly avoided providing details so he would not have to reveal how little he knew. Either way, this evidence creates an inference of scienter.

### 3. Reliance

Latinum's argument against reliance is one sentence that states the amended complaint "does not plead facts at all suggesting Plaintiffs relied on any statement or conduct made by Latinum or its . . . agents in deciding to invest Tokens." (ECF No. 19, PageID.336.)

"It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997).

Moreover, Plaintiffs state multiple times that they relied on Kevin's statements when they sent money to Latinum and Otto to invest in Tokens. (ECF No. 11, PageID.242, 243, 244, 245.) Simon also stated he relied on the materials on Latinum's website when deciding to invest. (*Id.* at PageID.243.) So the Court finds that reliance was also plausibly pled.

### E. Rescission

For similar reasons as above, Latinum argues that Plaintiffs' claim for rescission under Section 29(b) of the Securities Exchange Act (which voids contracts made in violation of the Act) should be dismissed because Plaintiffs did not allege "any conduct on the part of Latinum that suggests that Latinum effected a transaction in securities or attempted to induce the purchase or sale of any security with respect to Plaintiffs." (ECF No. 19, PageID.336.) As Plaintiffs alleged Kevin induced them into sending money to Latinum (and Otto) by falsely claiming the value and availability of Tokens, this argument fails to persuade the Court to dismiss this claim.

### IV. State-law Claims

The Court will now turn to Plaintiffs' state-law claims, which are alleged under both Michigan and California state law.

The Court must once again begin its analysis with personal jurisdiction. The Court conducts this analysis by applying the doctrine of pendent personal jurisdiction to Plaintiffs' state-law claims.

## A. Pendent Personal Jurisdiction

"The doctrine of pendent personal jurisdiction provides that where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available." *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 88 (2d Cir. 2018).

Other federal courts have similarly used pendent personal jurisdiction to exercise personal jurisdiction over state-law claims where the plaintiffs have plausibly asserted federal claims with a nationwide service of process clause. *See Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 123 (3d. Cir. 2020) (applying pendent personal jurisdiction to state law claims "arising from the same nucleus of facts" as RICO claims); *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (same with respect to federal-antitrust claims); *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 23 F.Supp.2d 796, 805 (N.D. Ohio 1998) (same with respect to RICO and federal-antitrust claims); *Clayton v. Heartland Resources, Inc.*, No. 1:08CV-94-M, 2008 WL 5046806, at *3–4 (W.D. Ky. Nov. 21, 2008) (same with respect to federal-securities violations); *Smith v. Swaffer*, 566 F.Supp.3d 791, 808 (N.D. Ohio 2021) (citing to pendent personal jurisdiction as an alternative basis for exercising jurisdiction); *see also United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002) ("[T]he

majority of federal district courts and every circuit court of appeals to address the question have upheld the application of pendent personal jurisdiction[.]").

Given this authority, the Court chooses to use pendent personal jurisdiction in this case. The Court has already decided that it has personal jurisdiction over Latinum for the federal-securities claims. Now it must determine whether the state-law claims arise from a "common nucleus of operative facts" such that judicial efficiency and fairness allow it to exercise personal jurisdiction over those claims. *See Action Embroidery Corp.*, 368 F.3d at 1180–81 ("The district court may have discretion to dismiss the pendent claims where considerations of judicial economy, convenience and fairness to litigants so dictate." (internal citations omitted)).

The Court finds that, as pled, Plaintiffs' state-law claims arise from the same set of facts that would be used to prove their federal securities' claims.

The California-state-law claims of unregistered offer and sale of securities and securities fraud mirror the federal-securities claims. The other two California claims, false advertising, and unfair competition, also overlap. The statements Plaintiffs allege were false or misleading for purposes of security fraud are the same statements they allege were used to "induce the public to enter into a transaction which is untrue or misleading" for their false advertising and unfair competition claims. *See People v. Johnson & Johnson*, 292 Cal. Rptr. 3d 424, 442 (Cal. Ct. App. 2022); (*see also* ECF No. 11, PageID.273). All of the statements

Kevin made to Plaintiffs and the content of Latinum's website form the basis of both sets of claims. There is no separate set of facts that Plaintiffs allege that would apply to one claim but not the other. So this Court will exercise pendent personal jurisdiction over Latinum for the claims based in California law.

