UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JONNA, SIMON
JONNA, and FARID JAMARDOV,

      Plaintiffs,

v.

GIBF GP, INC., BITCOIN
LATINUM, and KEVIN JONNA,

      Defendants.

Case No. 22-10208
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN
PART KEVIN JONNA'S MOTION TO DISMISS [29] AND DENYING
KEVIN JONNA'S MOTION FOR PROTECTIVE ORDER [31]**

---

In the fall of 2021, Kevin Jonna claimed to have a lucrative investment opportunity for his cousins, Raymond and Simon Jonna, and Farid Jamardov. That opportunity was to invest in GIBF GP, Inc. (doing business as Bitcoin Latinum and referred to collectively as "Latinum") and its cryptocurrency, Token. Raymond, Simon, and Farid all say that Kevin made false statements about Latinum's Token that induced them to invest almost a half-a-million dollars. After they invested, Kevin evaded their calls and texts and would not give them clear answers as to their investment. And, say Plaintiffs, Kevin did all of this as Latinum's agent. After a few months of getting the run-around, Plaintiffs asked Kevin for their money back. They did not receive a response, nor their money nor any Tokens.

So Raymond, Simon, and Farid sued Kevin and Latinum, bringing a host of claims that mostly boil down to making false statements to induce Plaintiffs' investment and to unjustly retaining that investment.

Kevin Jonna moves to dismiss the complaint. As a threshold matter, Kevin states that, as a resident of California, this Court does not have personal jurisdiction over him. Apart from personal jurisdiction, Kevin also argues that Plaintiffs' complaint should be dismissed because the complaint does not distinguish allegations against Kevin from the allegations against Latinum. He also argues that many claims were not properly pled under Federal Rule of Civil Procedure 12(b)(6).

For the reasons given below, the Court DENIES IN PART Kevin's motion.

## I. Background

### A. Facts

Because Kevin seeks dismissal under Federal Rules of Civil Procedure 12(b)(2) and (6), and the Court is relying only on the parties' written submissions for Kevin's 12(b)(2) motion, the Court accepts the factual allegations in Plaintiffs' complaint as true and draws reasonable inferences from those allegations in Plaintiffs' favor. *See Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020). Plaintiffs and Kevin have also submitted affidavits, which the Court will discuss separately when considering personal jurisdiction.

GIBF GP, Inc.[1] (doing business as Bitcoin Latinum, like "Platinum" without the "P") is in the business of cryptocurrency. (ECF No. 11, PageID.230.) Latinum's cryptocurrency is called Token, which unlike, say, the U.S. dollar, "is created, distributed, traded, and stored with the use of a decentralized ledger system known as blockchain." (ECF No. 11, PageID.233.) Plaintiffs allege that Token's characteristics make it akin to a security. (*Id.*)

Plaintiffs were first introduced to Latinum via Kevin Jonna. Kevin Jonna is Raymond and Simon's cousin. (ECF No. 11, PageID.231.)

Kevin reached out to Simon about Latinum in September 2021. (ECF No. 11, PageID.240.) Kevin called Simon about a "massively lucrative opportunity" that was backed by an insurance conglomerate and partnered with other "prominent sponsors[.]" (*Id.*) Kevin told Simon about partnerships with Steve Wynn, Monsoon Blockchain, and conference calls with Brian Armstrong, the CEO of Coinbase. (*Id.*) Kevin also touted Latinum's demand, stating Simon "had very limited time to act to invest in Latinum." (*Id.* at PageID.241.)

Kevin also held himself out to be knowledgeable about the cryptocurrency industry and Latinum specifically. He sent Simon a screenshot of what he claimed was his personal bank account with funds over $50 million, which he stated was due to his success within the cryptocurrency space. (ECF No. 11, PageID.241.) He

---

[1] GIBF GP, Inc. and Bitcoin Latinum are represented by different counsel and therefore, filed a separate motion to dismiss (ECF No. 19), which the Court will address in a separate opinion.

claimed to have connections to Latinum's Board of Directors and CEO, who, according to Kevin, "readily would join ZOOM or conference calls to discuss what [Kevin] and Latinum CEO claimed to be the greatest investment of our lifetimes." (*Id.*)

Kevin also told Simon that he would "return Plaintiffs' investment in full" and "promised [Simon] that no withholding would occur[.]" (ECF No. 11, PageID.242.)

Based on Kevin's statements and Latinum's website, Simon says he invested $140,000 in Tokens. (*Id.*; *see also* ECF No. 11, PageID.243.) On September 30, he wired the money to a Wisconsin-based bank account owned by Jason Otto. (*Id.*) Simon believes Otto is an agent of Latinum's who earns a commission from promoting and inducing investment in Latinum's Token. (*Id.*)

Following his investment, Simon sent a screenshot of his Latinum "wallet" to Kevin. (ECF No. 11, PageID.243.) Kevin responded, "I didn't tell you to download it . . . you are violating our contract . . . that can result in termination of your coins." (*Id.*) Though not totally clear what this statement means, it appears that Kevin believed he and Simon had entered into a contract and per that agreement, Simon was not to have access to his wallet.

Kevin also sent Simon other text messages encouraging him to "put big money in it's better than any investment" and that Simon should "trust" him because "I know a lot." (*Id.*) So Simon invested another $100,000 in Tokens. (*Id.*)

After investing, Simon says he reached out to Kevin to get "more information" on the Tokens, including the "possession or value of the Tokens[.]" (*Id.*) He received no response. (*Id.*)

Raymond Jonna's story is much the same. In September 2021, Kevin sent Raymond articles about Latinum and told him how "Latinum was going to revolutionize the crypto space." (ECF No. 11, PageID.244.) On September 22, Raymond wire transferred $100,000 to invest in Token, though it is not clear to whom. (*See id.*)

About a month later, in October, Raymond began to become concerned about his investment. (*Id.*) Kevin "provided reassurance" by sending Raymond "screenshots of what [Kevin] displayed to purport to be LTNM [Latinum's trading symbol] trading at $201 per Token." (*Id.* at PageID.245.) Kevin also sent a screenshot reflecting LTNM trading at $212.64 per Token on Crypto Stake, and another screenshot reflecting LTNM trading at $699.99 per Token. (*Id.*)

Around October 27, Kevin asked Raymond for another investment in Tokens and sent him account information. (*Id.* at PageID.245.) Raymond wired another $100,000 to a Citibank account in New York in the name of GIBF GP, Inc. (*Id.*) He wrote "for Kevin Jonna" in the memo line. (*Id.*) Raymond says Latinum accepted his funds, and he received no inquiry from Latinum regarding the funds. (*Id.* at PageID.246.)

Kevin told Raymond that the Tokens would be released around the time Latinum launches in the United States. (*Id.*) He was "evasive" when it came to

Raymond's follow-up messages and phone calls, however. (*Id.*) On November 29, he told Raymond that the Tokens would be released in February 2022. (*Id.* at PageID.247.)

Farid Jamardov (who is apparently not Kevin's cousin) entered the story a little bit later, in October 2021. Kevin told Farid that he would "receive his Tokens the next day, after [Farid] transferred the funds for the investment." (*Id.*) Kevin also said that he assumed there would be no restriction on selling or trading Tokens, and that Farid "would be able to immediately sell Tokens for a profit at $20 per Token." (*Id.* at PageID.247–248.) He also represented that he was "only $110,000 away from reaching his targeted sales total of Tokens and getting a 'bonus' in connection with such sales." (*Id.* at PageID.248.)

On October 21, Farid transferred $101,045 to GIBF GP's Citibank Account with "for Kevin Jonna" in the memo. (*Id.*)

The next day, Farid asked for an update as to when the Tokens would be in his wallet. (*Id.*) Kevin said that there was a delay because of "high demand" but that the Tokens would be transferred on "October 25, 2021." (*Id.*)

On October 25, Farid again asked about the status of the Tokens. (*Id.*) Kevin said they "would go live on Digifinex at midnight." (*Id.*) Plaintiffs allege that Digifinex is "yet another platform on which Latinum has represented that Tokens are transferable or tradeable." (*Id.* at PageID.249.) Farid says that the Token did not go live as promised. (*Id.*)

6

From October to December 2021, Farid "made repeated attempts" to contact Kevin. (*Id.*) On December 8, Kevin said the Tokens would be released to himself on February 26, 2022. (*Id.*)

Plaintiffs contend that Kevin was acting as Latinum's agent when he convinced them to invest. (*See, e.g.*, ECF No. 11, PageID.253.) Farid states that, based on Kevin's statements that he had a sales target and expected a bonus, Latinum was paying Kevin a commission in connection with Kevin's offer and sale of Tokens. (ECF No. 11, PageID.248.) Plaintiffs state that Latinum uses its Simple Agreement for Future Tokens (SAFT) "as cover to deploy sales agents aimed at collecting funds from the general public." (ECF No. 11, PageID.253.) Specifically, "Latinum (1) knew of, supported, and encouraged sales efforts to the general public, (2) accepted funds from sources other than investors who executed its SAFT, and (3) gave commission-based compensation to its sales agents (those who executed SAFTs) to reward fundraising success." (ECF No. 11, PageID.253.) Plaintiffs state they have personal knowledge of "other Michigan residents who invested in Latinum through agents who executed SAFTs with Latinum then proceeded to fundraise to the public with Latinum's assistance." (*Id.* at PageID.256.) The SAFT states, in relevant part, that investors are purchasing Tokens "for [their] own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or

otherwise distributing the same." (*Id.* at PageID.256; *see also* ECF No. 22-2, PageID.514.)

Plaintiffs also state that Latinum's CEO "made themselves available to agents . . . to shore up the agents' credibility and status[.]" (ECF No. 11, PageID.256.) Though Plaintiffs never took Kevin up on his offer to meet Latinum's CEO, they know of other Michigan investors who did meet with Latinum's CEO. (*Id.*)

Latinum's and Kevin's connections to the poker community also support (at least according to Plaintiffs) Plaintiffs' perception that Kevin was Latinum's agent. Plaintiffs allege that Latinum "utilizes poker players and the poker community to market its Token[.]" (*Id.*) Kevin is a "high profile poker player." (*Id.*) Other such poker players turned Latinum agents include Brandon Cantu and Jason Otto. (*Id.* at PageID.254–255.) Phil Helmuth, a popular poker player, is paid by Latinum to promote its Token and has referenced Otto "several times" on Twitter. (*Id.* at PageID.255.)

In January 2022, apparently having had enough of Kevin's evasiveness, Raymond asked Kevin to return "all money" that each Plaintiff invested in Latinum within three business days. (ECF No. 11, PageID.247.) Farid also told Kevin he no longer wanted to invest. (*Id.* at PageID.249.) Plaintiffs have yet to receive their investment nor any Tokens from Kevin or Latinum. (*Id.* at PageID.243, 247, 249.) Plaintiffs allege that instead of giving them access to

Tokens, Latinum credited Kevin's account for the wire transfers with the pre-purchase of Tokens. (*Id.* at PageID.257.)

### B. Procedural History

Soon after their demand was ignored, Plaintiffs filed this suit against GIBF GP, Inc., Bitcoin Latinum, and Kevin. (ECF Nos. 1, 11.) The amended complaint alleges 16 counts under federal, California, and Michigan law. The federal counts include unregistered offer and sale of securities in violation of the Securities Exchange Act (Count 1); securities fraud in violation of Section 10(b) of the Securities Exchange Act (Count 3); rescission under Section 29(b) of the Securities Exchange Act (Count 5); and wire fraud under 18 U.S.C. § 1343 (Count 12). The California counts include unregistered offer and sale of securities in violation of the California Corporations Code (Count 2); securities fraud in violation of the California Corporations Code (Count 4); false advertising in violation of the California Business and Professions Code (Count 13); and unfair competition in violation of the California Business and Professions Code (Count 14). And the Michigan counts are fraudulent concealment (Count 6); fraudulent inducement (Count 7); fraudulent misrepresentation (Count 8); breach of contract (Count 9); unjust enrichment (Count 10); conversion (Count 11); and negligent misrepresentation (Count 15). The negligence count (Count 16) is alleged against only Latinum.

In response, Kevin moved to dismiss. (ECF No. 29.) While this motion was pending, Kevin also filed a motion for a protective order, which asked this Court

to stay discovery pursuant to the automatic-stay provision in the Private Securities Litigation Reform Act (PSLRA). (ECF No. 31.)

The parties' positions are briefed extensively, and the motions can be decided without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Standard of Review

In deciding a motion to dismiss under Rule 12(b)(6), the Court "construes the

complaint in the light most favorable" to Plaintiffs and determines whether their "complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Detailed factual allegations are not required to survive a motion to dismiss, *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012), but they must "raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). What is plausible is "a context-specific task" requiring this Court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Additionally, Plaintiffs have brought certain claims with elements that are subject to the heightened pleading standard found in Federal Rule of Civil Procedure 9(b) and the PSLRA. *See City of Taylor Gen. Empls. Retirement Sys. v. Astec Indus, Inc.*, 29 F.4th 802, 810 (6th Cir. 2022). The Court will discuss this standard more when it analyzes the relevant claims.

10

## III. Analysis

### A. Personal Jurisdiction

The Court starts, as it must, with jurisdiction.

Both parties agree that Kevin is a resident and citizen of California. (ECF No. 29, PageID.664; *see* ECF No. 32, PageID.782.) As such, they both proceed on the premise that, because this Court sits in diversity, personal jurisdiction is proper only if "courts of the forum state would be authorized to do so by state law—and any such exercise of jurisdiction must be compatible with the due process requirements of the United States Constitution." *See Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 502 (6th Cir. 2020).

While the parties are correct on the law that applies when the Court sits in diversity, they fail to mention this Court's ability to exercise personal jurisdiction pursuant to federal securities law.

### 1. Nationwide Service of Process

The Securities Exchange Act of 1934, which governs Plaintiffs' federal securities claims, provides for what is known as nationwide service of process. *See* 15 U.SC. § 78aa(a) ("Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."). The Sixth Circuit has interpreted that provision to confer personal

11

jurisdiction to any federal district court over any defendant with minimum contacts to the United States as a whole. *See United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993).

As a resident of California, Kevin has minimum contacts to the United States. (*See* ECF No. 29-1, PageID.687.) Kevin's presence within the relevant forum (here, the United States) makes it so he has readily satisfied the minimum contacts requirement. *See Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]"). So this Court has personal jurisdiction over Kevin as to Plaintiffs' Securities-Exchange-Act claims.

### 2. Pendent Personal Jurisdiction over State-Law claims

Personal jurisdiction over Plaintiffs' state-law claims still remains to be decided. The Court may apply the doctrine of pendent personal jurisdiction to these claims.

"The doctrine of pendent personal jurisdiction provides that where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available." *Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 88 (2d Cir. 2018).

Other federal courts have similarly used pendent personal jurisdiction to exercise personal jurisdiction over state-law claims where the plaintiffs have also

plausibly asserted federal claims with a nationwide service of process clause. *See Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 123 (3d. Cir. 2020) (applying pendent personal jurisdiction to state law claims "arising from the same nucleus of facts" as RICO claims); *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (same with respect to federal-antitrust claims); *Iron Workers Local Union No. 17 Ins. Fund v. Philip Morris Inc.*, 23 F.Supp.2d 796, 805 (N.D. Ohio 1998) (same with respect to RICO and federal-antitrust claims); *Clayton v. Heartland Resources, Inc.*, No. 1:08CV-94-M, 2008 WL 5046806, at *3–4 (W.D. Ky. Nov. 21, 2008) (same with respect to federal-securities violations); *Smith v. Swaffer*, 566 F.Supp.3d 791, 808 (N.D. Ohio 2021) (citing to pendent personal jurisdiction as an alternative basis for exercising jurisdiction); *see also United States v. Botefuhr*, 309 F.3d 1263, 1273 (10th Cir. 2002) ("[T]he majority of federal district courts and every circuit court of appeals to address the question have upheld the application of pendent personal jurisdiction[.]").

Given this authority, the Court chooses to exercise pendent personal jurisdiction. Plaintiffs' state-law claims all arise from "a common nucleus of operative facts" such that judicial efficiency and fairness allow the Court to exercise personal jurisdiction over those claims. *See Action Embroidery Corp.*, 368 F.3d at 1180–81 ("The district court may have discretion to dismiss the pendent claims where considerations of judicial economy, convenience and fairness to litigants' so dictate." (internal citations omitted)).

The statements Plaintiffs allege Kevin made form the basis of all the fraud-based claims. These claims include the unregistered offer and sale of securities, securities fraud, false advertising, and unfair competition under California state law, and fraudulent inducement and fraudulent misrepresentation under Michigan state law. Kevin's statements about Token, including about its availability and value, are what Plaintiffs allege form the fraudulent scheme that induced them to invest in Token. There is no separate set of facts that Plaintiffs allege that would apply to one claim but not the others. And Plaintiffs cite to Kevin's statements when asserting these claims. (*See e.g.*, ECF No. 11, PageID.264 (citing Kevin's messages as basis for fraudulent inducement).) So all of the fraud-based claims against Kevin arise from a common set of facts, and thus, it is proper to exercise pendent personal jurisdiction over Kevin for these claims.

Though negligent misrepresentation involves a different level of intent from the fraud-based claims, the same facts that are alleged to show scienter for the federal-securities claims would also be used to show that Kevin acted unreasonably in making certain statements. And again, the misrepresentations at issue in this claim are the same representations at issue in the securities-fraud claim. So pendent personal jurisdiction is proper here as well.

The same can be said about the fraudulent-concealment claim, as Plaintiffs allege that Kevin never told Plaintiffs he did not purchase Tokens on their behalf with the investment money. (ECF No. 11, PageID.263 ("Between September 2021

and January 2022 . . . [Kevin] . . . concealed that [Kevin] never purchased Tokens on behalf of Plaintiffs[.]").) That could be considered an omission for securities-fraud purposes as well as concealing a material fact for fraudulent-concealment purposes.

Plaintiffs' breach-of-contract claim is legally distinct from securities fraud, but the same set of facts would prove both. The basis of Plaintiffs' breach-of-contract claim is that Kevin's representations to Plaintiffs formed an agreement for the purchase of Token. In other words, Kevin agreed to facilitate the purchase of Token for Plaintiffs in exchange for Plaintiffs wiring money to Latinum. (ECF No. 11, PageID.268.) Though the question of contract formation is distinct from the question of fraud, what Kevin told Plaintiffs from September 2021 through January 2022 will need to be determined for both claims. And the issue of whether Kevin bought or issued Tokens to Plaintiffs will also need to be determined to establish both breach for the contract claim and loss-causation for the securities-fraud claim. The Court thus finds that pendent personal jurisdiction shall also be exercised over Kevin for the breach-of-contract claim.

Unjust enrichment and conversion also arise from a similar set of facts. Plaintiffs sending money to Latinum on behalf of Kevin and receiving no Token is the basis of Plaintiffs' loss-causation for securities fraud, i.e. that their reliance on Latinum's and Kevin's representations caused them harm. And Kevin's alleged retention of Plaintiffs' right to pre-purchase Tokens (or whatever Latinum credited to his account for the money Plaintiffs" sent to Latinum) explains why

Plaintiffs did not receive any benefit from their investment, which goes toward their securities-fraud damages as well as their claims for unjust enrichment and conversion. So these two Michigan state-law claims also arise from the same set of facts that Plaintiffs allege show securities fraud.

In all, the Court finds that all state-law claims in Plaintiffs' complaint arise from the same "nucleus" of facts as the federal claims. So the Court may exercise pendent personal jurisdiction over Kevin for the state-law claims.

### B. 12(b)(6) analysis

The Court will now address Kevin's arguments that Plaintiffs' have failed to adequately plead claims against him under Federal Rule of Civil Procedure 12(b)(6).

### 1. Group Pleading

Kevin first challenges Plaintiffs' claims by stating that the complaint improperly directs "legal conclusions in each count" collectively against Kevin and Latinum rather than separating them out. Kevin cites law that a defendant "is entitled to know what he or she did that is asserted as wrongful" and that it "is not the defendant's task to guess at which, if any, of an enormous complaint's allegations address [him.]" (ECF No. 29, PageID.677–678.)

As an initial matter, the Court notes that Kevin has asserted this argument by providing multiple block quotes of case law, followed by one sentence at the end that states, "Because Plaintiffs' FAC groups Latinum and Kevin Jonna together as one in the same and fails to identify which allegations are directed at which

Defendants, the FAC should be dismissed[.]" This is how many of Kevin's arguments in his motion proceed. The Court makes clear that such conclusory statements are not sufficient to persuade this Court to dismiss the complaint. *See Mcpherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones."); *see also United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("Issues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forfeited.").

Further, the complaint states which facts pertain to Kevin and which facts pertain to Latinum. Of course, the complaint also asserts that Kevin was Latinum's agent, so Kevin's actions would be attributable to Latinum. But the complaint quite clearly provides detailed allegations as to what Kevin did, so he need not "guess" at which allegations pertain to him. (*See, e.g.*, ECF No. 11, PageID.240 ("[Kevin] called [Simon] to praise Latinum as a massively lucrative opportunity[.]"); *id.* at PageID.241 ("[Kevin] spoke highly of his connection to the Latinum Board of Directors and his close affiliations with Latinum's purported creator and Chief Executive Officer . . . whom [Kevin] stated would readily join ZOOM or conference calls to discuss what [Kevin] and Latinum CEO claimed to be the greatest investment of our lifetimes."); (*id.* at PageID.242 ("[Kevin] expressed to [Simon] that if Latinum were to 'tank' prior to release, then he [Kevin] would return Plaintiffs' investment in full."); *id.* at PageID.244 (describing Kevin "sending [Raymond] screenshots of what [Kevin] displayed to purport to be

17

LTNM . . . trading at $201 per Token on cryptocurrency trading platforms."); *id.* at PageID.247 (:[Kevin] informed [Farid] that [Farid] would receive his Tokens the next day, after Farid transferred the funds for the investment.").)

True, most of the claims are alleged "against all defendants[.]" (*See, e.g.*, ECF No. 11, PageID.258.) But Plaintiffs "incorporate by reference all paragraphs above," including those that lay out Kevin's allegedly fraudulent actions specifically. And for certain claims, Plaintiffs also allege what Kevin did that forms the basis of the claim. (*See* ECF No. 11, PageID.263 (alleging that Kevin concealed that he never purchased Tokens on behalf of Plaintiffs); *id.* at PageID.264 (stating Kevin "sent multiple text messages to Plaintiffs" to "induce each to invest in Tokens[.]").)

So Plaintiffs' complaint will not be dismissed merely because they allege both Kevin and Latinum are liable for the same claim. It is quite clear from the complaint, and this Court's opinions on the motions to dismiss, what Kevin said or did that caused Plaintiffs to invest in Latinum.

### 2. Agency

Kevin also argues that Plaintiffs have not plausibly shown that Kevin was an agent of Latinum. (ECF No. 29, PageID.681.)

An "agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. 1992) (citing Restatement (Second) of Agency § 15.2). An agent may have actual or apparent authority to act on behalf of the principal.

Restatement (Third) of Agency §§ 2.01, 2.03. Plaintiffs argue that they have pled both forms of authority. The Court agrees.

Start with actual authority. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006); *see* Restatement (Second) of Agency § 26 (similar). Actual authority may be "implied," meaning that the "agent believes he possess[ed]" certain authority. *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992); *see also Wigfall v. City of Detroit*, 934 N.W.2d 760, 765 (Mich. 2019). But regardless of whether it is implied or not, actual authority is concerned with the actions of the principal and the reasonable beliefs of the agent.

The primary allegation that Kevin had actual authority is that Plaintiffs say Kevin was being paid a commission by Latinum based on the amount of investment he was responsible for bringing to Latinum. (*See* ECF No. 11, PageID.257 (alleging that Latinum paid agents like Kevin "transaction-based compensation in the form of commissions for fundraising and selling to the general public.").) According to Plaintiffs, Kevin stated that he had a "targeted sales total of Tokens" and that he would be "getting a bonus in connection with such sales." (*Id.* at PageID.248.)

Taking this allegation as true, Plaintiffs have provided some support that Latinum manifested its assent to Kevin's efforts to seek third-party investment

19

in Latinum's Token. If Latinum paid Kevin a commission, it would be plausible that Kevin was providing some sort of service to Latinum. And based on the allegations against Kevin in the complaint, the main service Kevin provided was encouraging Plaintiffs to invest in Latinum. Further, if Kevin was being paid by Latinum, it would be reasonable for him to believe that Latinum approved of his actions.

The Court also infers actual authority from the allegation that Kevin "spoke highly of his connection to the Latinum Board of Directors and his close affiliations with Latinum's purported creator and Chief Executive Officer . . . whom [Kevin] stated readily would join ZOOM or conference calls[.]" (ECF No. 11, PageID.241.) One reasonable inference based on this allegation is that Latinum's CEO offered to speak to the people whom Kevin was recruiting. If true, that offer would make it plausible that Latinum approved of Kevin's actions and therefore provided Kevin with actual authority to promote Latinum's Token.

This is especially so when, as Plaintiffs allege here, Latinum knowingly deployed sales agents like Kevin to collect "funds from the general public." (ECF No. 11, PageID.253.) Indeed, Plaintiffs allege that Latinum expressly deployed these agents and knowingly encouraged and supported their sales efforts to the general public. (*Id.*; *see also id.* at PageID.256.) So, according to Plaintiffs, Latinum was not an unaware principal throughout these events. Rather, Latinum instructed sales agents to fundraise for Token and supported and encouraged their efforts to do so.

There is one more theory that also supports Plaintiffs' actual-authority argument. That is ratification, defined as "the affirmance by a person of a prior act which did not bind him, but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Corcoran for Jackson v. Spartan Barricading & Traffic Control, Inc.*, No. 341009, 2018 WL 6185555, at *5 (Mich. Ct. App. Nov. 27, 2018) (citing *David v. Serges*, 129 N.W.2d 882, 883 (Mich. 1964)); *see also Dobronski v. NPS, Inc.*, No. 356617, 2022 WL 1194212, at *4–5 (Mich. Ct. App. Apr. 21, 2022) (citing Restatement (Third) of Agency § 4.01(1) (similar)); Restatement (Second) of Agency § 82 (same). A principal can ratify an act in two ways: by "manifesting assent that the act shall affect the person's legal relations" or "conduct that justifies a reasonable assumption that the person so consents." *Dobronski*, No. 356617, 2022 WL 1194212, at *4–5 (citing Restatement (Third) of Agency § 4.01(2)); Restatement (Second) of Agency § 83 (similar). Ratification can only occur, however, if the principal has "knowledge of the material facts, on which such conduct was based[.]" *David Stout Flour Mills v. Saginaw Cnty. Farm Bureau*, 213 N.W. 147, 149 (Mich. 1927).

Plaintiffs claim that they sent money directly to Latinum and Latinum accepted these funds without any objection or inquiry. (ECF No. 11, PageID.245, 248.) This, say Plaintiffs, shows that Latinum ratified Kevin's actions. Further, Plaintiffs state that they wrote "for Kevin Jonna" in the memo line of their

payments to Latinum, so Latinum was aware that they were investing due to their interactions with Kevin. (ECF No. 11, PageID.245, 257.)

Making reasonable inferences in favor of Plaintiffs, Latinum's inaction upon receipt of Plaintiffs' funds provides support that Latinum ratified Kevin's actions. Though Latinum may not have known about the details of Kevin's conversations with Plaintiffs, by accepting money that was sent for Kevin, it is reasonable to infer that Latinum was aware that Kevin was soliciting funds to invest in Latinum. And as the complaint alleges, Latinum did not ask Plaintiffs to complete the SAFT after receiving their funds or treat them as independent investors. Instead, Latinum credited Kevin's account with Plaintiffs' funds. (ECF No. 11, PageID.257.) Latinum argues that it was merely following the directions that accompanied the transfers, which stated the money was "for Kevin Jonna." But it would also be reasonable for Plaintiffs to assume that Latinum's acceptance of the money demonstrated its approval of Kevin's solicitation efforts as Latinum made no independent effort to communicate with Plaintiffs. *See Dobronski*, No. 356617, 2022 WL 1194212, at *4–5 (ratification includes "conduct that justifies a reasonable assumption that the person so consents." (citing Restatement (Third) of Agency § 4.01(2))). In other words, Latinum made no effort to establish a separate relationship with Plaintiffs as investors. Rather it accepted money from them on behalf of Kevin, so it would be reasonable for Plaintiffs to assume that Latinum approved of the arrangement of Kevin as a middleman.

So the Court concludes that Kevin had actual authority to act as Latinum's agent because it plausibly ratified his actions.

And Plaintiffs also plausibly pled that Kevin had apparent authority.

Like actual authority, apparent authority focuses on the principal's manifestations. *See* Restatement (Third) of Agency § 2.03 (2006) ("Apparent authority is the power held by an agent . . . when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations."); *Meretta,* 491 N.W.2d at 280 ("Apparent authority must be traceable to the principal and cannot be established by the acts and conduct of the agent." (citing *Smith v. Saginaw Sav. & Loan Assoc.,* 288 N.W.2d 613 (1979))); Restatement (Second) of Agency §27 (similar). "In determining whether an agent possesses apparent authority to perform a particular act, the court must look to all surrounding facts and circumstances." *Meretta,* 491 N.W.2d at 280. In other words, apparent authority is concerned with the actions of the principal and the beliefs of third parties, not with the beliefs of the agent.

Latinum took several actions that reasonably led Plaintiffs to believe that Kevin was Latinum's agent. One such action is Latinum's acceptance of payments from Plaintiffs. *See Verizon Directories Servs v. Allied Home Mortg. Capital Corp.*, No. 284577, 2009 WL 2448162, at *3 (Mich. Ct. App. Aug. 11, 2009) ("In this case, plaintiff did not simply rely on the statements of [agent] in ascertaining his authority. Defendant tendered payment on the contracts for over three years,

23

thereby ratifying the actions of its agent."); Restatement (Third) of Agency § 3.03 ("The determinative question is whether a third party can establish a linkage between statements of authority by the agent and a manifestation of assent by the principal to the making of such statements."). As discussed before, Latinum did not ask Plaintiffs for further information or treat them as they would other investors—it simply credited Kevin's account, seemingly approving his role in recruiting investors.

Another manifestation is Latinum's use of high-profile poker players as agents to promote Latinum's Token. Plaintiffs state that Latinum uses the "poker community to market its Token—as the gambling community is known to be a good market for cryptocurrency investments." (ECF No. 11, PageID.253.) And Kevin is allegedly a high-profile poker player. (*Id.*) Further, Simon wire transferred money to Jason Otto, who is also "part of the high-profile poker community and is referenced several times on poker star Phil Helmuth's social media account (Twitter). Significantly, Phil Hellmuth is a poker star who is paid by Bitcoin Latinum to promote its Token." (ECF No. 11, PageID.255.) Thus, based on Plaintiffs' knowledge of Latinum's connections to high-profile poker players, and Kevin's status as a high-profile poker player, it was reasonable for Plaintiffs to think that Kevin was an agent Latinum recruited to promote its product, much like Otto or Helmuth. *See* Restatement (Third) of Agency § 2.03, cmt. d (evaluating reasonableness of third party's belief includes determining whether agent acts according to "reasonable expectations based on analogous situations and other

24

relevant circumstances"). The poker connection alone would likely be insufficient to find Plaintiffs reasonably believed Kevin had authority to promote Latinum's Token (as there are most certainly high-profile poker players that have nothing to do with Latinum). But this allegation in light of the allegations that Latinum accepted Plaintiffs' money "on behalf of Kevin Jonna," and that Simon wired money to Otto upon Kevin's direction, makes it plausible that Plaintiffs reasonably believed Kevin had authority to act on behalf of Latinum based on Latinum's own actions.

Plaintiffs' allegation that Kevin offered meetings with Latinum's CEO further tips the scale in favor of finding it plausible that Kevin had apparent authority. Recall that with apparent authority, the focus is on the principal's manifestations to the third-party. To that end, Plaintiffs allege that they know Latinum's CEO has met with other investors in Michigan that were recruited by agents, just as Plaintiffs had been recruited by Kevin. (ECF No. 11, PageID.253 ("Here, for example, although Plaintiffs did not accept [Kevin's] offer to discuss their investment with Latinum CEO, they were aware of other Michigan residents who did.").) Critically, here, Plaintiffs allege that Latinum's CEO was willing to meet with—and in fact had met with—investors such as themselves through promoters. This provides the necessary link from the principal to the third party for apparent authority.

* * *

25

In sum, Plaintiffs' allegations that Latinum paid Kevin a commission for his promotion efforts and that Latinum executives offered to meet with the investors Kevin recruited provide some limited evidence that Kevin was acting with actual authority when inducing Plaintiffs to invest in Latinum. And Plaintiffs' allegations that Latinum accepted money from them without executing a SAFT and with knowledge that it was on behalf of Kevin makes it plausible that Latinum ratified Kevin's actions, which supports actual authority. *See* Restatement (Third) of Agency § 4.02 ("[R]atification retroactively creates the effects of actual authority."). So at least at the motion-to-dismiss stage, this is enough to plausibly allege that Kevin had actual authority to act on Latinum's behalf.

Beyond actual authority, Plaintiffs have sufficiently pled that Kevin had apparent authority based on Latinum's manifestations. These manifestations include accepting Plaintiffs' investment without further inquiry or communication, using high-profile poker players as agents to promote Latinum's Token, and making Latinum's CEO available to other Michigan investors to encourage investment. These manifestations made it reasonable for Plaintiffs to believe that Kevin was also acting as an agent, and lent credence to his statements that he was in touch with Latinum and getting his information from Latinum directly.

So the Court finds that Plaintiffs have plausibly pled that Kevin acted as an agent for Latinum.

### 3. Fraud claims

Kevin makes a general argument that all of Plaintiffs' fraud claims fail to meet the heightened requirements of Federal Rule of Civil Procedure 9(b). Because Kevin does not separate out his challenge to the fraud claims on a claim-by-claim basis, and the Court has already found that all of the claims arise from the same set of facts, the Court will only analyze whether the federal-securities-fraud claim is properly pled. If it is, then it appears that Kevin agrees the other fraud claims would be too as he makes no separate arguments pertaining to them.

Securities fraud requires pleading (1) a misstatement or omission in connection with the purchase or sale of a security, (2) of a material fact, (3) made with scienter, (4) upon which the plaintiff justifiably relied, and (5) which proximately caused the plaintiff's injury. *City of Taylor Gen. Emp. Retirement Sys. v. Astec Indus, Inc.*, 29 F.4th 802, 810 (6th Cir. 2022). Kevin's argument gestures at case law regarding a misstatement or omission and scienter. So those are the two elements this Court will address.

*Misrepresentation or omission.* To properly plead a material misrepresentation or omission, Plaintiffs must meet the standard set out in Federal Rule of Civil Procedure 9(b) and the PSLRA. This means that they must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *City of Taylor Gen. Emp. Retirement Sys.*, 29 F.4th at 810 (citing *La. Sch. Emps. Retirement Sys. v. Ernst & Young*, 622 F.3d

27

471, 478 (6th Cir. 2010)). In other words, the complaint must allege the "who, what, where, when, and why" of the fraudulent statements. *Id.*

Much of the "who, what, where, [and] when" is clear from the complaint. For example, with respect to Simon, Plaintiffs allege that Kevin called Simon in September 2021 to "praise Latinum as a massively lucrative opportunity[.]" (ECF No. 11, PageID.240.) Kevin called Latinum's Token the "greatest investment of our lifetimes." (*Id.*) He also told Simon that Latinum would not withhold Simon's investment if "Latinum were to 'tank' prior to release," that Tokens would be disbursed to investors "immediately upon launch," and that Simon should "[p]ut big money in it it's better than any investment." (ECF No. 11, PageID.242–243.) Raymond Jonna was the target of similar statements from Kevin in October 2021, including a representation that Token was "trading at $201 per Token on cryptocurrency trading platforms." (ECF No 11, PageID.245.) And on November 29, 2021, Kevin told Raymond that "the Tokens will be released in February 2022." (*Id.* at PageID.247.) Similarly, in October 2021, Kevin told Farid that he "would receive his tokens the next day" and that there would be no restrictions on selling or trading Tokens. (*Id.* at PageID.247.) As far as omissions, Plaintiffs allege that Kevin failed to provide information to Simon regarding "the possession or value of the Tokens" and likewise failed to provide Farid information as to when he would get his Tokens. (*Id.* at PageID.243, 248.)

The "why" is also straightforward for many of these statements. Plaintiffs allege they have not received Tokens to date, which explains why Kevin's

28

statements regarding when Plaintiffs would receive their Tokens are false. And the statements representing that Tokens could be sold or traded without restriction, or were available on certain platforms, are alleged to have been false because the Token cannot be sold or traded without restriction at this point and has not been made available on certain platforms for public trading. (*See* ECF No. 11, PageID.249.) Further, Plaintiffs explain that because Token has yet to be released, it is impossible to sell, which allegedly contradicts Kevin's claims that the Token can be resold without restriction and at a certain price. (*See id.* at PageID.252.)

As for some of Kevin's other statements regarding the Token being the "greatest" investment of Plaintiffs' lifetimes, it is more difficult to evaluate why they are false other than Plaintiffs' general allegation that the Tokens have minimal value. To Kevin's point, these statements fall more in the category of puffery as opposed to material guarantees from Latinum. (*See* ECF No. 29, PageID.681–682.)

Nevertheless, given that there are a number of other more factual statements where Plaintiffs have given a more direct explanation as to why they are false, the Court finds that that material representation or omission prongs of securities fraud have been adequately pled under Rule 9(b) and the PSLRA.

*Scienter.* Scienter is defined as "knowing and deliberate intent to manipulate, deceive, or defraud" or "recklessness." *City of Taylor Gen. Empl.*

29

*Retirement Sys.*, 29 F.4th at 812 (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)).

Scienter also must be pled with particular "'facts giving rise to a strong inference that the defendant acted with the required state of mind' in violating securities laws." *Id.* (citing 15 U.S.C. § 78u-4(b)(2)(A)). Hence, the "strong inference" requirement is more stringent than the plausibility requirements of Rule 12(b)(6). It requires that the inference be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). In evaluating scienter at the motion-to-dismiss stage, courts "must consider 'plausible opposing inferences.'" *City of Taylor Gen. Emp. Retirement Sys.*, 29 F.4th at 812 (citing *Tellabs*, 551 U.S. at 323).

The Sixth Circuit uses a three-part test to evaluate the sufficiency of a plaintiff's scienter allegations. *Doughterty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 979 (6th Cir. 2018). As with all motions to dismiss, the Court first accepts the factual allegations in the complaint as true. *See Tellabs*, 551 U.S. at 322. Then, considering the allegations "holistically," it will determine "whether all the facts alleged taken collectively, give rise to a strong inference of scienter." *City of Taylor Gen. Emp. Retirement Sys.*, 29 F.4th at 812 (citing *Dougherty*, 905 F.3d at 979). Third, the Court will take account of "plausible opposing inferences" and "decide whether a reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

30

To echo the Sixth Circuit in other securities cases, a review of Kevin's statements to Plaintiffs reveals a theme. *See City of Taylor Gen. Emp. Retirement Sys.*, 29 F.4th at 813 ("Suffice it to say that a holistic review of Brock's statements reveals a theme: relentless, unfounded optimism that was contradicted by the undisclosed facts."). That theme is persistently pursuing investment in Token even if it meant brushing off or ignoring key details about the availability and value of it.

Kevin's statements as to when the Tokens would be available is the most obvious example of this. Kevin told Raymond that the Tokens would be released around the time Latinum launched in the United States. (ECF No. 11, Page ID.246.) He also told Raymond that the Tokens would be available in February 2022. (*Id.*) In October 2021, he told Farid that the Tokens would be available the next day. (ECF No. 11, PageID.247.) Around October 21, Kevin said he did not know when the Tokens would be available. (*Id.* at PageID.248.) Then on October 22, Kevin said the Tokens would transfer on October 25. (*Id.*) Later on December 8, Kevin said the Tokens would be released on February 26, 2022. (*Id.* at PageID.249.) To date, Plaintiffs have not received any Tokens. (*Id.* at PageID.243, 247, 249.) The number of different dates Kevin provided Plaintiffs as to when they would receive Tokens demonstrates Kevin's intentional, or, at least, reckless, disregard for the truth. Each time a promised date of release passed, Kevin changed his story to push the release back even further. *See Doshi v. Gen Cable*

*Corp.*, 823 F.3d 1032, 1039–40 (6th Cir. 2016) (finding one factor relevant to scienter is "disregard of the most current factual information[.]").

Kevin's statements about the transferability of the Tokens were also made without nuance. Kevin told Farid there would be no restrictions on selling or trading Tokens. (ECF No. 11, PageID.247.) But since Token has yet to be released to investors, broad statements about the transferability of Token without mentioning that investors have yet to actually use these exchanges could mislead potential investors about the value of Token.

And importantly, Kevin's statements cannot be protected by claiming they were made with "mere ignorance." *See City of Taylor Gen. Empl. Retirement Sys.*, 29 F.4th 813. For Kevin stated that he had insider access to Latinum's board of directors and Latinum's CEO, joined high-level investor calls, and could request Latinum's CEO to join Zoom calls with potential investors. (ECF No. 11, PageID.240–241.) If true, Kevin would have access to material information about Latinum, which would reasonably include when Token would be available. And Kevin apparently had exclusive access to the "wallet" that reflected his and Plaintiffs' investment. (ECF No. 11, PageID.246.) In fact, Kevin told Simon that downloading his Latinum "wallet" would "result in termination of your coins" because it would violate their contract. (*Id.* at PageID.243.) That exclusive access would also likely inform an individual when the Tokens they purchased would actually be available to resell and trade. Or at the very least, Kevin could have not promised any date of availability. Despite his alleged connections to Latinum,

however, Kevin was either dishonest about what he knew or recklessly avoided providing details so he would not have to reveal how little he knew. Either way, this evidence creates an inference of scienter.

So the Court will not dismiss any of Plaintiffs' fraud claims based on Kevin's argument that the requirements of Rule 9 and the PSLRA were not met.

### 4. Breach of Contract

Kevin asserts that Plaintiffs only allege that he entered into a contract with them "as an agent and representative of Latinum." (ECF No. 29, PageID.685.) So he cannot be personally liable for breach of contract because he is not a party to any alleged contract—Latinum is.

Kevin is correct about the allegation he cited. Plaintiffs also allege, however, that Kevin had obligations under the agreement "to purchase Tokens from Latinum on Plaintiffs' behalf," and that Kevin failed to do so. (ECF No. 11, PageID.268.) Plus, Plaintiffs are allowed to allege that, in the alternative to Kevin being Latinum's agent, he also made certain agreements with Plaintiffs on his own that he did not follow. And Plaintiffs allege that Kevin told Simon that he was "violating our contract" by downloading his Latinum wallet, which implies that Kevin had an agreement directly with Plaintiffs. (*See* ECF No. 11, PageID.242.) So the Court will not dismiss the breach-of-contract claim against Kevin because he was allegedly acting as Latinum's agent when entering into the agreement.

### 5. Conversion and Unjust Enrichment

Kevin presents the same argument as to why Plaintiffs' claims of conversion and unjust enrichment should be dismissed—that Plaintiffs did not allege they sent money to Kevin, so Kevin could not have been "enriched" nor exercised "dominion" over another's personal property. (ECF No. 29, PageID.685.)

The Court agrees that Plaintiffs have not alleged that they sent Kevin any money. Indeed, Plaintiffs do not argue as much in their response. (*See* ECF No. 32, PageID.797 ("KJ holds the contract with Latinum that purports to grant him ownership of Tokens that were presumably paid for with Plaintiffs' money."); *id.* ("[Kevin] completely ignores the fact that he holds the purported rights . . . to the Tokens paid-for by Plaintiffs.").)

Plaintiffs' arguments do, however, describe how Kevin derived some benefit from Plaintiffs wiring money to Latinum. And Plaintiffs allege that Latinum "gave [Kevin's] account credit for Plaintiffs' wire transfers[.]" (ECF No. 11, PageID.257.)

The Court finds that if Kevin received the opportunity to pre-purchase Tokens as a result of Plaintiffs wiring money to Latinum, he was plausibly enriched in some way. *See Wright v. Genesee Cnty.*, 934 N.W.2d 805, 809 (Mich. 2019) ("Unjust enrichment is a cause of action to correct a defendant's unjust retention of a benefit owed to another."). And if the arrangement was truly that Plaintiffs should have received the pre-purchase of Tokens (or the Tokens themselves), then it is plausible that Kevin wrongfully asserted dominion over Plaintiffs' property. *See Magley v. M&W Inc.*, 926 N.W.2d 1, 5–6 (Mich. Ct. App.

34

2018) ("Conversion, both at common law and under the statute, is defined as any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein.").

So the Court will not dismiss the unjust-enrichment or conversion claims at this stage.

### 6. Wire Fraud

The Court will dismiss Plaintiffs' claim of wire fraud, which is alleged under a federal criminal statute for which Plaintiffs have no private right of action. *See, e.g., Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 386 (6th Cir. 1997) (finding no private right of action under mail fraud and wire fraud statutes); *Ryan v. Ohio Edison Co.*, 611 F.2d 1170, 1177-79 (6th Cir. 1979) (holding there is no private right of action under the mail fraud statute).

## IV. Motion for Protective Order

While this motion was pending, Plaintiffs apparently issued some discovery requests to Kevin. Kevin moved to stay discovery under a provision of the PSLRA that automatically stays discovery pending a motion to dismiss. (ECF No. 31, PageID.746.)

As this opinion rules on the pending motion to dismiss, the Court finds no reason to stay discovery moving forward. So Kevin's motion for protective order is DENIED the parties may pursue discovery prior to the scheduling conference.

## V. Order

For the foregoing reasons, the Court will DENY IN PART Kevin's motion to dismiss. (ECF No. 29.) This Court has personal jurisdiction over Kevin for the federal-securities claims because of the Securities Exchange Act's nationwide-service-of-process clause and it has pendent personal jurisdiction over the state-law claims.

The Court largely rejects Kevin's arguments for dismissal under Rule 12(b)(6), but it will dismiss the Plaintiffs' wire fraud claim (Count 12) against Kevin.

Resolution of the pending motion to dismiss also moots Kevin's argument for staying discovery pursuant to the PSLRA. So the motion for protective order (ECF No. 31) is DENIED and the parties may pursue discovery prior to the scheduling conference.

SO ORDERED.

Dated: July 26, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE