# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

_____

RAYMOND JONNA, SIMON JONNA,
and FARID JAMARDOV,
        Plaintiffs,

v.

KEVIN JONNA, and GIBF GP, INC.
d/b/a BITCOIN LATINUM,
        Defendants.

_____

Case No. 22-cv-10208

U.S. District Court Judge:
Hon. Laurie J. Michelson
U.S. Magistrate Judge:
Hon. Jonathan J.C. Grey

## DEFENDANT GIBF GP, INC.'S MOTION TO BIFURCATE DISCOVERY PURSUANT TO FED. R. CIV. P. 42(b)

Defendant GIBF GP, Inc. d/b/a Bitcoin Latinum ("Defendant" or "Latinum"), through its counsel, the law firm Cooper Levenson, P.A., hereby moves pursuant to Fed. R. Civ. P. 42(b) to bifurcate from plenary discovery the issue of: whether a principal-agent relationship existed between Latinum and Co-Defendant Kevin Jonna ("Jonna") or whether Jonna was acting as Plaintiffs' agent for the transaction.

This Motion to Bifurcate Discovery is based upon the pleadings and papers on file herein, the attached Memorandum of Law, and oral argument to be made by Counsel at any hearing held on this matter. Concurrence in the relief requested was discussed among counsel and denied by Plaintiffs.

Dated: November 10, 2022

By: /s/ Eric A. Browndorf
    Eric A. Browndorf, Esq.
    William P. Rubley, Esq.
    1415 Marlton Pike East
    Cherry Hill Plaza, Suite 205
    Cherry Hill, NJ 08034
    (856) 795-9110; Fax: (856) 795-8641
    ebrowndorf@cooperlevenson.com
    wrubley@cooperlevenson.com

    *Attorneys for Defendant Bitcoin Latinum*

By: /s/ Patrick C. Lannen
    Patrick C. Lannen, Esq. (P73031)
    John R. Stevenson (P70241)
    38505 Woodward Ave., Suite 100
    Bloomfield Hills, MI 48304
    Bloomfield, MI 48304
    (248) 901-4027
    plannen@plunkettcooney.com
    jstevenson@plunkettcooney.com

    *Attorneys for Defendant Bitcoin Latinum*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

RAYMOND JONNA, SIMON JONNA,  
and FARID JAMARDOV,  
    Plaintiffs,

v.

KEVIN JONNA, and GIBF GP, INC.  
d/b/a BITCOIN LATINUM,  
    Defendants.

_____

:  
:  
:  
:  
:  
:  
:  
:  
:  
:  
:

Case No. 22-cv-10208

U.S. District Court Judge:  
Hon. Laurie J. Michelson  
U.S. Magistrate Judge:  
Hon. Jonathan J.C. Grey

## DEFENDANT GIBF GP, INC.'S BRIEF IN SUPPORT OF MOTION TO BIFURCATE DISCOVERY PURSUANT TO FED. R. CIV. P. 42(b)

## <u>STATEMENT OF THE ISSUE PRESENTED</u>

I.    Plaintiffs' case depends on the existence of an agency relationship between Latinum and Kevin Jonna. Discovery has already shown that Plaintiffs did not believe Kevin Jonna was Latinum's agent but in contrast was their agent. Kevin Jonna attested to the same. Should the Court bifurcate the issue of agency from plenary discovery?

Latinum answers: Yes.

Plaintiffs answer: No.

## TABLE OF CONTROLLING AUTHORITIES

*Brakebill v. Moncier*,
No. 3:14-cv-105, 2014 U.S. Dist. LEXIS 160026, at *4 - *5 (E.D. Tenn. Nov. 14, 2014)………………………………………………………………21

*In re Benedictin Litg*
857 F.2d 290, 320 (6th Cir. 1988)……………………………………………..22

*Maenner v. St. Paul Fire & Marine Ins. Co*.,
127 F.R.D. 488, 490-91 (W.D. Mich. 1989)…………………………………7

*Mais v. Allianz Life Ins. Co. of N. Am*.,
34 F. Supp. 3d 754, 762……………………………………………………..21

*Meretta v. Peach*,
491 N.W.2d 278, 280 (Mich. Ct. App. 1992)………………………………21

*Nationwide Mut. Fire Ins. Co. v. Jahic*,
No. 3:11-cv-00155, U.S. Dist. LEXIS 1798, at *8 (W.D. Kty. Jan. 7, 2013)..21

*Smith v. Allstate Ins. Co*.,
403 F.3d 401, 407 (6th Cir. 2005)…………………………………………..21

## I.     STATEMENT OF FACTS

This action involves both an extremely complex cryptocurrency platform and a family dynamic rooted in deceit and dishonesty. In October of 2021, Latinum offered accredited investors the opportunity to pre-purchase Latinum Tokens ("Tokens") at a set price so long as they entered into a Simple Agreement for Future Token ("SAFT"). Interested investors could only purchase Tokens if they were accredited as that term is defined by Rule 501(a) of Regulation D under the Securities Act, 17 C.F.R. §230.501 et seq., and if they agreed to be bound by certain terms contained in the SAFT — including but not limited to acknowledging that the right to purchase future Tokens was non-transferable, was for their own account, and was with full knowledge of the risks associated with such an investment.

Kevin Jonna signed the SAFT. Prior to doing so, he began discussing with Plaintiffs the idea that they would give him money to purchase Tokens because he could purchase them, he and Plaintiffs believed, at a price less expense than the price at which Plaintiffs could purchase Tokens on a publicly accessible exchange.

It is alleged that, in September 2021, Kevin Jonna induced Simon Jonna to give him $140,000 for 10,000 Tokens at $14 per Token, and an additional $100,000 for 4,000 Tokens at $25 per Token. It is also alleged, that, in September 2021, Kevin Jonna also induced Plaintiff Raymond Jonna to give him $100,000 for approximately 7,143 Tokens at $14 per Token.

The facts already uncovered show Plaintiffs knew they were investing through Kevin Jonna and not in Latinum, or directly in Tokens. The facts show Plaintiffs *knew* they could have sought to purchase Tokens directly on an exchange but decided to use Kevin Jonna as their agent instead. Plaintiffs were motivated only by the idea that they could obtain a sale price for an interest in Tokens through Kevin. All of this occurred without Latinum's knowledge.

Plaintiffs have failed to allege in the Complaint or otherwise (much less show) that Latinum ever communicated with them. Additionally, Plaintiffs fail to allege (or show) that Latinum had any knowledge of Jonna's activities and/or ever provided him with the authority to act in the manner in which he did, i.e. taking money from his own family members so he (and them) could profit in breach of the SAFT. As discussed in further detail below, what is clear is that Jonna acted as Plaintiffs agent, pre-purchasing to Tokens in his own name so Plaintiffs would receive indirectly a discounted rate.

## II.     LEGAL STANDARD

Rule 42(b) of the Federal Rules of Civil Procedure allows the court to bifurcate trial if such an action would be "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed. R. Civ P. 42(b). "Only one of these criteria needs to be met to justify bifurcation" and the language of Rule 42(b) places the decision to determine

2

what issues or claims should be tried separately within the discretion of the district court. *Saxion v. Titan-C-Manufacturing, Inc.,* 86 F.3d 553, 556 (6th Cir. 1996). The principal purpose of Rule 42(b) "is to enable the trial judge to dispose of a case in a way that advances judicial efficiency and is fair to the parties." *In re Bendectin Litigation,* 857 F.2d 290, 307 (6th Cir.1988). "In deciding whether one trial or separate trials will best serve the convenience of the parties and the court, avoid prejudice, and minimize expense and delay, the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." *Id.*

The Sixth Circuit has specifically held that "whether the resolution of a single issue would be dispositive of an entire claim is highly relevant in determining the efficacy of bifurcation." *In re Beverly Hills Fire Litig.,* 695 F.2d 207, 216 (6th Cir. 1982; *Honican v. Stonebridge Life Ins. Co.*, No. CIV.A. 05-73-DLB, 2005 WL 2614904, at *1–2 (E.D. Ky. Oct. 13, 2005).

Bifurcating issues and discovery is highly appropriate if efficiency and convenience would be accomplished. *Cook v. United Services Auto. Ass'n,* 169 F.R.D. 359, 361 (D. Nevada 1996); *Honican v. Stonebridge Life Ins. Co.*, No. CIV.A. 05-73-DLB, 2005 WL 2614904, at *2 (E.D. Ky. Oct. 13, 2005). Although "bifurcation of the trial does not necessarily require bifurcation of discovery," the decision to stay to discovery is within the discretion of the trial court. *Cook v. United States Auto. Ass'n,* 169 F.R.D. at 362. "One of the purposes

3

of bifurcation under Rule 42(b) is to defer costly discovery and trial preparation costs pending the resolution of preliminary liability issues." *Novopharm Ltd. v. Torpharm, Inc.,* 181 F.R.D. 308, 312 (E.D.N.C.1998). As such, one of the major benefits of bifurcation is the simplification of discovery. *Id.*

"To determine whether bifurcating discovery is appropriate, courts consider the benefits and detriments to each party's interest, as well as the Court's interest in reaching a just, speedy and efficient resolution of the issues raised by the pleadings." *Chenault v. Beiersdorf, Inc*., No. 1:20-cv-174, 2020 U.S. Dist. LEXIS 153068, at *4 (S.D. Ohio Aug 24, 2020) (internal quotation marks omitted) (quoting *Woods v. State Farm Fire & Casu. Co*., No. 2:09-cv-482, 2010 U.S. Dist. LEXIS 35230, at *3 (S.D. Ohio Mar. 16, 2010)). "Courts may bifurcate discovery if it serves judicial economy and does not unfairly prejudice any party." *Id*. at *4 (internal quotation marks omitted) (quoting *Galloway v. Nationwide Mut. Fire. Ins. Co.*, No. 3:09-cv-491, 2010 U.S. Dist. LEXIS 106520, at *1 (W.D. Ky. Oct. 5, 2010)).

"Whether to bifurcate is left to the sound discretion of the trial judge." *Farmers Bank v. BancInsure, Inc.*, No. 2:10-cv-02222, 2011 U.S. Dist. LEXIS 59649, at *4 (W.D. Tenn. May 20, 2011) (citing *Payne v. A.O. Smith Corp*., 99 F.R.D. 534, 536 (S.D. Ohio 1983)). "The principal purpose of [] rule [42(b)] is to enable the trial judge to dispose of a case in a way that both advances judicial efficiency and is fair to the parties." *Donnita Robinson*, 2022 U.S. Dist. LEXIS

4

170552, at *9 (internal quotation marks omitted) (quoting *In re Benedictin Litg*., 857 F.2d 290 at 307)).

## III.   ARGUMENT

Latinum requests to bifurcate discovery on the issue of agency pursuant to Fed. R. Civ. P 42(b) from plenary discovery. The Court should grant this request based on two grounds: (1) bifurcating the discovery period on the principal-agent relationship issue will avoid prejudice against Latinum given the complex nature of this action, and (2) bifurcation will promote judicial economy and expedite this litigation by avoiding a costly discovery on noncritical issues since the issue of agency is dispositive to the ultimate disposition of this case. Defendant addresses each ground supporting bifurcation of discovery on the agency issue in turn.

### A. Avoiding Prejudice

Latinum will be prejudiced if Plaintiffs cannot establish a principal-agent relationship between Latinum and Jonna. This case involves a novel and extremely complex cryptocurrency block-chain platform, and the sale of future Tokens to Plaintiffs through Jonna's personal Latinum account. Specifically, Jonna acted as an agent of Plaintiffs to facilitate the pre-purchase of Tokens at a discounted rate for Plaintiffs through his personal Latinum account.

No Tokens have been released. Kevin Jonna has allegedly used his relatives' money to prepurchase Tokens in his own name at a discounted, preferred rate, after

having signed the SAFT. "[I]n complex cases with complex issues, justice is often best served if issues are separated." *Maenner v. St. Paul Fire & Marine Ins. Co.*, 127 F.R.D. 488, 490-91 (W.D. Mich. 1989) (citing *Organic Chemicals, Inc. v. Carol Prod., Inc.*, 86 F.R.D. 468, 469 (W.D. Mich. 1980)). "District courts often bifurcate proceedings when factual issues are so complex that it would be more expeditious and less confusing to the jury, such as in tort cases involving liability and damages, intellectual property cases, and cases arising out of contracts, trust, and insurance agreements." *Blanchard v. City of Memphis*, No. 2:17-cv-02120, 2017 U.S. Dist. LEXIS 220801, at *7 (W.D. Tenn. Mar. 31, 2017) (citing Wright & Miller, Federal Practice and Procedure § 2389). While *Blanchard* dealt with bifurcation of a jury trial, the same principles hold true when a district court considers a motion to bifurcate discovery.

Here, Plaintiffs allege that Latinum acknowledged and encouraged Jonna to induce his family members to invest in Tokens, all while Jonna funneled the money through his own account. Yet, the only evidence Plaintiffs provide are statements directly from Jonna. Moreover, this case involves a complex cryptocurrency platform that, to date, has not released any Tokens to investors because the platform is still under development.

The issue of agency is central to this litigation and without establishing an agency relationship, Plaintiffs will fail to establish their causes of action. Plaintiffs

repeatedly claim Latinum encouraged Jonna to induce Plaintiffs to invest. But Plaintiffs recorded conversations with Jonna that prove otherwise. For example, during the limited discovery that has already been conducted on the agency issue, Plaintiffs and Kevin Jonna actually acknowledge the complete lack of agency between Jonna and Latinum. Specifically, during a telephonic conversation between Raymond Jonna and Jonna, the following statements were made:

> 23. like I –- I asked you before, like, what happens, Kev,
> 24. if something happened to you, God forbid, a million
> 25. times? like, does anybody know who Raymond –- Raymond
> ….
>
> 1. is or Simon (phonetic), you don't know?
> 2. MR. K. JONNA: Yes. I told them my brother
> 3. has a whole sheet.
> 4. MR. R. JONNA: Claude (phonetic) does?
> 5. MR. K. JONNA: Yes, yes. My brother has
> 6. everything. He has all of the money sent to me. I
> 7. had everything written on a –- on a, like, Excel
> 8. sheet.

**Ex. A** – Tr. of Telephonic Conversation Between Raymond Jonna and Kevin Jonna at 9:23-25, 10:1-8.

Here, Raymond Jonna questions Jonna because he is concerned that no one at Latinum knows who he is (or his relative Simon Jonna). In response, Jonna acknowledges this and tells Raymond that Claude (Kevin Jonna's brother) has a spread sheet, presumably listing all of the "investments" Jonna received from his family members and friends.

7

Critically, during the same conversation, Plaintiffs and Jonna acknowledge

the lack of a principal-agent relationship with Latinum, stating:

> 3. MR. K. JONNA: I am not withholding the
> 4. coins.
> 5. MR. R. JONNA: I know you're not. There's
> 6. no official board, there's no official place. There's
> 7. no official website that says, "Raymond Jonna has this
> 8. much invested and this many coins." Like, I worry
> 9. about that, but naturally, bro.
> 10. MR. K. JONNA: So, that's –- that's a worry
> 11. that you have to have with me –-
> 12. MR. R. JONNA: Right, right.
> 13. MR. K. JONNA: -- not with anything else.
> 14. That –- that –- that would –- that would be your trust
> 15. in me.
> 16. MR. R. JONNA: It is –- it is my trust in
> 17. you and I get the trust and I do trust you one hundred
> 18. percent. What I do worry –- what I do worry about,
> 19. though, is again, God forbid, bro, you never know what
> 20. happens. Like, does anybody know who I am? You know
> 21. what I mean? I –- I worry about that. Like, hey
> 22. guys, yes, I know –- I know -- you know, again, I
> 23. don't even like saying this because it's such worst
> 24. case scenario, you know, but –-

**Ex. A** – Tr. of Telephonic Conversation Between Raymond Jonna and Kevin Jonna
at 18:3-24.

Kevin Jonna confirms that nowhere in any of Latinum's records is there any

information that would indicate that Raymond Jonna "invested" in Bitcoin Latinum.

This is unsurprising because Kevin Jonna, as Plaintiffs' agent, apparently agreed

with Plaintiffs to only funnel funds through Kevin Jonna's personal Latinum

account.

During another conversation between Raymond Jonna and Jonna, Kevin Jonna specifically states that everything goes through him and Raymond will not receive any confirmation from Latinum. The transcript of this conversation reads:

> 5. **MR. K. JONNA**: Yes. **You keep asking for a**
> 6. **confirmation. There is no confirmation, Ray. It's**
> 7. **through me. There is no other confirmation**. Like, I
> 8. –- I don't know how –- what other way to tell you
> 9. that.
> 10. **MR. R. JONNA: What do you mean?**
> 11. **MR. K. JONNA**: There is –- there's not –- **I**
> 12. **am your confirmation**. There's no, like –- I –- I can
> 13. create something for you from me. There's no other
> 14. way to give you –- because there's no confirmation.
> 15. You keep asking for these confirmations. There's just
> 16. no confirmation, man.
> 17. MR. R. JONNA: I don't get that though. You
> 18. bought –- you bought the coins, right?
> 19. MR. K. JONNA: Yes, but that's not your
> 20. confirmation. That's my confirmation.
> 21. MR. R. JONNA: Right.
> 22. MR. K. JONNA: That has nothing to do with
> 23. you guys.
> 24. MR. R. JONNA: I know, but can't you just
> 25. be, like, "Hey, guys. Here's your 10,000 coins or
> ….
> 1. 11,000 coins" or whatever the hell it is. "Here it is
> 2. in this wallet, screenshot. Here is what you guys own
> 3. right now." I mean, Kev, you have to understand
> 4. something too. It's not just me and Simon. Freddie
> 5. (phonetic) calls me once every three days, "Hey,
> 6. what's up, Ray? You talk to your cousin? Baby boy,"

Ex. B – Tr. of Telephonic Conversation Between Raymond Jonna and Kevin Jonna at 16:5-25, 17:1-6.

Remarkably, during the same conversation, Kevin Jonna affirms he is acting as Plaintiffs' agent and facilitating Plaintiffs' pre-purchase of Tokens at a preferred rate. During this conversation, it is acknowledged that Ray and Simon Jonna could have purchased Tokens directly from Latinum, but instead chose to purchase Tokens through Kevin Jonna under his umbrella as early investors. The conversation reads, in pertinent part, as follows:

> 10. MR. K. JONNA: -- crypto –- I said crypto is
> 11. a little bit different than the real estate business
> 12. you guys are in.
> 13. MR. R. JONNA: I –- I get that. I am not
> 14. talking about –-
> 15. MR. K. JONNA: Okay? **It's not in uniform,**
> **16. it's newer. Everything is a little bit different.**
> **17. It's almost more of a gray area.** It's not so black
> 18. and white. There's moving targets. There's just a
> 19. lot of things going on –-
> 20. MR. R. JONNA: Right.
> 21. MR. K. JONNA: -- and especially something
> **22. like this where you guys came into a privileged deal**
> **23. as early investors under my umbrella. It's all, like**
> **24. –- it's not normal.**
> 25. MR. R. JONNA: So –-
> ….
>
> 1. MR. K. JONNA: This isn't regular.
> 2. MR. R. JONNA: So, then why –- so, then why
> 3. –- so, then should we have just –- if we wanted this
> 4. security, if we wanted to feel good about it, like,
> 5. hey, here's our tokens, should we have just invested
> 6. with Latinum direct instead of going through you at 20
> 7. bucks?
> 8. MR. K. JONNA: Through the website, yes.
> 9. MR. R. JONNA: We should've –-
> 10. MR. K. JONNA: That would've been the way to

10

11. get your own stuff, through the website at -- at $20.
12. Yes.

**Ex. B** – Tr. of Telephonic Conversation Between Raymond Jonna and Jonna at 26:10-25, 27:1-12.

Simon Jonna was also aware that Plaintiffs could have invested directly through Latinum instead of using Kevin Jonna as an agent. In an email exchange between Simon Jonna, Erik Sharkey (Simon Jonna's business partner), and a Latinum representative, Simon Jonna discusses his interest in investing with Latinum and requests a quote for Token prices. Specifically, the email exchange reads "**my partner and I are big Commercial Real Estate Investors/Brokers in the Midwest and Southeast and we would like to invest heavily in Bitcoin Latinum**" and "**[w]e can also invest via USD $ wire etc. Just want to get in on pre-sale please. And know where it is held and what the logistics are . . . . [e]xcited about contributing**." **Ex. C** – Email Exchange Between Simon Jonna, Erik Sharkey, and Latinum at bates stamp BITCOIN000714, BITCOIN000710. Simon Jonna was acutely aware that he could invest directly with Latinum, rather than utilizing Kevin Jonna as his agent and investing under Jonna's "umbrella."

Here, by allowing bifurcated discovery on the issue of agency, prejudice will be prevented by permitting the parties to exchange any other information on the agency issue and Kevin Jonna and his family members' decision to funnel their "investment funds" through Kevin Jonna's personal Latinum account.

11

Bifurcated discovery is particularly important in this case because of the complexity involved in "selling" a future right to acquire Tokens and the way in which Kevin Jonna collected funds from his relatives and then purchased future Tokens from Latinum. As the transcripts establish, Kevin Jonna acted as an agent of Plaintiffs, not Latinum, promising Plaintiffs a discounted rate in Tokens under his "umbrella." Kevin Jonna admits, and Raymond and Simon Jonna acknowledge, repeatedly, Plaintiffs had the option to purchase Tokens directly from Latinum.

Similar to the Court's observation in *Maenner*, justice will be best served by bifurcation in this complex case involving complex issues. Bifurcating this case and ordering a separate discovery period on the agency issue will permit the parties to dispose of the central issue of agency before considering the remaining issues in Plaintiffs Complaint, thus preventing prejudice to either party. See *Fed. Express Corp. v. Accu-Sort Sys.*, No. 01-2503 Ma/P, 2005 U.S. Dist. LEXIS 50948, at *5 (W.D. Tenn. Mar. 31, 2005) (granting motion to bifurcate because the case involves "considerations involv[ing] complex issues that are separate from the underlying questions about liability"). The facts already show kevin Jonna was acting as Plaintiffs' agent and not Latinum's agent. If that is all the more agency discovery will show, then the Plaintiffs would be bound by the SAFT executed and delivered to Bitcoin by Jonna – which includes an arbitration provisions, various waivers and

12

releases, as well as limitations of liability. See in general **Ex. D**. All of this directly applies to Plaintiffs' claims asserted in their Second Amended Complaint.[1]

---

[1] The SAFT and related documents contain a multitude of waivers, releases, and acknowledgements:

SAFT, §1

(c)      **Refund of Purchase Amount**. Upon 30 days after (i) the failure of the Company to meet the Milestone by the Evaluation Date or (ii) a Dissolution Event, the Company will refund to the Investor the Purchase Amount, net of applicable taxes and expenses associated with the SAFT Offering (such amount, the "**Returned Investment**"). The Investor acknowledges and agrees that applicable taxes and expenses associated with the SAFT Offering, is a nonrefundable portion of the Purchase Amount ("**Nonrefundable Amount**") and accordingly, will not be subject to payment to Investor as a Returned Investment. For the avoidance of doubt, funds from the business operations of GIBF GP, Inc. other than funds received in the SAFT Offering shall not be available for payment of Returned Investments. Any Returned Investments shall be paid in U.S. Dollars or Bitcoin, at the discretion of the Company. The Investor acknowledges that there may be circumstances in which the Company will not be able to refund all or a portion of the Purchase Amount to Investor.

(d)      **Full Satisfaction**. The Investor agrees that payment of the Returned Investment by the Company to the Investor or notice that there are not sufficient funds to pay any Returned Investment amount shall be in full satisfaction of any and all obligations of GIBF GP, Inc. under this SAFT to the Investor subject to applicable law.

SAFT, §2 Definitions

"**Milestone**" means the newly forked Bitcoin Network is operational after a successful Hard Fork with Token functionality as determined by the Company in its sole discretion.

SAFT, §5 Investor Representations

(b) The Investor is: (i) an "accredited Investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act; or (ii) not a U.S. person within the meaning

of Rule 902 of Regulation S under the Securities Act. The Investor has been advised that this SAFT is a security that has not been registered under the Securities Act, or any state securities laws and, therefore, cannot be resold unless registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Investor is purchasing this security instrument for his, her or its own account for investment, not as a nominee or agent, and not with a view to, or for resale in connection with, the distribution thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of such investment, is able to incur a complete loss of such investment without impairing the Investor's financial condition, and is able to bear the economic risk of such investment for an indefinite period of time. The Investor further represents that he, she or it has been provided the opportunity to ask the Company questions, and where applicable, has received answers from the Company, regarding the SAFT Offering and this SAFT.

SAFT, Purchase Agreement

There are substantial restrictions on the transferability of the SAFT, and there will initially be no public market for the SAFT for U.S. Purchasers. The SAFT will not be registered under the Securities Act of 1933, and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements.

Similarly, there are substantial restrictions on the transferability of the Tokens, and there will initially be no public market for the Tokens for U.S. Purchasers, unless and until the Company determines that the Tokens are not securities. Tokens will not be registered under the Securities Act of 1933, and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements.

SAFT, Purchase Agreement, Investor Questionnaire, §4

I acknowledge that important information about the material terms of the SAFT and Tokens is provided in the Offering Materials. Such information includes, but is not limited to, details regarding the timing and pricing of the SAFT, the amount of Tokens offered, the anticipated milestones to be met prior to issuance of the Tokens,

14

and the anticipated use of the SAFT offering proceeds. I represent and warrant that I understand and have no objection to these material terms.

I acknowledge and accept that there are risks associated with purchasing the SAFT, holding the SAFT, and, once the Tokens are delivered, using Tokens on the Network, as more fully disclosed and explained in the Offering Materials. BY PURCHASING THE SAFT, I EXPRESSLY ACKNOWLEDGE AND ASSUME THESE RISKS.

I represent and warrant that I have sufficient knowledge, understanding, and experience, either independently or together with my purchaser representative(s), in financial and business matters, and of the functionality, usage, storage, transmission mechanisms, and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems, to understand the terms of this Purchase Agreement and the Offering Materials, and such knowledge, understanding, and experience enables me to evaluate the merits and risks of purchasing the Tokens.

I represent and warrant that I am purchasing the SAFT to receive future delivery of the Tokens. I desire to receive future Tokens in order to provide or receive services on the Network and to support the development, testing, deployment and operation of the Network. I am not purchasing the SAFT for any other uses or purposes, including, but not limited to, any investment, speculative or other financial purposes.

SAFT, Purchase Agreement, Part III Additional Legally Binding Terms §2.3

(b) *Other Federal and State Regulatory Matters*. The Purchaser acknowledges and understands that the SAFT is not registered with the Securities and Exchange Commission, and that the Company is not registered or licensed with any federal or state regulator as an investment adviser, broker-dealer, money services business, money transmitter, or virtual currency business. As a result, the Purchaser will not be afforded the full set of protections provided to the clients and customers of such entities under the Securities Act of 1933, as amended (the "**Securities Act**"), the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), the Investment Advisers Act of 1940, as amended (the "**Advisers Act**"), and any similar or applicable state laws.

SAFT, Purchase Agreement, Part III Additional Legally Binding Terms §2.4

_____

(a) The Purchaser acknowledges and is aware that there are substantial restrictions on the transferability of the SAFT, and there will be no public market for the SAFT for U.S. Purchasers. The SAFT will not be registered under the Securities Act, and may not be offered or sold in the United States absent registration or an applicable exemption from the registration requirements. This means that holders of the SAFT may not transfer the SAFT to any "U.S. Person," within the meaning of Rule 902(a)(k) under the Securities Act; ***provided that*** holders of the SAFT may transfer the SAFT to U.S. Persons that are "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act and in compliance with applicable U.S. securities laws.

SAFT, Purchase Agreement, Part III Additional Legally Binding Terms §2.6

(b) *No Reliance.* The Purchaser acknowledges that in making a decision to purchase a SAFT, the Purchaser has relied solely upon this Purchase Agreement and the Offering Materials and independent investigations made by the Purchaser. The Purchaser is not relying and may not rely on any other marketing materials for purposes of making a decision to purchase a SAFT. The Purchaser is also not relying on the Company and their respective officers, directors, principals, members, employees, agents, and other affiliates with respect to the legal, tax and other economic factors involved in this purchase and understands that it is solely responsible for reviewing the legal, tax and other economic considerations involved with purchasing the SAFTs with its own legal, tax and other advisers.

(c) *Purchaser's Review.* The Purchaser understands that it is solely responsible for reviewing the Offering Materials and this Purchase Agreement and, to the extent he, she or it believes necessary, for discussing with counsel the representations, warranties and agreements that the Purchaser is making in this Purchase Agreement. The Purchaser understands that Bull Blockchain Law LLC acts as counsel only to the Company and does not represent the Purchaser or any other person by reason of purchasing the SAFT.

(d) *No Guarantees.* Neither the Company nor anyone on its behalf has made any representations (whether written or oral) to the Purchaser (i) regarding the future value of the SAFT or the future value or utility of the Tokens or (ii) that the past business performance and experience of the Sponsoring Parties will in any way predict the current or future value of the SAFT or future value or utility of the Tokens.

_____

SAFT, Purchase Agreement, Part III Additional Legally Binding Terms §2.7

Purchaser's Knowledge. The Purchaser has sufficient knowledge, understanding, and experience, either independently or together with his, her or its purchaser representative(s), in financial and business matters, and of the functionality, usage, storage, transmission mechanisms, and other material characteristics of cryptographic tokens, token wallets and other token storage mechanisms, public and private key management, blockchain technology, and blockchain-based software systems, to understand the terms of this Purchase Agreement and the Offering Materials, and such knowledge, understanding, and experience enables the Purchaser to evaluate the merits and risks of purchasing the Tokens.

SAFT, Purchase Agreement, Part III Additional Legally Binding Terms §2.8

(a) *General Economic Risk.* The Purchaser (i) is able to bear the economic cost of holding the SAFT for an indefinite period of time; (ii) has adequate means of providing for his, her, or its current needs and possible personal contingencies even in the event that the SAFT loses all of its value; and (iii) has no need for liquidity of the SAFT. The Purchaser's purchase of the SAFT is consistent with the objectives and cash flow requirements of the Purchaser and will not adversely affect the Purchaser's overall need for diversification and liquidity.

(b) *Additional Risk Disclosures*. The Purchaser is solely responsible for reviewing, understanding and considering the risks above and any additional risks, including without limitation those described in the Offering Materials. The Company's operations, financial condition, and results of operations could be materially and adversely affected by any one or more of those risk factors, as could the underlying value of each Purchaser's SAFT, which may lead to the SAFT losing all value.

SAFT, Purchase Agreement, Part III Additional Legally Binding Terms §6

**Limitation of Liability**. PLEASE READ SECTIONS 6.1, 6.2, AND 6.3 CAREFULLY. THESE PROVISIONS LIMIT THE SCOPE OF THE COMPANY'S LIABILITY IN CONNECTION WITH THE SALE OF THE SAFT.

6.1. To the fullest extent permitted by applicable law: (i) in no event will the Company and their respective officers, directors, principals, members, employees, agents, and other affiliates be liable for any indirect, special, incidental,

17

### B. Promotion of Judicial Economy

The issue of agency is central to this case, and without establishing the existence of a principal-agent relationship, the claims Plaintiffs have asserted against Latinum will fail. Plaintiffs contend that Jonna was an agent of Latinum, purportedly having apparent and actual authority to act on Latinum's behalf. Yet, Plaintiffs provide nothing more than conclusory statements regarding their contentions that Latinum authorized Jonna to take money from his own family members and funnel it through his own Latinum account. Only by inference has this case survived Rule 12. Conversely, Plaintiffs by their own admissions, actually contradict their own

---

consequential, or exemplary damages of any kind (including, but not limited to, where related to loss of revenue, income or profits, loss of use or data, or damages for business interruption) arising out of or in any way related to the sale of the SAFT or otherwise related to these terms, regardless of the form of action, whether based in contract, tort (including, but not limited to, simple negligence, whether active, passive or imputed), or any other legal or equitable theory (even if the party has been advised of the possibility of such damages and regardless of whether such damages were foreseeable); and (ii) in no event will the aggregate liability of the Company and their respective officers, directors, principals, members, employees, agents, and other affiliates (jointly), whether in contract, warranty, tort (including negligence, whether active, passive or imputed), or other theory, arising out of or relating to these terms exceed the amount purchaser pays to the company for the SAFT.

SAFT, Purchase Agreement, Part III Additional Legally Binding Terms §8.2

Revocation. Purchaser acknowledges and accepts that all purchases of the SAFT from the Company during the SAFT Offering are final, and there are no refunds or cancellations except as may be required by applicable law or regulation. Purchaser further acknowledges and accepts that the Company reserves the right to refuse or cancel Purchase Agreements at any time in its sole discretion.

allegations. What's worse is that Plaintiffs have known this all along. Evidence of the lack of any reliance on Latinum and affirmation that Kevin Jonna was *Plaintiffs' agent* is clear from Raymond and Simon Jonna's communications, and acknowledgement that they were under Kevin Jonna's "umbrella." See Ex. B and Ex. C.

"The law of this Circuit speaks to staying, or bifurcating, discovery where dispositive legal determinations may eliminate the need for discovery." *Brakebill v. Moncier*, No. 3:14-cv-105, 2014 U.S. Dist. LEXIS 160026, at *4 - *5 (E.D. Tenn. Nov. 14, 2014). "What is remarkable is that courts have consistently bifurcated cases where resolution of a single claim would be dispositive of the entire case." *Nationwide Mut. Fire Ins. Co. v. Jahic*, No. 3:11-cv-00155, U.S. Dist. LEXIS 1798, at *8 (W.D. Kty. Jan. 7, 2013) (citing *Smith v. Allstate Ins. Co*., 403 F.3d 401, 407 (6th Cir. 2005)).

The issue of agency is a matter of state law and federal courts often look to restatements of law for guidance in disputes involving issues of principal-agent relationships. Under Michigan Law, "agency relationship may arise when there is a manifestation by the principal that the agent may act on his account." *Meretta v. Peach*, 491 N.W.2d 278, 280 (Mich. Ct. App. 1992). Such manifestations of authority to act may be actual or apparent. See *Mais v. Allianz Life Ins. Co. of N. Am*., 34 F. Supp. 3d 754, 762 ("[a]n agent's authority may be actual or apparent").

19

"Apparent authority may arise when a purported agent's acts and appearances lead a third person to reasonably believe that an agency relationship exists; however, this authority cannot be established only by the agent's acts but must be traceable to the principal." *Kassab v. Dennis*, No. 2009 Mich. App. LEXIS 673, at *6 (Mich. Ct. App. Mar. 24, 2009) (citing *Meretta,* 491 N.W.2d at 280. Conversely, "[a]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." *Mais*, 34 F. Supp. at 762 (quotation marks omitted) (quoting Restatement (Third) of Agency: Actual Authority § 2.01 (2006)). Under *Meretta*, the key consideration is whether an ordinary prudent person, conversant in the subject matter of dealings, would be justified in assuming that an alleged agent had authority on behalf of a principal. *Meretta*, 491 N.W.2d at 280-281.

Here, given the dispositive nature of agency in this case, if Plaintiffs ultimately fail to establish agency between Jonna and Latinum, Plaintiffs' claims under the various securities laws will fail because they will be unable to show that Latinum ever solicited Plaintiffs to buy securities, or interest in securities, for value. As the Sixth Circuit noted in *In re Benedictin Litg*., this Court must consider bifurcation "conducive to judicial economy, especially if a decision regarding that question would be dispositive of the case and would obviate the necessity of trying

any other issues." 857 F.2d 290, 320 (6th Cir. 1988) (deciding if a separate trial under Fed. R. Civ. P. (42)(b) would promote judicial economy).

Plaintiffs, by their own admissions, state that they relied entirely on the representations and conduct of Kevin Jonna with respect to his authority to act, and that neither the Latinum CEO or anyone else on behalf of Latinum made any act or communication to Plaintiffs. Am. Compl. ¶88. In its Opinion dated July 26, 2022, this Court noted that "if, after discovery, Plaintiffs can only show that Kevin made these statements, and not that Latinum made such representations to him, then they will have failed to prove actual authority . . . . it is just as reasonable to infer that Latinum told Kevin that its high-level executives were available to meet with investors as it is that Kevin made this offer without any manifestation from Latinum. Opinion dated July 26, 2022 at 21-22. Moreover, this Court also noted that "Plaintiffs' allegation that Kevin offered meetings with Latinum's CEO further tips the scale in favor of finding it plausible that Kevin had apparent authority." Opinion dated July 26, 2022 at 27. However, as noted above, Plaintiffs' allegations are supported only by statements made by Kevin Jonna, nothing more, and are not traceable to Latinum, even Kevin and now Plaintiffs admit as much.

Additionally, at one point during a conversation between Kevin Jonna and Ray Jonna, Kevin Jonna states:

14. MR. K. JONNA: The –- the –- I –- I –- I
15. just don't understand what other way to tell you. **You**

21

**16. guys are under my umbrella. You're under my deal.**
**17. Any confirmation I give you would have to be through**
**18. me.** I can send you a paper from myself saying you
19. have this many coins with me. That's what I can do.
20. Beyond that, I –- that's all I can do. Everything
21. else is with me. **You're under my umbrella**. If you
22. want a confirmation from me saying you have x amount
23. of tokens with me, that's fine

Ex. B – Tr. of Telephonic Conversation Between Raymond Jonna and Jonna at 48:14-23.

This admission that everything went through him and Latinum was unable to give Ray Jonna a confirmation because they had no record of Ray Jonna making an "investment" through Latinum (because everything went through Kevin Jonna's account when he was acting as Plaintiffs agent) further supports the lack of any principal-agent relationship between Jonna and Bitcoin Latinum.

It is clear that Jonna was Plaintiffs' agent, placing Plaintiffs' "investment" under *his* umbrella and into *his* personal Latinum account in order to provide Plaintiffs with a discounted rate *at Plaintiffs' own insistence,* rather than purchasing at a non-discounted price. If the issue of whether a principal-agent relationship existed between Latinum and Jonna is disproven during the bifurcated discovery period (as it most likely will be disproven, given the admitted actions that Kevin Jonna was an agent of Plaintiffs), the remaining causes of action will never be reached.

If the court finds that Jonna was acting as an agent of the Plaintiffs, rather than as an agent of the Defendants, then the Plaintiffs are bound by the terms of the SAFT, including the arbitration provision which would deprive this Court of jurisdiction. See Ex. D, SAFT, Purchase Agreement §7. If, after discovery is concluded on the agency issue, the Court finds that a principal-agent relationship exists, in accordance with the SAFT agreement between Jonna and Latinum this case must proceed to arbitration in the State of Delaware. See *Big City Small World Bakery Café v. Francis David Crop.*, 265 F. Supp. 3d 750, 764 (E.D. Mich. 2017) (citing *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (noting "[t]he weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.")).

Even if the Court finds that it does not lack jurisdiction because of the arbitration agreement, the Plaintiffs would still be bound by the waivers, releases, and limitations of liability provided in the SAFT. See Ex. D. SAFT, Purchase Agreement §6. In fact, the SAFT anticipates such a scenario as argued by the Plaintiffs. The SAFT provides:

(c)    Ultimate SAFT Owners.

(I)    If the Purchaser is acting as trustee, agent, representative or nominee for the ultimate owner of the SAFTs (an "Ultimate SAFT Owner"), the Purchaser understands and acknowledges that the representations, warranties and agreements made in this Purchase Agreement are made by

the Purchaser both (a) with respect to the Purchaser and (b) with respect to the Ultimate SAFT Owner. The Purchaser further represents and warrants that it has all requisite power and authority from the Ultimate SAFT Owner to execute and perform the obligations under this Purchase Agreement.

Ex. D. SAFT, Purchase Agreement §2.5(c).

The interests of judicial economy virtually require the Court to determine whether Jonna was an agent of the Plaintiffs or an agent of the Defendants at the time he solicited the funds from the Plaintiffs and invested in the Defendant. All of Plaintiffs claims would be subject to the limitations and releases set forth in the SAFT.

Accordingly, bifurcating discovery on the issue of agency will promote judicial economy and expedite the disposition of this case. See *Chenault v. Beiersdorf, Inc.*, No. 1:20-cv-174, 2020 U.S. Dist. LEXIS 153068, at *5 - *7 (S.D. Ohio Aug. 24, 2020) (noting "bifurcation should promote judicial economy because defining any potential class may limit or focus discovery on the merits and prevent potentially unnecessary discovery costs" and as such "efficiency and judicial economy favor bifurcation, Defendant's motion is well-taken"): See also *Scf v. Hartford Fire Ins. Co.*, No. 1:20-cv-01173, 2021 U.S. Dist. LEXIS 153204, at *10 - *11 (W.D. Tenn. May 5, 2021)(holding that judicial economy weighs in favor of bifurcation because "[defendant] may not be held liable for breaching the underlying

contract in bad faith until there has been a determination that it breached the contract").

## IV.   CONCLUSION

For the foregoing reasons, bifurcation of discovery will promote judicial economy and expedite the disposition of this matter because of the dispositive nature of the agency issue and prevent prejudice because of the complexity of this case. Accordingly, Defendant GIBF GP, Inc. respectfully requests that this Honorable Court grant the Motion to Bifurcate Discovery and bifurcate the discovery period on the issue of agency.

Respectfully submitted,

By:  /s/ Eric A. Browndorf
Eric A. Browndorf, Esq.
William P. Rubley, Esq.
1415 Marlton Pike East
Cherry Hill Plaza, Suite 205
Cherry Hill, NJ 08034
(856) 795-9110; Fax: (856) 795-8641
ebrowndorf@cooperlevenson.com
wrubley@cooperlevenson.com

*Attorneys for Defendant Bitcoin Latinum*

By:  /s/ Patrick C. Lannen
Patrick C. Lannen, Esq. (P73031)
John R. Stevenson (P70241)
38505 Woodward Ave.,
Suite 100
Bloomfield Hills, MI 48304
(248) 901-4027
plannen@plunkettcooney.com
jstevenson@plunkettcooney.com

*Attorneys for Defendant Bitcoin Latinum*

Dated: November 10, 2022

25