## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

RAYMOND JONNA, SIMON
JONNA, and FARID JAMARDOV,

      Plaintiffs,

    v.

KEVIN JONNA, and GIBF GP, INC.
d/b/a BITCOIN LATINUM,

      Defendants.

Case No. 22-cv-10208

Hon. Laurie J. Michelson

Mag. Jonathan J.C. Grey

_____

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs, Raymond Jonna, Simon Jonna, and Farid Jamardov, through their attorneys, bring this Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56. As detailed in the attached Brief in Support, applying the undisputed facts to the applicable law, no reasonable jury could determine that Defendant GIBF GP Inc. d/b/a Bitcoin Latinum is not liable for the sale of unregistered securities to the public. Thus, Plaintiffs are moving for partial summary judgment against Defendant Latinum on Counts 1 and 2. Plaintiffs seek judgment as to liability only, as there exists issues of fact regarding the damages Plaintiffs sustained as a result of Defendant's sale of unregistered securities.

This motion was originally filed on June 8, 2023 [ECF No. 126], but was dismissed without prejudice on August 15, 2023 [ECF No. 132] pending resolution

of an alleged conflict of interest involving plaintiffs' counsel. That conflict having resolved, Plaintiffs renew this motion.

There was a conference between attorneys or unrepresented parties and other persons entitled to be heard on the motion in which the movant explained the nature of the motion or request and its legal basis and requested, but did not obtain, concurrence in the relief sought.

Respectfully Submitted,

FOX ROTHSCHILD LLP

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman
DE State Bar No.  3702
919 N. Market Street, Suite 300
Wilmington, DE 19801
(302) 622-4237
sliebesman@foxrothschild.com

Marc C. Tucker (P57023)
434 Fayetteville Street, Suite 2800
Raleigh, NC 27601-2943
(919) 755-8713
mtucker@foxrothschild.com

WARNER NORCROSS + JUDD
Dennis W. Loughlin (P57084)
Ashley E. Racette (P80965)
2715 Woodward Avenue, Suite 300
Detroit, MI 48201
(313) 546-6000
aracette@wnj.com
dloughlin@wnj.com
*Attorneys for Plaintiffs*

Dated:  October 23, 2025

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

RAYMOND JONNA, SIMON
JONNA, and FARID JAMARDOV,

      Plaintiffs,

  v.

KEVIN JONNA, and GIBF GP, INC.
d/b/a BITCOIN LATINUM,

      Defendants.

_____

Case No. 22-cv-10208

Hon. Laurie J. Michelson

Mag. Jonathan J.C. Grey

## PLAINTIFFS' BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**PAGE**

I.     INTRODUCTION ......................................................... 1

II.    STATEMENT OF UNDISPUTED FACTS ................................. 2

    A.    The Parties ...................................................... 2

    B.    Latinum Sold its Tokens to the Public................................ 2

    C.    Latinum Created an Expectation of Profits Relating to its Tokens ........ 3

    D.    Kevin Jonna Sells Tokens to Plaintiffs.............................. 7

III.   LEGAL STANDARD ..................................................... 10

IV.   ARGUMENT............................................................. 10

    A.    Latinum Sold Unregistered Securities in Violation of Federal Law .... 10

        1.    Applicable Law (The *Howey* Test) ............................ 10

        2.    Plaintiffs Invested in Response to Defendants' Offerings ......... 12

        3.    Latinum Caused Plaintiffs to Invest in a Common Enterprise .... 13

        4.    Plaintiffs Expected Their Investment Would Yield Profits........ 15

    B.    Defendants Sold Unregistered Securities in Violation of State Law.... 23

V.    CONCLUSION ........................................................... 25

i

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                    <u>PAGE(S)</u>

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................................ 10

*Deckebach v. La Vida Charters, Inc. of Florida*,
    867 F.2d 278 (6th Cir. 1989) .......................................................................... 12

*Diamond Fortress Technologies, Inc. v. EverID, Inc.*,
    274 A.3d 287 (Del. Super. Ct. 2002)................................................. 13, 14, 15, 16

*Milnarik v. M-S Commodities, Inc.*
    457 F2d 274 (7th Cir. 1972) ........................................................................... 14

*Moreland v. Dep't of Corps.*,
    194 Cal.App.3d 506, 239 Cal. Rptr. 558 (Cal. Ct. App. 1987) ......................... 24

*Redding v. St. Eward*,
    241 F.3d 530 (6th Cir. 2001) .......................................................................... 10

*S.E.C. v. Mut. Benefits Corp.*,
    408 F.3d 737 (11th Cir. 2005)......................................................................... 19

*S.E.C. v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020)........................................................*passim*

*Schaffer Fam. Invs., LLC v. Sonnier*,
    120 F. Supp. 3d 1028 (C.D. Cal. 2015)............................................................ 24

*SEC v. GenAudio Inc.*,
    32 F.4th 902 (10th Cir. 2022) ......................................................................... 11

*SEC v. Int'l Loan Network, Inc.*,
    968 F.2d 1304 (D.C. Cir. 1992) ...................................................................... 13

*SEC v. Kahlon*,
    873 F.3d 500 504 (5th Cir. 2017)…………………………………………………11

*SEC v. LBRY, Inc.*,
    2022 WL 16744741 (D.N.H. Nov. 7, 2022) ...............................................*passim*

**PAGE(S)**

*SEC v. NAC Foundation, LLC*,
    512 F. Supp. 3d 988 (N.D. Cal. 2021) ...............................................19, 20, 21, 22

*In re Trade Partners Litig.*,
    2009 WL 5171884 (W.D. Mich. 2009) ...........................................................24

*Union Planters Nat. Bank of Memphis v. Commercial Credit Business
    Loans, Inc.*,
    651 F.2d 1174 (6th Cir. 1981) ......................................................................14

*United Housing Foundation, Inc. v. Forman*,
    421 U.S. 837 (1975) .......................................................................................18

*Uselton v. Comm. Lovelace Motor Freight, Inc.*,
    940 F.2d 564 (10th Cir. 1991) ......................................................................12

**STATUTES**

6 Del. C. § 73-202 ........................................................................................................23

15 U.S.C. § 77d(a)(2) ...................................................................................................11

15 U.S.C. § 77e ............................................................................................................10

15 U.S.C. § 77l (1) .......................................................................................................10

MCL § 451.2301 ...........................................................................................................23

MCL § 451.2503(1) .......................................................................................................24

MCL § 451.2509(2) .......................................................................................................23

Securities Act Section 5 ...............................................................................................11

Securities Act Section 12(1) ........................................................................................10

Securities Act Section 77b(a)(1) ..................................................................................11

**OTHER AUTHORITIES**

17 C.F.R.§§ 230.502(b), 230.506 (Rule 506).............................................................11

Fed. R. Civ. P. 56(a) ....................................................................................................10

## ISSUES PRESENTED

1.     Should the Court grant partial summary judgment, as to liability only, against Defendant GIBF GP, Inc. d/b/a Bitcoin Latinum on Count 1 of Plaintiffs' Second Amended Complaint (ECF No. 53) because the undisputed facts show that Defendant is liable to Plaintiffs under Sections 5 and 12(a) of the Securities Act?

    **Plaintiffs' Answer: Yes.**

2.     Should the Court grant partial summary judgment, as to liability only, against Defendant GIBF GP, Inc. d/b/a Bitcoin Latinum on Count 2 of Plaintiffs' Second Amended Complaint (ECF No. 53) because the undisputed facts show that Defendant is liable to Plaintiffs for a violation of state securities law?

    **Plaintiffs' Answer: Yes.**

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

*Deckebach v. La Vida Charters, Inc. of Florida*, 867 F.2d 278 (6th Cir. 1989).

*Diamond Fortress Technologies, Inc. v. EverID, Inc.*, 274 A.3d 287 (Del. Super. Ct. 2002).

*SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022).

*S.E.C. v. NAC Foundation, LLC*, 512 F. Supp. 3d 988 (N.D. Cal. 2021).

*S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).

*S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

**Other Authorities**

15 U.S.C. § 77e

15 U.S.C. § 77l (1)

Fed. R. Civ. P. 56

## I.    INTRODUCTION

Plaintiffs, Raymond Jonna, Simon Jonna, and Farid Jamardov, through their attorneys, bring this Motion for Partial Summary Judgment against Defendant GIBF GP Inc. d/b/a Bitcoin Latinum ("Latinum") for liability as to Counts 1 and 2 because the undisputed, irrefutable facts show that it offered unregistered securities to the public—including Plaintiffs—in violation of state and federal law.

As detailed below, Latinum offered Tokens to the public, including Plaintiffs, via investment contracts titled "Simple Agreement for Future Tokens" (hereinafter, "SAFT").  The SAFTs have all the hallmarks of a security and, as such, should have been registered with the SEC.  Indeed, the SAFT states it "is a security."  Latinum, as the issuer of SAFTs (and the corresponding Tokens), violated state and federal securities law by failing to file a registration statement with the SEC.  Indeed, Latinum cultivated an expectation of profits relating to their unregistered securities, which caused Plaintiffs to invest $541,000 in the Latinum enterprise.

Latinum is liable to Plaintiffs for at least Counts 1 and 2 of the Second Amended Complaint.  No genuine issue of material fact exists as to any of the *prima facie* elements of Plaintiffs' unregistered securities claims—and Latinum will undoubtedly fail to put forth evidence showing that its offering fell under any exemptions to the federal or state registration requirements.  Thus, liability on Counts 1 and 2 should enter against Latinum.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    The Parties

1.    Defendant, GIBF GP, Inc. d/b/a Bitcoin Latinum, is a Delaware corporation with its place of business in California. ECF No. 56, PageID.1308, ¶6.

*2.*    Plaintiffs, Raymond Jonna, Simon Jonna, and Farid Jamardov, are Michigan residents who collectively invested $541,000 in response to Latinum's sale of a digital asset it deems a "cryptocurrency" (hereinafter, "Tokens"). *See* ECF No. 56, at ¶¶ 101, 108, 123, 142 (Latinum admitting it received the funds relating to Plaintiffs' investment); *see also* (**Exs. 1–4**); ECF No. 22-3.

3.    Defendant Kevin Jonna ("KJ") is the individual who induced Plaintiffs into investing in Latinum's Token.  KJ directed Plaintiffs to wire funds to Latinum for the purposes of purchasing Tokens. *See, e.g.*, (**Ex. 3**) (transfer from Raymond Jonna to Latinum, with "for Kevin Jonna" in the memo line); (**Ex. 5**) (KJ saying "your tokens are part of my group"); *see also* ECF No. 19-3 (KJ SAFT).

### B.    Latinum Sold its Tokens to the Public

4.    In November 2020, Latinum began marketing and selling its Tokens to the public. (**Ex. 6**).  In a release posted by Bloomberg Business, Latinum announced that "Bitcoin Latinum is now available for pre-sale on www.bitcoinlatinum.com and will be available on exchanges in 2021." *Id.*  Latinum made an identical statement in a news article posted by the London Stock Exchange. (**Ex. 7**); *see also* (**Ex. 8**) (Latinum Whitepaper stating its "Pre Launch Token Sales" took place in late 2020).

5.     Latinum offered its Tokens directly to the public via its website.  The website was designed to allow unknown investors from all over the United States to unilaterally purchase Tokens without communicating with Latinum representatives. (**Ex. 9**) (Liang Declaration); *see also* ECF No. 22, PageID.468; ECF No. 22-4 (Latinum website's "Buy Tokens" button). And, Latinum made two more rounds of "pre-sale" offers to the public, via Latinum's website. *See* (**Ex. 8**) (White Paper stating pre-sales took place in late-2020 and mid-2021).

6.     Further, Latinum recruited agents to solicit larger investments from the public. *See* (**Exs. 10–11**).  Indeed, Latinum contracted with renowned poker players Brandon Cantu and Phil Hellmuth to solicit additional investments. *Id.*

7.     Significantly, Latinum knew that certain of its SAFT investors were gathering funds from members of the public for the benefit of their account (as was the case here). *See* (**Ex. 12**); (**Ex. 13**) (Jason Otto Deposition Transcript, at pp. 38–39) (testifying that he told Latinum he was raising funds from his friends).

8.     Moreover, as shown by the marketing materials below, Latinum aggressively promoted its Token and announced its pre-sales to the public. Taken together, it is clear that Latinum offered Tokens to the public.

## C.     Latinum Created an Expectation of Profits Relating to its Tokens

9.     Latinum describes its Token as an "asset-backed cryptocurrency." *See, e.g.*, (**Ex. 14**).  This "asset-backing" model creates an expectation of profits.

10.     Indeed, Latinum designed its Token to function like an asset-backed security.  An "asset-backed" security is a security that is backed by revenue-generating assets—ensuring growth over time.  Latinum's CEO, Donald Basile, has admitted as much by stating publicly that the Token functions "in such a way that corporations could be very comfortable with it as an ***asset backed security*** that they could take and use for that purpose." (**Ex. 15**) (emphasis added).

11.     More specifically, the touted functionality of Latinum's Token creates an expectation of profits because, according to Latinum, 80% of the Tokens' transaction fees are deposited to an asset fund that backs the Token, creating a "self-inflating cryptocurrency."  Below are a handful of examples in which Latinum states publicly that its Token is "asset-backed" and/or "self-inflating":

a. <u>Bloomberg Business Release</u>: "LTNM is insured and backed by real-world assets.  Its asset backing is held in a fund model so that base asset value increases over time. It accelerates this asset-backed funds growth by depositing 80% of the transaction fee bank into the asset fund that backs the currency.  Thus, the more Bitcoin Latinum is adopted, the faster its asset funds grow, creating a self-inflating currency." (**Ex. 16**).

b. <u>Website Media Releases</u>: Latinum released many articles on its website that stated "Unlike other crypto assets, LTNM is insured, and backed by real-world and digital assets.  Its asset backing is held in a fund model so that base asset value increases over time.  It accelerates this asset-backed funds growth by depositing 80% of the transaction fee back into the asset fund that backs the currency.  Thus, the more Bitcoin Latinum is adopted, the faster its asset funds grow, creating a self-inflating currency." (**Exs. 17–22**).  In one of its media releases, Latinum stated, "We are **bullish** about Bitcoin Latinum." (**Ex. 23**).

c. <u>Latinum's Whitepaper</u>: states that "80% of network fees will be used to support the underlying value of LTNM." (**Ex. 8,** p. 20 (Roadman)).

d. <u>Benzinga Interview</u>: During this interview, Donald Basile (1) stated the decision to utilize the "Bitcoin" name and Bitcoin Blockchain was to give the appearance that Token is not a security (as Bitcoin is viewed as a currency and not a security); (2) stated the decision to reinvest the transaction fees into an underlying fund was to "ensure the currency continues to increase in value over time," and "guarantees over time [that the] currency will inflate quite a bit"; and, (3) made numerous other statements regarding the Token being a "self-inflating" asset and/or an "appreciating asset." (**Ex. 24**).[1]

e. <u>Other Interviews</u>: During several other media interviews, Donald Basile characterizes Latinum's Token as a "self-inflating" digital asset and that, because it is "asset-backed," it is likely to provide investors with "exponential growth." (**Exs. 25–27**).

12. Relatedly, Latinum made numerous representations to the public, via its social media accounts, that created the perception that an investment in Tokens would yield a significant return:

a. Latinum made direct statements on its Twitter page that indicated that purchasers of Tokens could expect profits:



---

[1] Video available at https://www.youtube.com/watch?v=TBeXkjSlvmI (last visited March 7, 2023). Bitcoin Latinum's website contains a link to this interview (as well as other interviews conducted by Donald Basile).



13.    Taken together, there is no doubt that Latinum created an expectation of profits through its aggressive marketing of Token.

**D.      Kevin Jonna Sells Tokens to Plaintiffs**

14.    On or about August 31, 2021, KJ began communicating with an individual named Jason Otto regarding the purchase of Tokens. (**Ex. 29**).[2]

15.    Prior to meeting KJ, Otto had previously executed a SAFT with Latinum for the purchase of Tokens in the amount of $1,000,000. (**Ex. 30**).

16.    However, after discussing the purchase of Tokens with KJ, Otto began negotiating a new contract with Latinum for additional Tokens. (**Ex. 31**). Specifically, Otto intended to collect $1,500,000 from KJ and execute another contract for that amount with Latinum on KJ's behalf. (**Ex. 13**, p. 38) (testifying that the $1.5 million in his SAFT was the "amount that [KJ] was looking to purchase").

17.    As part of the SAFT that he intended to execute through Otto, KJ solicited investments from his friends and family, including Plaintiffs.

18.    Specifically, KJ began conveying Latinum promotion materials to Plaintiffs through a series of calls and texts that caused Plaintiffs to invest. (**Ex. 32**) (conveying Latinum promotion materials during initial investment discussion); (**Ex. 33**) (link to Latinum media release shortly before first wire transfer).

19.    Notably, since KJ was originally raising funds to purchase Tokens pursuant to a SAFT between Otto and Latinum, he instructed his group of investors

---

[2] As this is a refiled motion and the Court previously issued an order referring to the redactions of exhibits by exhibit number, there will be no exhibit 28, but a placeholder is being maintained for the sake of consistency.

(including Plaintiffs) to wire money directly to Otto, which they did. *See* ECF Nos. 22-1, 22-2.   Indeed, as a result of KJ's re-distribution of Latinum's promotion materials, Simon and Raymond Jonna wired $140,000 and $100,000, respectively, to Otto. (**Exs. 1–2**) (transfers from Raymond and Simon Jonna to Otto).

20.   While KJ was eliciting funds from Plaintiffs to purchase Tokens, he began communicating directly with Latinum executives (including Basile); and ultimately became a Latinum insider. *See* (**Ex. 5**) (KJ text to Plaintiffs stating "your tokens are part of my group . . . [y]our money is safe and the board knows exactly who you are and how many tokens you are to be issued."); (**Ex. 13**, at pp. 60, 73, 92, 94) (discussing Basile's preference to communicate through KJ, and KJ's representations that he was "a part of it."); (**Exs. 34–35**) ("our crew has been in contact with Digifinex's management most of the day" and "[w]e've been dealing with tons of delays from [Digifinex] but tonight we are in action").[3]

21.   For instance, on September 13, 2021, KJ sent a text message to Basile that said, "Hi Don, it's Kevin, do you have an updated deck I can send to somebody? I have somebody else who may rly [sic] be interested." (**Ex. 12**).  And, thereafter, Basile attended a webinar organized by KJ, to which KJ invited "about 20–50 big east coast investors." *See* (**Exs. 12, 36, 47**).

---

[3] Whether KJ was an agent or insider of Latinum is immaterial for purposes of this Motion, as the issue of agency relates to Plaintiffs' other claims.

22.    As a result of KJ's interactions with Basile, he was eventually provided his own SAFT document; and Otto was cut out as the middleman. *See, e.g.*, (**Ex. 47**); ECF No. 19-3; (**Ex. 12**); (**Ex. 13**, p. 67) ("Kevin asked me to just instead of sending the money back to Raymond and Simon and whoever, to just forward it to [] Bitcoin Latinum and he would deal with the contractual portion.").

23.    After arranging his own SAFT with Latinum, KJ instructed Otto to send Plaintiffs' investment directly to Latinum for the benefit of his account. *See* (**Ex. 13**, p. 104) ("I received [] wire transfers . . . 100 from Raymond Jonna, 140 from Simon Jonna.  I then sent out . . . to Bitcoin Latinum."); *see also* (**Ex. 37**) (texts from KJ sending transfer instructions; directing investment be deposited to Latinum's bank).

24.    Then, after initially raising $240,000 from Simon and Raymond Jonna, KJ further induced Plaintiffs to invest in Tokens by making Plaintiffs believe that the Tokens could be resold at more than ten times the price they were purchased. ECF Nos. 22-1, 22-2, 22-3; (**Ex. 38**) (text from KJ showing Latinum trading at $201 and $212 per Token); (**Ex. 39**) (text from KJ showing Latinum trading at $699.99 per Token); *see also* (**Ex. 40**) (KJ text to Plaintiff stating "I can guarantee you it will open at north of $20" and "it's gonna open in the 20s and you'll be able to sell for an immediate profit if you wanted to").[4]  Indeed, as a result of KJ's solicitation

---

[4] KJ knew that this information was misleading. (**Ex. 13**, at 96); (**Ex. 41**) (KJ discussing trading price, saying "Everyone thinks this is real price …lol it's funny.").

efforts, Plaintiffs collectively sent three more wire transfers relating to KJ's SAFT; this time, directly to Latinum. (**Exs. 3–4**); ECF No. 22-3, PageID.540.

25.    As stated above, Latinum knew that KJ was raising funds from others to attempt to meet the $1,500,000 amount stated in his SAFT. *See, e.g.*, (**Ex. 12**) (KJ texts to Basile disclosing that his transfers were from a group of investors).

## III.   LEGAL STANDARD

The summary judgment standard is well known, so Plaintiffs will not belabor a lengthy recitation of it here.  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material only if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must view the evidence, in a light favorable to the non-moving party. *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

## IV.   ARGUMENT

### A.    Latinum Sold Unregistered Securities in Violation of Federal Law

#### 1.    Applicable Law (The *Howey* Test)

Section 12(1) of the Securities Act provides in part that "any person who . . . offers or sells a security in violation of Section 77e of this title shall be liable to the person purchasing such security from him," and authorizes appropriate remedies for such violation. 15 U.S.C. § 77l (1).  Section 5 of the Act, 15 U.S.C. § 77e, in turn makes it unlawful for any person, directly or indirectly, to make use of any means

of communication in interstate commerce or the mails to sell such security through the use or medium of any prospectus unless a registration statement for such security has been filed with the SEC.  In other words, to establish *prima facie* violation of Section 5 and 12 of the Securities Act, Plaintiffs must prove that Defendants "offered or sold securities in interstate commerce without filing a registration statement, unless the transaction qualifies for an exemption from registration." *SEC v. LBRY, Inc.*, 2022 WL 16744741, at *3 (D.N.H. Nov. 7, 2022) (citing *SEC v. GenAudio Inc.*, 32 F.4th 902, 939 (10th Cir. 2022); *SEC v. Kahlon*, 873 F.3d 500, 504 (5th Cir. 2017)).  Exemptions to registration requirements include, *inter alia*, the "private offering" exemption, *see* 15 U.S.C. § 77d(a)(2) and the Rule 506 "safe-harbor" exemption, *see* 17 C.F.R.§§ 230.502(b), 230.506.  "The 'burden of proof is clearly upon' those litigants 'claiming [the exemption's] benefit, as public policy strongly supports registration.'" *See GenAudio Inc.*, 32 F.4th at 939).

Here, Latinum does not dispute that the offer of Tokens, via Latium's SAFT, was not registered with the SEC.  Nor do Defendants dispute that the sale of Tokens was effectuated via interstate commerce.  Defendants further have not purported reliance on any specific or applicable exemptions from registration requirements. And, as detailed below, Latinum appears to concede that its Token are a "security" under federal law.

Section 77b(a)(1) of the Securities Act includes "investment contract" within its definition, and the Sixth Circuit has recognized that the test for whether an

investment contract constitutes a security is derived from *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). The Sixth Circuit has synthesized a three part test to determine whether an investment contract would be considered a "security" under the *Howey* test: "(1) an investment of money; (2) in a common enterprise; (3) an expectation of profits that will be derived solely from the efforts of others." *Deckebach v. La Vida Charters, Inc. of Florida*, 867 F.2d 278, 281 (6th Cir. 1989). The *Howey* Court noted the term "investment contract" has been used to classify those instruments that are of a "more variable character" that may be considered as a form of "contract, transaction, or scheme whereby an investor lays out money in a way intended to secure income or profit from its employment." *Howey*, 328 U.S. at 298. And, applicable here, the SEC has issued guidance regarding the application of the *Howey* test to digital assets and cryptocurrencies. (**Ex. 42**).[5] As detailed below, applying this federal law and SEC guidance to Latinum's Token offerings, it is clear that it engaged in the sale of an unregistered security.

## 2. Plaintiffs Invested in Response to Defendants' Offerings

In determining whether an investment contract exists, the investment of "money" need not take the form of cash. *See, e.g., Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991). The SEC has stated that "[t]he first prong of the *Howey* test is typically satisfied in an offer and sale of a digital

---

[5] Also, available at https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of real (or fiat) currency, another digital asset, or other type of consideration." (*Id.*, at Sec. II.A, p. 2).  Here, it is undisputed that Plaintiffs invested a combined $541,000 in response to Latinum's SAFT offerings by sending money to Latinum (indirectly, through Otto, and directly, via wire transfers to a bank account owned and controlled by Latinum). ECF No. 56, at ¶¶ 101, 108, 123, 142 (Latinum's Answer, admitting that it received Plaintiffs' investment of funds).  Thus, the first element of the *Howey* test is satisfied by the undisputed facts.

### 3.    Latinum Caused Plaintiffs to Invest in a Common Enterprise

The SEC has stated that "a 'common enterprise' typically exists" in the offer and sale of digital assets. (*Id.*, at Sec. II.B, p. 2).  Indeed, selling purported cryptocurrencies "have constituted a common enterprise because the investees 'pool' the contributed funds for the purpose of securing a profit for themselves and the investors, and the risks and benefits are shared equally among the parties." *Diamond Fortress Technologies, Inc. v. EverID, Inc.*, 274 A.3d 287, 301 (Del. Super. Ct. 2002); *see also*, *SEC v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1307 (D.C. Cir. 1992) ("Investments in digital assets have constituted investments in a common enterprise because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts.").  A "common enterprise" is found to be present in the Sixth Circuit if there is "horizontal commonality," which is when (a)

13

investors' contributions are pooled together and (b) the fortune of each investor depends on the success of the overall enterprise. *Union Planters Nat. Bank of Memphis v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1183 (6th Cir. 1981); *see also Milnarik v. M-S Commodities, Inc.* 457 F2d 274, 278 (7th Cir. 1972).

"Horizontal commonality has been found to exist before *and* after the launch of a defendant's cryptocurrency and blockchain platform." *EverID*, 274 A.3d at 301 (citing *S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 369–70 (S.D.N.Y. 2020)) (emphasis in original). "Where one initially pools his investors' money in order to develop and launch a digital token and blockchain platform, he effectively renders his investors' profits entirely dependent upon the blockchain's successful launch." *Id.* "If the launch is unsuccessful, the investors are equally affected and lose any opportunity to profit." *Id.*

Here, Latinum is undeniably a "common enterprise" that has pooled investor funds "in order to develop and launch a digital token and blockchain platform [] effectively rendering [] investors' profits entirely dependent upon the blockchain's successful launch." *Id.* (citing *Telegram*, 448 F. Supp. 3d at 369–70). Latinum admits as much in its filings. *See, e.g.*, ECF No. 65, PageID.1670–71 ("Latinum is the entity in charge of overseeing the private placement offering of the Tokens to investors . . . [and] Latinum's role [was to] collect[] monies under the SAFTs."). Thus, this prong of the *Howey* test is also satisfied by the undisputed facts.

14

### 4. Plaintiffs Expected Their Investment Would Yield Profits

Whether the sale of a digital asset is the sale of a "security" typically hinges on the third prong of the *Howey* test, *i.e.*, whether there is a reasonable expectation of profits derived from the efforts of others. *See* (**Ex. 42**, at Sec. II.C p. 2) ("the main issue in analyzing a digital asset under the *Howey* test is whether the purchaser has a reasonable expectation of profits [] derived from the efforts of others").

Federal courts have routinely held that investment contracts like Latinum's SAFT satisfy this prong of the *Howey* test.  Indeed, in *EverID*, the court began its analysis of a token called "ID Tokens" by recognizing that "[c]ourts commonly classify a cryptocurrency as a security when the economic harm directly relates to or arises from its ICO." 274 A.3d at 302.  "Just like any security, the purpose of an ICO is to *raise capital* by selling *new* coins or tokens to investors." *Id.* (emphasis in original).  And, in *EverID*, the "failure to distribute the due ID Tokens on the date of the ICO [was] the direct cause of the Plaintiffs' injury . . . [b]ecause the Plaintiffs could not be reimbursed until after EverID's initial ICO." *Id.*  Accordingly, the expectation of profits was "no different than that of a traditional investment contract entered into before an IPO, thus, ID Tokens [are] like a security." *Id.*

Moreover, Courts have defined "profits" broadly to include not only the fiat currency, but also digital assets and other valuable benefits.  For example, in *In the Matter of Munchee Inc*. (Release No. 10445, December 11, 2017), the SEC found that although the tokens at issue ("MUN Tokens") did not promise investors any

dividend or other periodic payment, investors could reasonably expect "to profit from the appreciation of value of MUN Tokens resulting from Munchee's efforts." In that case, Munchee sold digital tokens to raise funds to improve its existing restaurant review app and create an "ecosystem" wherein users could buy advertisements, write interviews, sell food, and conduct other transactions within the app. The Munchee Token was meant to be the currency of denomination within the app and was expected to trade on secondary markets. The SEC analyzed the MUN Token under the *Howey* test. With respect to the third prong, the SEC cited multiple public statements by Munchee and its agents promising significant returns. The SEC also took issue with Munchee's incentives to third parties to promote the MUN token offering. The SEC noted that Munchee targeted investors interested in ICOs and digital assets rather than current users of the app or those in the restaurant industry.

Here, similar to *EverID* and *Munchee*, Latinum has raised capital by selling new Tokens to investors—and Plaintiffs' harm arises from Latinum's failure to distribute Tokens. As detailed above, Latinum's marketing efforts, listing on public exchanges, and its design of Token to be a "self-inflating" digital asset created the expectation of profits (and was the direct cause of Plaintiffs' investment in Tokens).

Significantly, digital tokens like Latinum's—which have the hallmarks of a traditional security—have been deemed a security under the *Howey* test. For example, in *SEC v. LBRY, Inc.*, the SEC prevailed on a summary judgment motion against the defendant's "LBC token" as violating the Security Act's registration

requirement. 2022 WL 16744741, at *3.  In *LBRY*, the defendant had made

statements that its token would grow in value as the company continued to oversee

the development of the token's network. *Id.*  The Court found the defendants' public

statements created an expectation of profits, which included: "1.2B Market Cap and

We Don't Care"; "the long-term value proposition of LBRY is tremendous, but also

dependent on our team staying focused"; "Over the long-term, the interests of LBRY

and the holders of [LBC] are aligned"; LBC being traded on "major crypto

exchanges"; the "opportunity is obvious, buy a bunch of credits, put them away

safely, and hope that in 1-3 years we've appreciated even 10% of how much Bitcoin

has in the past few years"; "If our product has the utility we plan, the credits should

appreciate accordingly" *Id.* at *4.  The defendant attempted to "minimize the

significance of these statements [by] pointing to its many disclaimers that it did not

intend for LBC to be purchased as an investment." *Id.*  But the court was

unpersuaded and held that the defendant had "been acutely aware of LBC's

potential value as an investment [a]nd made sure potential investors were too." *Id.*

Indeed, "a disclaimer cannot undo the objective economic reality of a transaction."

*Id.* (citing *Telegram*, 448 F. Supp. 3d at 365).

Here, as in *LBRY*, Latinum made public statements that caused investors to

expect a return on their investment in Latinum's Tokens.  As stated above, Latinum

made the following statements that created the expectation of profits:

- "LTNM is insured and back by real-world assets. Its asset backing is held in a fund model so that base asset value increases over time. It accelerates this asset-backed funds growth by depositing 80% of the transaction fee bank into the asset fund that backs the currency. Thus, the more Bitcoin Latinum is adopted, the faster its asset funds grow, creating a self-inflating currency."

- "We are bullish about Bitcoin Latinum."

- Interview statements by Basile stating Latinum's asset backing "guarantees over time [that the] currency will inflate quite a bit"

- "@bitcoinlatinum allows you to invest in your future"

- "80% of the transaction fees . . . is put back in the trust fund to increase the price of Latinum!!"

- "$LTNM on the way to the moon"

Notably, these statements by Latinum are even more aggressive (and unqualified) than the statements made by the defendant in *LBRY*. And, although Latinum will undoubtedly point to its disclaimers, "a disclaimer cannot undo the objective economic reality of a transaction." *Id.* (citing *Telegram*, 448 F. Supp. 3d at 365). Indeed, as in *LBRY*, Defendants were "acutely aware of [Latinum's] potential value as an investment [a]nd made sure potential investors were too." *Id.*

Moreover, a purchasers' expectation of profits in Tokens is to be derived from the efforts of the promoters of the Tokens—*i.e.*, the Defendants. Though *Howey* states that the expectation of profits should stem "solely from the efforts of the promoter or a third party," *Howey*, 328 U.S. at 299, subsequent decisions have focused on whether the "reasonable expectation of profits [were] derived from the entrepreneurial or managerial efforts of others." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975). The efforts of promotors, undertaken either

18

before or after gaining control over investor funds, are relevant considerations due to *Howey*'s focus on economic realities. *S.E.C. v. Mut. Benefits Corp.*, 408 F.3d 737, 743–44 (11th Cir. 2005) (stating that the law does not require "a clean distinction between a promoter's activities prior to his having use of an investor's money and his activities thereafter" and that "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether *Howey*'s test is satisfied."). Here, an expectation of profits from an investment in Tokens rests entirely on the efforts of Defendants—both pre- and post- purchase of the Tokens.

Other analogous cases also show that Latinum's sale of Tokens should be treated as the sale of unregistered securities. For instance, in *SEC v. NAC Foundation, LLC*, 512 F. Supp. 3d 988, 997 (N.D. Cal. 2021), when denying a motion to dismiss, the court found it significant that the SEC had alleged that the defendant had issued a White Paper, promised that the tokens "would be tradeable on stock market-like exchanges," and that the tokens "could appreciate in value through speculative trading." *Id.* Likewise, in *Telegram*, the SEC sought to enjoin the defendants from engaging in a plan to distribute digital tokens called "Grams," as unregistered offering of securities. *Telegram*, 448 F. Supp. 3d at 358. Through the use of promotional materials, the defendants collected from high net-worth investors in exchange for a promise to deliver Grams. The defendants argued that the agreements to sell the Grams were lawful private placements of securities

19

covered by an exemption from the registration requirement. The defendants argued that "the anticipated resales of Grams by the purchasers into a secondary public market via [defendants'] Blockchain as wholly unrelated transactions and argue[d] they would not be the offering of securities." *Id.* However, the court agreed with the SEC's view that "[t]he [] initial purchasers are [] "underwriters" who . . . [would] soon engage in a distribution of Grams in the public market, whose participants would have been deprived of the information that a registration statement would reveal." *Id.* "Considering the economic realities under the *Howey* test, the Court [held] that . . . the resale of Grams into the secondary public market would be an integral part of the sale of securities without a required registration statement." *Id.*

Here, as in *NAC Foundation* and *Telegram*, Latinum's Tokens were sold to the public for the stated purpose of being available for re-sale on public exchanges. Like the "Grams" in *Telegram*, Latinum's Tokens purport to be proof-of-stake tokens, which allowed Latinum to raise capital before releasing Tokens for sale. And, even assuming *arguendo* that Latinum intended to only execute a finite number of SAFTs to high net-worth investors (it did not), as in *Telegram*, Latinum knew that its SAFTs were being executed on behalf of other investors and would eventually be traded to the public on secondary markets. And, as in *NAC,* Latinum investors were led to expect that Tokens would be tradeable on stock-market-like exchanges, and that the opening value would be "north of $20." (**Ex. 43**); (**Ex. 20**). And, as in *NAC*, the Tokens were "solely objects for trading." *Cf. LBRY*, 2022 WL 16744741, at *3

(LBC tokens deemed a security even though the tokens could be used for purposes other than trading). Also, as in *NAC*, Latinum's investor's prospective trading success hinged on Latinum's ability to effectuate adaptation of its Tokens. "[A]fter all, the demand for [LTNM], as reflected in [its] pricing, would rely almost exclusively on market perception of defendants' work product." *NAC*, 512 F. Supp. 3d at 997. Thus, Token is a security that should have been registered with the SEC.

Moreover, under similar circumstances, the SEC has found a violation of the federal registration requirement. For instance, in an SEC Report published on July 25, 2017, the SEC applied the *Howey* test to a token known as the DAO Token. *See* (**Ex. 44**) (DAO Report).[6] The DAO Token was a hard-fork of the Ethereum Blockchain, and "would earn profits by funding projects that would provide DAO Token holders a return on investment." *Id.* "DAO Token holders were not restricted from re-selling DAO Tokens acquired in the offering, and DAO Token holders could sell their DAO Tokens [] in the secondary market and thereby monetize their investment." *Id.* In determining that the DAO Tokens were securities that should be registered, the SEC deemed it significant that "[i]nvestors' expectations were primed by the marketing of the DAO and active engagement between [founders] and DAO Token holders." *Id.* Indeed, the SEC stated that there was an expectation of profits

---

[6] Also available at https://www.sec.gov/litigation/investreport/34-81207.pdf

created by the dissemination of the DAO's White Paper, online forums, and "[t]he creators of The DAO held themselves out to investors as experts in Ethereum." *Id.*

Like the DAO Tokens, Latinum's Tokens are a hard-fork of an existing digital asset (Bitcoin). Investors expected to earn profits via an increased demand for Tokens resulting from Latinum's network development—as well as through the Token's asset-backed fund, which would increase in value with each transaction and cause Latinum's Token to appreciate in value. And, like the DAO Token, Latinum's Tokens were poised to be released to investors to be traded on secondary markets. Indeed, Latinum had "pre-listed" its Tokens on secondary markets and published media releases relating to the same. *See, e.g.*, (**Ex. 20**) (Latinum announcing that its Token has been listed on 9 public exchanges). Like the DAO Token, Latinum's Token is a security and created the expectation of profits through dissemination of its White Paper, online publications, social media posts, and its creators, who held themselves out to investors as experts in Bitcoin and Blockchain technology.

In addition to the inescapable legal conclusion that Latinum's Token satisfies the *Howey* test, Latinum's own documents admit that Latinum was selling unregistered securities. Specifically, in Latinum's SAFT documents, it states "**this SAFT is a security that has not been registered under the Securities Act**." *See, e..g*, (**Ex. 45**) (emphasis added). Likewise, in its Finder Fee Agreements Latinum states that it is "**offering [] securities**" (**Ex. 11**) (emphasis added). And, in its Token

Option Agreements, Latinum states, "**the securities represented hereby have not been registered or qualified under the securities act**." (**Ex. 46**). Notably, while admitting that it was selling unregistered securities, Latinum's documents contain general disclaimers that make vague references to registration exemptions. As stated above, however, "a disclaimer cannot undo the objective economic reality of a transaction." *LBRY*, 2022 WL 16744741, at *3. And, to date, Latinum has not articulated a single exemption that would cover its public offerings.

Because the undisputed facts show that Latinum sold unregistered securities, this Court should grant summary judgment on Count 1 against Latinum.

### B.  Defendants Sold Unregistered Securities in Violation of State Law

Plaintiffs' Count 2 alleges violation of state securities laws. Three state laws potentially apply. But the choice-of-law issue need not be decided, because "all three jurisdictions rely on similar, if not identical, rules." ECF No. 41, PageID.882.

Under Michigan law, "[a] person shall not offer or sell a security in this state unless 1 or more of the following are met: (a) The security is a federal covered security[;] (b) [t]he security, transaction, or offer is exempted from registration under sections 201 to 203[;] (c) [t]he security is registered under this act." MCL § 451.2301; *see also* MCL § 451.2509(2). California and Delaware state law set forth similar *prima facie* elements. 6 Del. C. § 73-202 ("It is unlawful for any person to offer or sell any security in this State unless: (1) It is registered under this chapter;

(2) The security or transaction is exempted under § 73-207 of this title; or (3) It is a federal covered security for which a notice filing has been made pursuant to the provisions of § 73-208 of this title."); *In re Trade Partners Litig.*, 2009 WL 5171884, at *1 (W.D. Mich. 2009) (stating "upon review of the security laws of Michigan [and] California . . . the Court finds that there is no material difference between these states' laws with respect to liability for the sale of unregistered securities").

For the same reasons that Plaintiffs are entitled to summary judgment as to their unregistered securities claims under federal law, Plaintiffs are likewise entitled to summary judgment as to liability regarding their unregistered securities claims under applicable state law. *See Schaffer Fam. Invs., LLC v. Sonnier*, 120 F. Supp. 3d 1028, 1045 (C.D. Cal. 2015) (citing *Moreland v. Dep't of Corps.*, 194 Cal.App.3d 506, 513 n. 3, 239 Cal. Rptr. 558 (Cal. Ct. App. 1987) (stating that, since "Plaintiffs satisfy the *Howey* test, they also adequately allege a security under California law")). Indeed, as detailed above, the undisputed and/or irrefutable facts show that Defendants sold unregistered securities. And, notably, it is Defendants' burden to show that an applicable exemption applies to their sale of unregistered securities to the public. *See* MCL § 451.2503(1) ("In a civil action [] under this act, a person claiming an exemption, exception, preemption, or exclusion has the burden to prove the applicability of the exemption, exception, preemption, or exclusion."). Thus, summary judgment as to Defendants' liability must be entered—unless Defendants

24

can come forward with enough evidence to create a genuine issue of material fact

relating to the applicability of an available exemption (which they cannot do).

## V.   CONCLUSION

For the reasons above, Plaintiffs respectfully request that this Court enter

summary judgment, for liability, against Latinum as to Plaintiffs' Counts 1 and 2.

Respectfully Submitted,

FOX ROTHSCHILD LLP

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman
DE State Bar No.  3702
919 N. Market Street, Suite 300
Wilmington, DE 19801
(302) 622-4237
sliebesman@foxrothschild.com

FOX ROTHSCHILD LLP
Marc C. Tucker (P57023)
434 Fayetteville Street, Suite 2800
Raleigh, NC 27601-2943
(919) 755-8713
mtucker@foxrothschild.com

WARNER NORCROSS + JUDD
Dennis W. Loughlin (P57084)
Ashley E. Racette (P80965)
2715 Woodward Avenue, Suite 300
Detroit, MI 48201
(313) 546-6000
dloughlin@wnj.com
aracette@wnj.com

*Attorneys for Plaintiffs*

Dated:  October 23, 2025

## CERTIFICATE OF SERVICE

I, Sidney S. Liebesman, certify that on October 23, 2025, I caused the foregoing

document to be filed with the Clerk of the Court via the CM/ECF system, which will

cause notice of the same to be sent to all counsel of record.

Respectfully Submitted,

FOX ROTHSCHILD LLP

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman
DE State Bar No.  3702
919 N. Market Street, Suite 300
Wilmington, DE 19801
(302) 622-4237
sliebesman@foxrothschild.com

FOX ROTHSCHILD LLP
Marc C. Tucker (P57023)
434 Fayetteville Street, Suite 2800
Raleigh, NC 27601-2943
(919) 755-8713
mtucker@foxrothschild.com

WARNER NORCROSS + JUDD
Dennis W. Loughlin (P57084)
Ashley E. Racette (P80965)
2715 Woodward Avenue, Suite 300
Detroit, MI 48201
(313) 546-6000
dloughlin@wnj.com
aracette@wnj.com

*Attorneys for Plaintiffs*

## **BRIEF FORMAT CERTIFICATION FORM**

I, Sidney S. Liebesman, hereby certify that the foregoing brief complies with Eastern District of Michigan Local Rules 5.1(a), 5.1.1, and 7.1 and Judge Michelson's Case Management Requirements.  In particular, I certify that each of the following is true:

☒ the brief contains a statement regarding concurrence, *see* LR 7.1(a);

☒ the brief, including footnotes, uses 14-point font, *see* LR 5.1(a)(3);

☒ the brief contains minimal footnotes and, in all events, no more than 10, *see* Case Management Requirements § III.A;

☒ the brief and all exhibits are searchable .pdfs, *see* Case Management Requirements § III.A;

☒ the brief is double spaced (except for footnotes and necessary block quotes) with one-inch margins, *see* LR 5.1(a)(2);

☒ deposition transcripts have been produced in their entirety and not in minuscript, *see* Case Management Requirements § III.A;

☒ if the brief and exhibits total 50 pages or more, a courtesy copy with ECF headers will be sent to chambers, *see* Case Management Requirements § III.B.

I also acknowledge that if the Court later finds that these requirements are not met, my brief will be stricken.

Respectfully Submitted,

FOX ROTHSCHILD LLP

*/s/ Sidney S. Liebesman*
Sidney S. Liebesman
DE State Bar No.  3702
919 N. Market Street, Suite 300
Wilmington, DE 19801
(302) 622-4237
sliebesman@foxrothschild.com

FOX ROTHSCHILD LLP
Marc C. Tucker (P57023)
434 Fayetteville Street, Suite 2800
Raleigh, NC 27601-2943
(919) 755-8713
mtucker@foxrothschild.com

WARNER NORCROSS + JUDD
Dennis W. Loughlin (P57084)
Ashley E. Racette (P80965)
2715 Woodward Avenue, Suite 300
Detroit, MI 48201
(313) 546-6000
dloughlin@wnj.com
aracette@wnj.com

*Attorneys for Plaintiffs*