UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RAYMOND JONNA, et al.,

Plaintiffs,

v.

Case No. 22-cv-10208
HON. MARK A. GOLDSMITH

BITCOIN LATINUM, et al.,

Defendants.
_____________________________/

**OPINION & ORDER**
**DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 194)**

The Plaintiffs in this lawsuit claim that the Defendants, Kevin Jonna and Bitcoin Latinum, induced them to invest $541,000 in Bitcoin Latinum tokens and then refused to hand over the digital tokens to which they are entitled. Plaintiffs assert various statutory and common-law claims, including counts for offering or selling an unregistered security in violation of § 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l (Count 1) and similar state laws (Count 2). See Am. Comp. (Dkt. 53). Plaintiffs move for summary judgment in their favor, as to liability only, on those two counts against Bitcoin Latinum.[1] (Dkt. 194).[2] For the reasons that follow, the Court denies Plaintiffs' motion.

## I. BACKGROUND

### A. Bitcoin Latinum

[1] Plaintiffs obtained a default judgment against Defendant Kevin Jonna.

[2] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefs. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Bitcoin Latinum's response (Dkt. 203) and Plaintiffs' reply (Dkt. 204).

Bitcoin Latinum ("Latinum") is a cryptocurrency company incorporated in Delaware. SOMF ¶ 1, Pls. Mot. at PageID.6011 (Dkt. 194); CSOMF ¶ 2, Def. Resp. at PageID.7574 (Dkt. 203). In November 2020, it announced a new digital asset, a Bitcoin hard fork, also called Bitcoin Latinum (the "Token"), which it made available to the public for pre-sale on its website in 2020 and 2021. SOMF ¶¶ 4-5. Promotional materials on Latinum's website and elsewhere described the Token as an asset-backed cryptocurrency and explained that, because a portion of investors' transaction fees were deposited into the fund that backed the Tokens' value, "the more Bitcoin Latinum is adopted, the faster its assets grow, creating a self-inflating currency." See, e.g., Website Media Release at PageID.6353-54 (Dkt. 194-23); SOMF ¶¶ 9-10.

Online pre-sales of Latinum Tokens were governed by a Simple Agreement for Future Tokens (SAFT), under which the pre-purchaser paid a fixed price in exchange for the right to receive a fixed number of Tokens in the future. Specifically, Latinum would issue Tokens to pre-purchasers when its hard-forked Bitcoin network became operational. See CSOMF ¶ 2; Sample SAFT at PageID.384-88 (Dkt. 19-2). Language in the contract described the SAFT as "a security that has not been registered under the Securities Act" and required American investors to attest that they were accredited investors "as such term is defined in Rule 501(a) of Regulation D under the Securities Act." CSOMF ¶¶ 3-4 (quoting Otto SAFT at PageID.6428 (Dkt. 194-31)).

**B. Kevin Jonna's Relationship with Latinum**

Defendant Kevin Jonna became interested in pre-purchasing Latinum Tokens, and in 2021 he raised funds for that purpose from his friends and family.[3] SOMF ¶ 17. Kevin had an acquaintance, Jason Otto, who already had a SAFT and who agreed to purchase additional Tokens on his behalf. SOMF ¶¶ 15-16; Otto Dep. 38:5-39:11 (Dkt. 194-14). A number of third parties

---

[3] Because three parties to this litigation share the same last name, the Court refers to individual Plaintiffs and Kevin Jonna by their first names.

sent money to Otto in relation to this arrangement with Kevin. See, e.g., Otto Dep. 36-37, 40-41, 43.

However, Kevin soon acquired his own line of communication to Latinum and its founder, Don Basile. See Otto Dep., 60; 73; 921. Indeed, by mid-September 2021, Kevin and Basile were occasionally in touch with each other by email and text. As a result of his contacts with Basile in September, Kevin arranged to sign his own SAFT with Latinum. CSOMF ¶ 8; SOMF ¶ 22; Basile Dep. 107:6-15, at PageID.7712 (Dkt. 203-2). The SAFT, providing for the pre-purchase of 125,000 Tokens for $1.5 million, was signed by Kevin on October 25. Jonna SAFT, at PageID.390-95 (Dkt. 19-3).

As Kevin prepared to execute this SAFT, he fulfilled his $1.5-million commitment in part through third-party payors. According to Basile, Latinum received payments from different third parties that were marked as being for Kevin and that Kevin represented were "for his fulfillment and commitment." CSOMF ¶ 12; Basile Dep. 111-113 at PageID. 7716-18. Latinum accepted these payments and credited Kevin's account with them, rather than regarding the third-party payors as beneficial investors in any Tokens or SAFTs. CSOMF ¶ 12; Basile Dep. 112-113 at PageID.7717-18.

While Latinum contracted with certain individuals, like professional poker players, to promote investments in its Tokens, see SOMF ¶ 6, Basile attests that Latinum never hired Kevin, authorized him to act on the company's behalf, or promised or paid him any commission. CSOMF ¶ 18. Nor was Basile close to Kevin personally or in his capacity as a Latinum board member. CSOMF ¶ 18.

### C. Plaintiffs' Investments

Plaintiffs Raymond Jonna, Simon Jonna, and Farid Jamardov were among the friends and family from whom Kevin raised funds for Tokens. SOMF ¶ 17. Over the course of September and October 2021, they collectively paid a total of $541,000 in relation to Kevin's fundraising efforts.

Their first payments were made in September in wire transfers to Otto, Kevin's SAFT-holding acquaintance. Raymond and Simon transferred $100,000 and $140,000, respectively, to Otto on September 21. See Raymond Jonna Sep. Wire at PageID.6048 (Dkt. 194-3); Simon Jonna Sep. Wire at PageID.6043 (Dkt. 194-2).

At the end of September, Latinum announced that Tokens would begin trading on DigiFinex, a public cryptocurrency exchange, in the third week of October, and that other public listings would follow. See Bloomberg Release at PageID.6317 (Dkt. 194-17). As Plaintiffs considered making further investments in the Tokens, Kevin assured them that the Tokens would trade at a high price and that Plaintiffs would be able to re-sell the Tokens for a significant profit. Jonna Oct. 20-21 Texts at PageID.6467-68 (Dkt. 194-41) ("I can guarantee you it will open at north of $20"; "I swear it's a steal at [$14], it's gonna open in the 20s and you'll be able to sell for an immediate profit if you wanted to").

After trading on public exchanges opened, Kevin sent Plaintiffs screenshots showing a trading price of over $200 per Token and, on October 27, over $600 per Token. Jonna Oct. 26 Text (4:13 PM) at PageID.6450; Jonna Oct. 26 Text (9:58 PM) at PageID.6452; Jonna Oct. 27 Text at PageID.6465 (Dkt. 194-40). Kevin told Plaintiffs that he could secure them a price of roughly $25 per Token, a hefty discount over these trading prices. Raymond Jonna Aff. at PageID.498-99 (Dkt. 22-1); Simon Jonna Aff. at PageID.503 (Dkt. 22-2).

Plaintiffs made a second round of payments that same week. Farid wired $101,000 on October 21, and Raymond and Simon each wired $100,000 on October 27. These transfers were made directly to Latinum's account with the reference "For Kevin Jonna" or "Kevin Jonna." Jamardov Wire at PageID.540 (Dkt. 22-3); Raymond Jonna Oct. Wire at PageID.6053 (Dkt. 194-4); Simon Jonna Oct. Wire at PageID.6057 (Dkt. 194-5). Otto also forwarded Raymond and Simon's earlier payments—the $240,000 transferred to Otto in September—to Latinum's account, at the request of Kevin, who had arranged his own SAFT with Latinum by this point. SOMF ¶ 23; Otto Dep. 104:5-16.

It is undisputed among the parties to this motion that Kevin solicited Plaintiffs to purchase Latinum Tokens. SOMF ¶ 17; CSOMF ¶ 7. But the briefing reveals surprisingly little about the structure of the investment that Plaintiffs understood themselves to be making. There is some evidence that Plaintiffs expected Latinum to release Tokens to Kevin, who would in turn distribute them to Plaintiffs. CSOMF ¶¶ 10-11, 20. For example, in a later conversation with Kevin, Raymond described Kevin as having "bought [Tokens] for" Plaintiffs and described Plaintiffs as "going through [Kevin]" instead of "invest[ing] with Latinum direct." Raymond–Kevin Call Tr. 23-24, 27 at PageID.8373-74, 8377 (Dkt. 203-8); <u>see also</u> Jamardov Dep. 55 at PageID.8206 (Dkt. 203-5) (Q: "Was it your understanding that the tokens would be released to him and then he would then distribute them to you, Simon and Raymond?" A: "I can't remember that conversation specifically, but somewhere in that nature.").

**D. Latinum's Relationship with Plaintiffs**

Plaintiffs corresponded directly with Latinum on only one occasion. In September 2021, two weeks before his initial transfer of $100,000, Simon exchanged emails with the Latinum sales department after his business partner, Erik Sharkey, contacted the company to inquire about pre-

purchasing Tokens. Sharkey said that he and Simon "would like to invest heavily." When the company responded that the Tokens were still available for pre-purchase, Simon replied, offering to make a wire transfer in order to "get in on pre-sale please." Sharkey–Latinum–Jonna Emails at PageID.507-508 (Dkt. 22-2). Neither Simon nor Sharkey mentioned Kevin during this exchange of emails, and Simon ultimately opted not to pre-purchase Tokens directly through Latinum's website. CSOMF ¶¶ 14, 15 (citing Simon Jonna Aff. at PageID.504). Other than Simon's email exchange, Plaintiffs had no direct contact with Latinum about their investment or any other subject. CSOMF ¶ 17.

The primary connection between Latinum and Plaintiffs was, therefore, Latinum's ultimate receipt of Plaintiffs' money. Either directly from Plaintiffs or indirectly through Otto, Latinum received all $541,000 collectively paid by Plaintiffs. CSOMF ¶¶ 9, 16; Mot. at PageID.6022. But Latinum did not regard Plaintiffs as having pre-purchased any Tokens from Latinum by virtue of their payments. Rather, according to Basile, Latinum's understanding was that only Kevin was pre-purchasing Tokens and that third-party payments marked for him were for his account. Basile Dep. 111-113, 136-137 at PageID.7716-18, 7741-42. And the memos on Plaintiffs' wire transfers—referring to Kevin—were consistent with other third-party payments that Latinum credited to Kevin's account. CSOMF ¶ 16.

Basile testified that he never communicated with Kevin about Plaintiffs. CSOMF ¶ 18 (citing Basile Dep. 70 at PageID.7675). Nonetheless, after Plaintiffs had made their payments, Kevin promised them that Latinum was aware of their investment. He told them to, "[R]est assured your tokens are part of my group, Kevin Jonna and Partners . . . Your money is safe and the board knows exactly who you are and how many tokens you are to be issued." Jonna Dec. 8 Text at PageID.6062.

Latinum has since released the Tokens that it considers due to its SAFT investors: Kevin received access to the Tokens due under his SATF in early 2023. CSOMF ¶ 23; Basile Dep. 56, 67 at PageID.7661, 7672. But Plaintiffs never received Latinum Tokens in exchange for their money. Raymond Jonna Aff. at PageID.499; Simon Jonna Aff. at PageID.504; Jamardov Aff. at PageID.534 (Dkt. 22-3).

## II. STANDARD OF DECISION

When a plaintiff moves for summary judgment on a claim to which he "bears the burden of proof, [he] must lay out the elements of the claim, cite the facts which [he] believes satisfies these elements, and demonstrate why the record [evidence] is so one-sided as to rule out the prospect of finding in favor of the non-movants on the claim." Hotel 71 Mezz Lender LLC v. National Ret. Fund, 778 F.3d 593, 601 (7th Cir. 2015); see also Surles v. Andison, 678 F.3d 452, 455-56 (6th Cir. 2012) ("In cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.") (punctuation modified); United States v. Feldman, 439 F. Supp. 3d 946, 951 (E.D. Mich. 2020) (stating that a plaintiff moving for summary judgment must do more than "identify holes in the non-moving party's case" and must show why the record evidence "is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim").

## III. ANALYSIS

Under § 12(a)(1) of the Securities Act of 1933, a plaintiff has a cause of action against a person who offers or sells him an unregistered security in violation of the Act's registration provisions. 15 U.S.C. §§ 77e(a)(1), 77l(a)(1). Plaintiffs contend that any reasonable jury would

find in their favor on their claims against Latinum under § 12(a)(1) and similar state-law provisions. Mot. at PageID.6002. In response, Latinum argues that: (i) Latinum did not offer or sell to Plaintiffs within the meaning of the securities statutes and, therefore, is not liable to Plaintiffs; and (ii) even if it had sold securities to the Plaintiffs, Latinum enjoyed an exemption from the registration requirements pursuant to SEC Rule 506(c), which provides a safe harbor for certain eligible private offerings and Rule 506(c)'s state analogues. Resp. at Page ID.7573-74.[4]

The Court need not reach Latinum's exemption argument, nor the other elements of Plaintiffs' claims, because the Court agrees with Latinum that Plaintiffs have not met their burden of establishing that Latinum qualifies as a seller within the meaning of § 12(a)(1). For the same reason, Plaintiffs have not met their burden of establishing their parallel state-law claims.

### A. The "Statutory Seller" Requirement of the Securities Act

Section 5(a)(1) of the Securities Act makes it unlawful to sell a non-exempt unregistered security in interstate commerce. 15 U.S.C. § 77e(a)(1). But a private plaintiff's cause of action arises in § 12(a)(1), which provides in relevant part that "[a]ny person who offers or sells a security in violation of [Section 5] shall be liable . . . to the person purchasing such security from him."[5] 15 U.S.C. § 77l(a)(1) (emphasis added). This language "defines the class of defendants" whom a civil plaintiff may charge with unlawfully selling unregistered securities. Pinter v. Dahl, 486 U.S. 622, 643, 644 (1988).

---

[4] Latinum does not concede that its Tokens are securities, though it does not contest this issue in its brief. See Resp. at Page ID.7584 n.6.

[5] Two key terms are defined elsewhere in the Act: (i) a sale includes "every contract of sale or disposition of a security or interest in a security, for value," and (ii) an offer includes "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3).

Pinter is the authoritative elaboration of the so-called statutory seller requirement in § 12(a)(1). In Pinter, the Supreme Court held that § 12(a)(1) imposes liability on only two groups of statutory sellers: (i) persons "who passed title, or other interest in the security, to the buyer for value"; and (ii) persons "who successfully solicit[ed] the purchase" of the security. Id. at 644, 647. In either case, the focus of the statutory seller requirement is "the defendant's relationship with the plaintiff-purchaser," not "the defendant's degree of involvement in the securities transaction and its surrounding circumstances." Id. at 651. Thus, a defendant who sells a security to one buyer does not ipso facto become liable to all eventual buyers of that security: Because he is liable "to the person purchasing . . . from him," 15 U.S.C. § 77l(a)(1), he is liable only to his "immediate" buyers. Id. at 643 n.21.

Here, genuine disputes of material fact prevent a finding, on summary judgment, that Latinum is a statutory seller to Plaintiffs under Pinter. Plaintiffs have neither produced conclusive evidence that Latinum transferred any legal interest in a security to them, nor shown that Latinum's conduct amounted to solicitation of their investments. As a result, it remains an open question whether Latinum was either a direct seller or a solicitor to Plaintiffs and, therefore, whether Latinum can be found liable to Plaintiffs under § 12(a)(1).[6] The Court discusses each prong of the Pinter test in turn.

**1. Seller Who Passed Title**

---

[6] Notably, Plaintiffs' opening brief did not address Pinter's statutory seller requirement. Plaintiffs' arguments that Latinum qualifies as a direct seller and solicitor were raised for the first time in their reply brief. Usually, the court "would not consider arguments raised for the first time in a reply brief and would deem them waived." Catchings v. Hazel Park Sch. Dist., No. 2:23-cv-11313, 2025 WL 2640419, at *4 n.6 (E.D. Mich. Sept. 12, 2025) (citing Sanborn v. Parker, 629 F.3d 554, 579 (6th Cir. 2010)). However, the usual concerns about unfairness to the non-moving party are absent here, as the Court is denying Plaintiffs' motion.

As mentioned, § 12(a)(1) imposes liability on an "owner who passed title, or other interest in the security, to the buyer for value." Pinter, 486 U.S. at 642. This category of statutory sellers comprises "seller[s] in [a] conventional sense," related to their buyers by something akin to "traditional contractual privity." Id. While Latinum contends that it only ever passed title in the Tokens to Kevin, Resp. at PageID.7584, Plaintiffs suggest that they received title in the Tokens from Latinum. See Pls.' Reply at Page ID.8479 (Dkt. 204) ("Title to any Tokens passed directly from Latinum to those purchasing tokens, including Plaintiffs."). However, Plaintiffs' evidence does not establish that Latinum passed any title or interest to them.

Their briefing on this issue is not a model of clarity, but Plaintiffs contend that: (i) Latinum received Plaintiffs' money, and, in the case of the later transfers, received it directly from Plaintiffs; (ii) Latinum's representations "induc[ed] them to purchase the Tokens"; and (iii) Kevin did not own any Tokens until long after Plaintiffs transferred money to Latinum. Reply at PageID.8479-80. Even if these contentions could be established beyond dispute, Plaintiffs have failed to establish their legal significance.[7] Plaintiffs do not provide any legal basis for regarding them as having established passage of title. Plaintiffs neither claim that they signed a SAFT, for example,

---

[7] Latinum disputes the second of these contentions, see Resp. at PageID.7584-85, and, indeed, Plaintiffs have not pointed to record evidence that Latinum's representations induced them to invest in the Tokens. While Plaintiffs repeatedly allege that their investments were induced or otherwise caused by Latinum's conduct, they do not cite record evidence supporting this claim. See, e.g., Mot. at PageID.6011, 6016-17, 6022, 6025; Reply at PageID.8480. Indeed, the only record evidence that Plaintiffs point to on this issue suggests that Plaintiffs were enticed by Kevin's assurances that the re-sale value of the Tokens significantly exceeded the price that Plaintiffs would pay for them. See SOMF ¶ 24, Mot. at PageID.6018-19.

Plaintiffs' third contention, concerning whether and when Kevin acquired an interest or title in the Tokens, depends on questions of law that the Court does not now decide. However, the court notes that Plaintiffs' argument on this point—that in October 2021, when the Tokens were available only for pre-purchase, Kevin "did not yet own any Tokens . . . as none had been released to individual investors"—appears inconsistent with their own argument that they acquired title upon making payment. See Reply at PageID.8479.

or had a different written contract with Latinum that provided for transfer of title upon Latinum's receipt of their payments; nor do they argue that such a contract was implied.

While Plaintiffs may have been led to believe that they would become owners of Tokens upon making payment, Pinter requires something different: a showing that the defendant in fact passed legal title to the plaintiff. Byrd v. ViSalus, Inc., No. 17-cv-12626, 2018 WL 1637948, at *11 (E.D. Mich. Apr. 5, 2018) (holding that the first prong of Pinter was not satisfied by evidence that the plaintiff-investors received a putative certificate of ownership when the language of the certificate "does not appear to pass title to anything, much less a security"). Thus, Plaintiffs have not established that Latinum directly sold securities to them.

**2. Seller Who Successfully Solicited the Purchase**

Under Pinter, a person may become liable under § 12(a)(1) without passing title to the plaintiff-buyer, but only if he "successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." 486 U.S. at 647. Solicitation, in this context, means at a minimum that the statutory seller "urged the buyer to purchase" the security. Id. at 658. Plaintiffs suggest that Latinum engaged in solicitation through its general promotional materials and by marketing its Tokens for sale to the public. See Reply at PageID.8480-82. Bearing in mind that, under the Pinter test, "whether someone 'solicit[ed]' a purchase is a fact-bound inquiry," In re Regions Morgan Keegan Sec., Derivative & ERISA Litig., No. 2:09-2009, 2012 WL 12875982, at *11 (W.D. Tenn. Mar. 30, 2012), the Court concludes that Plaintiffs' evidence does not establish solicitation as a matter of law, and there remains a genuine dispute of fact as to whether Latinum solicited their investments.

The Sixth Circuit reads Pinter as requiring that a statutory seller "actively" and "actual[ly]" solicited the purchase. Smith v. American Nat'l Bank & Tr. Co., 982 F.2d 936, 941-42 (6th Cir.

1992). In Smith, the court considered whether a defendant bank lender was liable under § 12(a)(2) in a securities transaction proposed by one of its clients. The plaintiff had been approached by a local businessman who offered the plaintiff stock in his car dealership in consideration of the plaintiff's guaranteeing a loan to the dealership. Id. at 940. The defendant bank was the issuer of the loan and the purpose of the loan was to cover the dealership's overdrafts at the same bank; indeed, the court was willing to infer that the bank had encouraged the businessman to seek this kind of arrangement as an alternative to losing his line of credit with the bank. Id. at 942. Even so, the court dismissed the claim against the bank, applying Pinter to hold that the bank had not solicited the plaintiff's purchase. As the court explained, it is not sufficient to allege that a defendant stood to benefit from the transaction or even that he was a "substantial factor" in, or proximate cause of, the transaction: A statutory seller "must have engaged in actual solicitation." Id. at 941-42 (citing Pinter, 486 U.S. at 650). In the situation in Smith, where the stock transaction was proposed to the plaintiff by a third party, the defendant bank was not a statutory seller unless it "actively participated in the solicitation of an offer to purchase the stock." Id. at 942.

Plaintiffs do not offer any more evidence of direct communication between the parties than did the plaintiff in Smith. Plaintiffs had no direct contact with Latinum other than Simon's email inquiries to the company in early September, see CSOMF ¶¶ 14, 17, and Plaintiffs do not appear to argue that the latter exchange constituted solicitation. Instead, Plaintiffs' respond to Smith and its progeny by pointing out that, unlike the bank in Smith, Latinum was in the business of selling securities—it offered Tokens for pre-sale on its website—and it advertised its Tokens to the public on its website, in media releases by the company and by Basile, and in tweets. Reply at PageID.8480-82.

Plaintiffs' evidence of Latinum's "representations" about the Tokens is sparse. Reply at PageID.8480. Their citations to the record on this point consist entirely in a general citation to nine pages of their motion brief and several citations to their own amended complaint, especially the descriptions therein of content allegedly posted on Latinum's website. See, e.g., Reply at PageID.8482 (citing Am. Comp. ¶¶ 37, 168-73, and Mot. at PageID.6013-22). The allegations in Plaintiffs' unverified complaint are not evidence for the purposes of summary judgment. Smith v. Shelby Cnty. Bd. of Educ., No. 23-5815, 2024 WL 3622387, at *2 (6th Cir. Aug. 1, 2024) (citing King v. Harwood, 852 F.3d 568, 577-78 (6th Cir. 2017)). As for the Plaintiffs' sweeping citation to its motion, it seems to encompass only a few representations actually made by Latinum or Basile.[8] These fall into two categories: several press statements describing the Token as a self-inflating currency; and a series of Tweets, only one of which (describing the Token as "about making money . . . [and] replacing money"), was posted before Plaintiffs transferred money to Latinum. See Mot. at PageID.6013-15.

In sum, Plaintiffs proffer evidence that Latinum made the Tokens available to the public for pre-sale and suggested in general advertising materials that the value of the Tokens would or was likely to appreciate over time. While the Sixth Circuit has not yet addressed the status of generalized or mass marketing under Pinter, courts in this district have been wary of (and some even categorically opposed to) recognizing promotional activities as a form of solicitation in the absence of "direct communicat[ion] with the buyer." Kerrigan v. ViSalus, Inc., No. 14-cv-12693,

---

[8] Plaintiffs cannot establish that Latinum solicited their investments by pointing to Kevin's representations. This is not because § 12 allows defendants to shield themselves from liability by using agents to solicit buyers. See e.g., Capri v. Murphy, 856 F.2d 473, 477-78 (2d Cir. 1988) (holding that an agent's solicitation activities are "directly attributable" to his principal for purposes of the Pinter test). Rather, it is because no agency has been established here. See Mot. at PageID.6017 n.3 (disclaiming reliance on any argument based on agency); Reply at PageID.8484 (urging that "arguments concerning agency should not be factored in ruling on the Motion").

2016 WL 892804, at *17 (E.D. Mich. Mar. 9, 2016) (quoting Rosenzweig v. Azurix Corp., 332 F.3d 854, 871 (5th Cir. 2003)); Wells Fargo Advantage Nat'l Tax Free Fund v. Helicon Assocs., No. 2:08-cv-15162, 2010 WL 11541839, at *9 (E.D. Mich. Mar. 15, 2010) (holding that Pinter imposes solicitation liability only when the defendant "actually contacted a buyer and urged the buyer to purchase" the securities).

Moreover, recent cases suggest that a plaintiff cannot rest his solicitation theory on general promotional materials without, at the least, establishing a factual connection between the defendant's promotional materials and the plaintiff's purchase of securities. Byrd, 2018 WL 1637948, at *11-12 (requiring complaints to identify "at a minimum . . . how, when, and where Plaintiffs heard the solicitation . . . and facts that could tend to establish that the identified solicitation led directly to the 'ultimate purchase of the security' "); see also Kerrigan, 2016 WL 892804, at *17 (holding that indirect promotion certainly is not solicitation unless it "solicits 'the purchase' under attack," meaning that there must be evidence that the defendants "actually saw and/or were aware [of] the specific activities") (quoting Pinter, 486 U.S. at 649). In the instant case, Plaintiffs do not engage with these authorities or attempt seriously to establish that they saw or were influenced by Latinum's public representations.[9]

More crucially, Plaintiffs do not provide any authority or analysis whatsoever to affirmatively support a finding that, as a matter of law, Latinum's actions constituted "active[]" and "actual" solicitation under Smith, 982 F.2d at 941-42, or other precedent. Plaintiffs thus have not carried their heavy burden at the summary judgment stage; this sparse and unelaborated evidence of solicitation by Latinum is not "so one-sided that [they] must prevail as a matter of

[9] The record may well contain relevant evidence, but Plaintiffs bore the burden of pointing the court to it. " '[J]udges are not like pigs, hunting for truffles' that might be buried in the record." Emerson v. Novartis Pharms. Corp., 446 F. App'x 733, 736 (6th Cir. 2011) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Because Plaintiffs also have not established that Latinum passed an ownership interest to them, they have not established that Latinum was a statutory seller to them and therefore have not established a required element of their § 12(a)(1) claim.

**B. Plaintiffs' State- Law Claims**

Because Plaintiffs do not offer any independent or additional arguments in support of their state-law claims, they have also failed to establish liability as to them. Count 2 of Plaintiffs' complaint asserts that Latinum violated state law in Michigan, California, and/or Delaware in connection with the same alleged unregistered offer and sale of securities. Am. Comp. at PageID.1153-54. Characterizing the securities laws in all three states as sufficiently similar to each other that no choice-of-law issue arises, Plaintiffs argue that they are entitled to summary judgment on their state-law claims "[f]or the same reasons that Plaintiffs are entitled to summary judgment as to their unregistered securities claims under federal law." Mot. at PageID.6032-33. And, Latinum argues that "for the same reasons that Latinum is not a statutory 'seller' under federal law, it likewise is not a statutory 'seller' under applicable state law." Resp. at PageID.7596.[10]

Plaintiffs have not shown that the applicable state securities laws omit or relax the statutory seller requirement of the federal Securities Act; to the contrary, they appear to urge the Court to interpret the state statutes as identical to the federal one. As a result, the Court agrees with Latinum that Plaintiffs have not established that Latinum sold or offered securities within the meaning of the state securities laws, and Plaintiffs have not established their state claims as a matter of law.

[10] Latinum additionally opines that "it would be more appropriate to apply Delaware or Michigan law," because of "the lack of any meaningful nexus to California," and argues that Latinum is exempt from the registration arguments under both the Delaware and Michigan statutes. Resp. at PageID.7594-96. The Court need not reach the choice-of-law or exemption issues here.

## IV. CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' motion for partial summary judgment (Dkt. 194).

**SO ORDERED.**

Dated: September 30, 2026
Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2026.

s/Joseph Heacox
JOSEPH HEACOX
Case Manager