The Michigan counts are also based on the same facts. Fraudulent inducement, fraudulent misrepresentation, and negligent misrepresentation are all based on Latinum and Kevin's representations about Token, which Plaintiffs state were false and misleading and led them to invest in Token. (ECF No. 11, PageID.264 (citing Kevin's text messages and investment-related materials on Latinum's website as basis for fraudulent inducement); *id.* at PageID.266 (same for fraudulent misrepresentation); *id.* at PageID.277 (same for negligent misrepresentation).) And though the level of intent is different for these claims, the same facts that show scienter for securities fraud would be used to show that Latinum acted unreasonably. Latinum also allegedly hid important details about Plaintiffs' investment, which is both an omission under federal securities law and a basis of for the Michigan fraudulent-concealment claim. (*See id.* at PageID.263.) In other words, the fraud is the same for the state-law claims as it is for the securities-fraud claim. So pendent personal jurisdiction is also warranted over Plaintiffs' claims for negligent misrepresentation, fraudulent misrepresentation, fraudulent inducement, and fraudulent concealment.

Plaintiffs' breach of contract claim is legally distinct from securities fraud, but the same set of facts would prove both. The basis of Plaintiffs' breach of contract claim is that Kevin's representations to Plaintiffs formed an agreement for the purchase of Token. In other words, Kevin agreed to facilitate the purchase of Token for Plaintiffs in exchange for Plaintiffs wiring money to Latinum. (ECF No. 11, PageID.268.) And through Kevin, Latinum agreed to furnish Plaintiffs with Tokens. (*Id.*) Though the question of contract formation is distinct from the question of fraud, what Kevin told Plaintiffs from September 2021 through January 2022 will need to be determined for both claims. And the issue of whether Latinum or Kevin bought Token for or issued Token to Plaintiffs will also need to be determined to establish both claims. The Court thus finds that pendent personal jurisdiction shall also be exercised over Latinum for the breach-of-contract claim.

Unjust enrichment and conversion are based on whether Plaintiffs sent money to Latinum and Latinum retained the money without issuing Tokens to Plaintiffs. Plaintiffs sending money to Latinum and receiving no Token is the basis of Plaintiffs' loss-causation for securities fraud and their damages. Latinum's retention of Plaintiffs' money shows both receiving a benefit for unjust enrichment and exercising dominion or control over Plaintiffs' property. So these two Michigan state-law claims also arise from the same set of facts that Plaintiffs allege show securities fraud.

43

Finally, for their negligence claim, Plaintiffs state that Latinum was negligent in accepting money from it without any inquiry and without determining whether they were accredited investors. (ECF No. 11, PageID.279.) They also state that Latinum was negligent in encouraging agents to sell to the general public. (*Id.* at PageID.280.) Facts as to what money was received by Latinum, what Latinum did with that money, and how Latinum determined what to do with that money will also be used to show ratification and whether Kevin's actions can be attributed to Latinum. The question of agency is relevant to the securities-fraud claim, as is what damages Plaintiffs incurred as a result of Latinum's actions. The negligence claim, therefore, also overlaps with the federal claims such that pendent personal jurisdiction should be exercised over Latinum with regards to negligence.

In all, the Court finds that all state-law claims in Plaintiffs' complaint arise from the same "nucleus" of facts as the federal claims. So the Court may exercise pendent personal jurisdiction over Latinum for the state-law claims.

## B. 12(b)(6) Analysis of State-Law Claims

Now that the Court has sorted out personal jurisdiction, it can move on to Latinum's challenges to various state-law claims.

As an initial matter, the Court notes that Latinum either did not challenge certain claims or challenged them on the basis that Plaintiffs had not properly pled that Kevin acted as Latinum's agent. These claims include unregistered offer

and sale of securities under California Corporation Code §§ 25110, 25503; securities fraud under California Corporation Code § 25401; fraudulent concealment; fraudulent inducement, fraudulent misrepresentation; and negligent misrepresentation. As the Court has already found that Latinum plausibly pled Kevin's agency relationship with Latinum, the Court is not persuaded by Latinum's challenges to these claims, to the extent they were made. So these state-law claims will remain in the case.

The Court will, however, dismiss Plaintiffs' claim of wire fraud, which is alleged under a federal criminal statute for which Plaintiffs have no private right of action. *See, e.g., Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 386 (6th Cir. 1997) (finding no private right of action under mail fraud and wire fraud statutes); *Ryan v. Ohio Edison Co.*, 611 F.2d 1170, 1177-79 (6th Cir. 1979) (holding there is no private right of action under the mail fraud statute).

As for the remaining challenges, the Court will address each by claim.

## 1. False Advertising

Plaintiffs allege that Latinum acted in violation of the false advertising provision in § 17500 of the California Business and Professions Code. This provision "broadly prohibits false or misleading advertising, declaring that it is unlawful for any person or business to make or distribute any statement to induce the public to enter into a transaction which is untrue or misleading[.]" *People v. Johnson & Johnson*, 292 Cal. Rptr. 3d 424, 442 (Cal. Ct. App. 2022). Latinum

argues that the complaint "does not allege any specific facts indicating that Latinum made any statements to the public which Latinum knew or should have known were untrue or misleading." (ECF No. 19, PageID.342.)

As discussed when considering the securities-fraud claim, Plaintiffs have alleged some statements that Latinum made on its website were untrue. One such statement is that Latinum offered Tokens for sale on its website and failed to deliver such Tokens to investors. (ECF No. 22, PageID.493; ECF No. 11, PageID.252.) Plaintiffs also allege that Latinum's statements regarding the Tokens' transferability are false. For example, Plaintiffs allege that Latinum wrote in a press release in January 2022 that it "currently trades publicly on" a number of exchanges. Plaintiffs say this is misleading for a couple of reasons. One, the Token has not been released to investors, so they are not able to sell it, which renders the Token nontransferable. (ECF No. 11, PageID.252.) Two, the exchanges listed as the ones where Latinum "trades publicly" are not registered as exchanges with the SEC. (ECF No. 11, PageID.251.) These allegations suffice to state a claim for false advertising under California law where Plaintiffs allege that these statements could reasonably cause an investor to think Token is transferable, and therefore has more opportunity to be lucrative, than it actually does. *See Williams v. Gerber Products Co.*, 552 F.3d 934, 938–39 (9th Cir. 2008) (finding that California's false advertising law also prohibits "advertising which, although true, is either misleading or which has a capacity, likelihood or tendency

to deceive or confuse the public." (citing *Kasky v. Nike, Inc.*, 119 Cal. Rptr. 2d. 296, 304 (Cal. 2002))). Further, California courts hesitate to determine whether a business practice is deceptive on a motion to dismiss. *Id.* (citing *Linear Tech. Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 134–35 (Cal. 2007) (finding that deceptiveness is a fact question requiring evidence from both sides)).

Latinum also may plausibly be responsible for Kevin's statements to Plaintiffs that were untrue or misleading. Kevin made a few statements to Plaintiffs about the transferability of the Token, including that there would be no restrictions on trading and that the Token was currently being traded on certain exchanges at more than $200. (ECF No. 11, PageID.245, 247.) Kevin also told one plaintiff the Tokens would be available the "next day" in October 2021, and later stated (along with Latinum) that they would be released in February 2022. (*Id.* at PageID.247, 249, 252.) Plaintiffs allege they still have not received Tokens. Based on the allegations, those statements were false and used to induce Plaintiffs to wire money to Latinum.

Plaintiffs' claim for false advertising under California law therefore survives.

## 2. Unfair Competition

Latinum also challenges Plaintiffs' unfair-competition claim under the California code. Latinum alleges that Plaintiffs have only made a conclusory

allegation of unfair competition and have not alleged any facts in support of their claim. (ECF No. 19, PageID.345.)

An unfair competition claim under California law is even broader than a false advertising claim in that it prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]" *See In re Outlaw Laboratory, LLP*, 463 F.Supp.3d 1068, 1088 (S.D. Cal. 2020). California courts have noted that because of the disjunctive nature of the statutory text, "it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent." *Id.* (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 83 Cal. Rptr. 2d 548 (1999)).

This Court has already determined that Plaintiffs have pled securities fraud with sufficient particularity as required by Federal Rule of Civil Procedure 9(b). Similarly, to make a claim under the "fraudulent" prong of the California unfair competition provision, federal plaintiffs must meet the pleading requirements of Rule 9. *In re Outlaw Laboratory, LLP*, 463 F.Supp.3d at 1088 (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2013)).

Consistent with and for the reasons it found Plaintiffs' securities-fraud claim properly pled, the Court also finds that Plaintiffs have pled particular facts that plausibly show a violation of California's unfair-competition provision. The false statements and omissions alleged as part of the securities claim also

plausibly amount to "a fraudulent business act or practice." *See* Cal. Bus. & Prof. Code § 17200.

So Plaintiffs' claim for unfair competition will not be dismissed.

### 3. Breach of contract

Turning to the claims made under Michigan law, the Court starts by addressing Plaintiffs' breach-of-contract claim. Latinum argues that Plaintiffs have not alleged that they entered a contract with Latinum. "If Plaintiffs entered into a contract," says Latinum, "at most it was allegedly with [Kevin], and it cannot be said to be a party to the alleged contract with Plaintiffs." (ECF No. 19, PageID.338.) As for Plaintiffs, they do not address the breach-of-contract claim directly in their response. Instead, when arguing about whether rescission is properly pled, Plaintiffs state that Kevin "entered into the unlawful securities agreements, as selling agent for Latinum, with Plaintiffs. The fact that Plaintiffs did not receive the Tokens only demonstrates breach of the contract, not the nonexistence of it[.]" (ECF No. 22, PageID.489.)

Latinum's argument here, as with many other claims, seems to be about whether Plaintiffs have plausibly alleged that Kevin acted as an agent of Latinum. As the Court has already found that they have, it will not address the issue again. Seeing as this is Latinum's sole argument for dismissal, the breach-of-contract claim will remain.

### 4. Unjust Enrichment

"Unjust enrichment is a cause of action to correct a defendant's unjust retention of a benefit owed to another." *Wright v. Genesee Cnty.*, 934 N.W.2d 805, 809 (Mich. 2019). Unjust enrichment, as the name suggests, is grounded "in the idea that a party shall not be allowed to profit or enrich himself inequitably at another's expense." *Id.*

Latinum argues that it cannot be unjust for it to have retained funds that Plaintiffs sent it and credited the pre-purchase of Tokens to Kevin's account because Plaintiffs alleged they put "for Kevin Jonna" in the memo line of the transfers. Because Plaintiffs directed it to confer the benefit of the funds to Kevin, says Latinum, Latinum did not receive any benefit and if it did, it would not be unjust to retain any benefit.

Latinum will have plenty of opportunity to argue its version of events. At this stage, however, the Court is bound to believe Plaintiffs' version of events, and that version does not line up with Latinum's argument. Plaintiffs' theory is that Latinum directed Kevin as an agent to solicit funds to invest in Latinum's Token. Kevin then solicited his family members and induced them to invest by making false statements or hiding relevant information from them. Based on these false statements or omissions, Plaintiffs invested, in part by sending money directly to Latinum. In Plaintiffs' view, the "for Kevin Jonna" information was intended to give Kevin credit for recruiting them as investors, and not for gifting Kevin more

50

pre-sale Tokens at the expense of Plaintiffs. Under this theory, it would plausibly be unjust for Latinum to retain the funds Plaintiffs sent it, even if in exchange for the funds, it gave Kevin more pre-purchased Tokens. *See* Restatement (Third) of Restitution & Unjust Enrichment § 3 ("A person is not permitted to profit by his own wrong."). Further, part of the injustice Plaintiffs have alleged is that they were misled as to the date of release of Tokens, and that has yet to happen. So that would also make it unjust for Latinum to retain Plaintiffs' money if it were invested based on a false premise that Plaintiffs would receive the object of their investment by now.

Thus, Plaintiffs' unjust enrichment claim has been plausibly pled.

### 5. Conversion

Latinum's argument in favor of dismissing Plaintiffs' conversion claim is similar to its argument for dismissing unjust enrichment and therefore, similarly fails to persuade the Court.

"Conversion, both at common law and under the statute, is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Magley v. M&W Inc.*, 926 N.W.2d 1, 5–6 (Mich. Ct. App. 2018).

Latinum argues, once again, that because it retained "the funds for the account of [Kevin] as directed by [two of Plaintiffs]," dominion or control was not "wrongfully exercised, since that is what Plaintiffs directed, and since Latinum

51

gave consideration for the funds in the form of the pre-purchase of the Tokens at a set price." (ECF No. 19, PageID.341.)

For the reasons explained above, the Court finds that this interpretation of the facts does not make Plaintiffs' conversion claim implausible. Plaintiffs pled that they did not send the funds to Latinum so Kevin could enjoy "pre-purchase of the Tokens[.]" They pled that they sent the money to invest in Latinum's Token, which they never received. Plus, "a defendant who wrongfully exerts dominion over property is not shielded from liability on the basis that the action was undertaken in good faith on behalf of a third party." *Magley*, 926 N.W.2d at 5–6 ("Good faith, mistake, and ignorance are not defenses to a claim of conversion."). So even if Latinum wrongfully thought Plaintiffs were gifting money to Kevin for the pre-purchase of Tokens, that would not mean it did not "wrongfully exert" control over their property. Perhaps it would also be a different case if Plaintiffs sent the funds to Latinum and Latinum then sent the same funds to Kevin. But Latinum, according to Plaintiffs, is still in retention of their funds, even if it credited Kevin's account with the "prepurchase" of Tokens.

Therefore, the Court will not dismiss Plaintiffs' claim for conversion.

### 6. Negligence

To proceed on a negligence claim against Latinum, Plaintiffs must plausibly have pled, among other things, that Latinum had a duty to act. *See Romain v. Frankenmuth Mut. Ins. Co.*, 762 N.W.2d 911, 913 (Mich. 2009). The existence of a

duty is a question of law. *Hill v. Sears, Roebuck and Co.*, 822 N.W.2d 190, 195 (Mich. 2012).

Plaintiffs have alleged a few different duties that Latinum was supposed to comply with: one, that Latinum has a duty to monitor reasonably the investment activities and wire transfers it receives from persons and entities proclaiming to be accredited investors pursuant to 17 C.F.R. § 230.506(c), (ECF No. 11, PageID.279); two, a duty to inquire into the direct wire transfers it received from Plaintiffs with whom it had no written agreement or dealing other than through its agent, Kevin (*id.*); and three, a duty to ensure agents, like Kevin, do not make false representations in promoting Latinum's product (*id.* at PageID.279–280).

The regulation Plaintiffs cite in favor of the first proposed duty—to monitor the wire transfers Latinum receives from persons and entities proclaiming to be accredited investors—states that "[t]he issuer shall take reasonable steps to verify that purchasers of securities sold . . . are accredited investors." 17 C.F.R § 230.506(c). But the Court agrees with Latinum that, even if this establishes a duty in tort (which the Court does not decide), Plaintiffs have not stated they were harmed by Latinum's alleged failure to comply with this regulation. Indeed, Plaintiffs allege that they "would likely meet the definition of accredited investors[.]" (ECF No. 11, PageID.256.) And none of the damages Plaintiffs allegedly incurred could be plausibly caused by Latinum failing to exercise

reasonable care in verifying accredited investor status. So this theory fails to show a plausible negligence claim.

The second alleged duty is to inquire into the direct wire transfers Latinum received from Plaintiffs "with whom it had no written agreement or dealings (other than through its agent, [Kevin])." (ECF No. 11, PageID.279.) Plaintiffs have offered no case law or legal reasoning that would support the Court finding that such a duty exists. And the Court declines to do so absent any proffered analysis showing that "the social benefits of imposing a duty outweigh the social costs of imposing a duty." *Hill*, 822 N.W.2d at 196; *see also Williams v. Cunningham Drug Stores, Inc.*, 418 N.W.2d 381, 382 (1988) (holding that parties are usually not liable for "passive inaction or the failure to actively protect others from harm.").

So only the third theory, premised on monitoring agents like Kevin, remains. In the complaint, Plaintiffs allege that Latinum "negligently encouraged sales to the general public." (ECF No. 11, PageID.280.) And in its response, Plaintiffs argue that "Latinum knew or should have known that its representations, through agents like [Kevin], resulted in sales to the general public and induced illegal investments." (ECF No. 22, PageID.493.)

It is somewhat unclear what specific duty Plaintiffs claim Latinum owed in this context. To the extent Plaintiffs are arguing that Latinum is vicariously liable for Kevin's negligence, they have not made any arguments as to what duty Kevin owed Plaintiffs. And while they need not recover in negligence against Kevin to

recover for Latinum's vicarious liability, they do need to plausibly state "that an agent has acted negligently." *See Al-Shimmari v. Detroit Med. Ctr.*, 731 N.W.2d 29, 36 (Mich. 2007) ("Nothing in the nature of vicarious liability . . . requires that a judgment be rendered against the negligent agent. Rather, to succeed on a vicarious liability claim, a plaintiff need only prove that an agent has acted negligently."). While of course Plaintiffs have alleged that Kevin made several false statements to them and falsely induced their investment in Latinum, the Court fails to see how this form of negligence is meaningfully different than Plaintiffs' claim for negligent misrepresentation against Latinum and Kevin. (*See* ECF No. 11, PageID.278 ("At all times, [Kevin] was acting under the cloak of actual or apparent authority, which was furthered by Defendant Latinum's willingness to facilitate [Kevin's] selling to the general public[.]"). Indeed, many of the allegations supporting Plaintiffs' negligent misrepresentation claim are similar to the arguments Plaintiffs make in favor of negligence in their response. So to the extent the negligence claim is premised in Kevin's inducement of Plaintiffs' investment in Latinum, it is duplicative of Count 15 and will be dismissed.

The other duty that Plaintiffs could be asserting against Latinum is a duty to monitor its agents and their activities in promoting its Token. Plaintiffs have cited no authority in favor of such a duty to third parties in the sales context. The monitoring duty Plaintiffs described is similar to fiduciary duties owed by

directors and officers. *See Williamson v. Recovery Ltd. Partnership*, 467 F. App'x 382, 401 (6th Cir. 2012) (describing directors' fiduciary duties under Delaware law that "required them to oversee the actions of their officers and employees.").

But a corporation itself does not owe fiduciary duties. *Radol v. Thomas*, 772 F.2d 244, 258 (6th Cir. 1985) ("There is not, and could not conceptually be any authority that a corporation as an entity has a fiduciary duty to its shareholders."). And Plaintiffs have not sued any Latinum officers or directors, nor have they provided "special facts" that would support "such a heightened duty" between Latinum and themselves. *See Banker & Brisebois Co. v. Maddox*, 2014 WL 1720285, at *5–6 (Mich. Ct. App. 2014) ("[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one on the judgment and advice of another. However, the placement of trust, confidence, and reliance must be reasonable." (citing *Prentis Family Foundation, Inc. v. Barbara Ann Karmanos Cancer Inst.*, 698 N.W.2d 900 (2005))). So it cannot pursue this claim based on a breach of fiduciary duties.

For all of these reasons, Plaintiffs' negligence claim (Count 16) will be dismissed.

## V. Motion for Protective Order

While this motion was pending, Plaintiffs apparently issued some discovery requests to Latinum. Latinum moved to stay discovery because a dispositive motion was pending. (ECF No. 30, PageID.700.)

As this opinion rules on the pending motion to dismiss, the Court finds no reason to stay discovery at this point. So Latinum's motion for protective order is DENIED and the parties may pursue discovery prior to the scheduling conference.

Because the motion for protective order is denied, there is no need for Plaintiffs to file a sur-reply or for oral argument on the motion. (ECF No. 36.) So that motion is also DENIED.

## VI. Order

The Court largely denies Latinum's motion to dismiss. (ECF No. 19.)

This Court has personal jurisdiction over Latinum. As to the federal-securities-law claims, the nationwide service of process clause confers personal jurisdiction over Latinum. And the Court has pendent personal jurisdiction over Latinum for the state-law claims.

After considering the 12(b)(6) arguments, the Court finds that Plaintiffs have plausibly pled an agency relationship between Kevin and Latinum such that Kevin's actions can be attributed to Latinum at this stage. The Court also finds that, in part based on the agency relationship, Plaintiffs have plausibly pled all claims against Latinum with the exception of negligence and criminal wire fraud. Thus, the negligence claim (Count 16) and wire fraud claim (Count 12) will be DISMISSED.

Finally, the Court DENIES Latinum's motion for a protective order (ECF No. 30) as the only basis for staying discovery was the pending motion to dismiss,

and that motion is no longer pending. The Court thus also DENIES Plaintiffs'

motion for sur-reply. (ECF No. 36.)

SO ORDERED.

Dated: July 26, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE